1   FOLGER LEVIN & KAHN LLP
    Michael F. Kelleher (CSB No. 165493, mkelleher@flk.com)
2   Kevin P. O'Brien (CSB No. 215148, kobrien@flk.com)
    Embarcadero Center West
3   275 Battery Street, 23rd Floor
    San Francisco, CA  94111
4   Telephone: (415) 986-2800
    Facsimile: (415) 986-2827
5
    BREALL & BREALL
6   Joseph M. Breall (CSB No. 124329, jmbreall@breallaw.com)
    1255 Post Street, Suite 800
7   San Francisco, CA 94109
    Telephone:  (415) 345-0545
8

9   Attorneys for Plaintiffs and Counter Defendants.

                    UNITED STATES DISTRICT COURT
10
                  NORTHERN DISTRICT OF CALIFORNIA
11

12

13  LOUIS ROVENS, ADRIENNE ROVENS,        Case No. C 07-05473 CRB
    and RAYMOND BREGANTE and
14  JEFFREY M. WHITE as Trustees of the    **PLAINTIFFS AND COUNTER
    Michael W. Rovens and Elise D. Shanfeld  CLAIMANTS' MOTION FOR SUMMARY
15  Irrevocable Trust,                     JUDGMENT OR IN THE ALTERNATIVE
                                           SUMMARY ADJUDICATION**
16               Plaintiffs,
                                           **Judge:        Hon. Charles R. Breyer**
17        v.                               **Date:         July 25, 2008**
                                           **Time:         10:00 a.m.**
18  THEODORE BROWN & PARTNERS,             **Courtroom:     8, 19th Floor**
    INC.
19
                 Defendant.
20

21
    ──────────────────────────────
22  AND RELATED COUNTER CLAIMS

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION .................................................................................................... 1

RELIEF SOUGHT ......................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

I.    SUMMARY OF ARGUMENT ............................................................... 1

II.   FACTUAL OVERVIEW .......................................................................... 3

    A.    TBP Prepared Drawings For the Rovens' Interior Designer Under a
        Written Contract That Allowed Termination of TBP At Will Without
        Penalty ......................................................................................................... 3

    B.    TBP Was Terminated After Refusing to Continue on the Project ......................... 5

    C.    A New Designer, ODADA, Prepared New Plans for the Rovens That
        Preserved Much of the Preexisting Layout of the Apartment ................................. 6

    D.    Walters Was Hired By ODADA's Third Party Permit Expediter To Review
        And Stamp ODADA's Plans ...................................................................... 7

    E.    Whitehouse Builders Was Later Hired to Build the ODADA Plans Without
        Ever Seeing the TBP Plans ........................................................................ 7

    F.    Months After ODADA Started on the Project, TBP Registered Its Plans
        With the Copyright Office ........................................................................... 8

    G.    TBP Has Asserted That Its "Copyright" Is Infringed By Construction of the
        Remodel ........................................................................................................ 8

III.  LEGAL STANDARD OF REVIEW ......................................................... 9

IV.   ARGUMENT ............................................................................................ 9

    A.    Because TBP Was Paid For Preparation of Its Plans For Use in the
        Remodel, the Rovens Have An Implied Non-Exclusive License To Use
        The TBP Plans ........................................................................................... 9

    B.    TBP Has Misused Its Copyright And, Thus, Should Be Barred From
        Prosecuting Its Infringement Claims Against Counter Defendants ..................... 13

        1.    TBP's Copyright Is Unenforceable Because TBP Misled The
            Copyright Office Regarding The Fact That Its Plans Are Derivative
            And That TBP Is Not The Sole Author ............................................. 13

        2.    TBP Has No Copyright In And No Remedy For "Infringement" Of
            The Derivative Aspect of Its Plans ................................................. 15

    C.    Construction of the Remodel Does Not Constitute Copyright Infringement
        Because Drawings of the Interior Remodel of a Condominium Unit Are
        Not A "Building" Protected Under the Architectural Works Protection Act ....... 16

        1.    The TBP Plans Do Not Depict a Building ............................................... 16

        2.    Constructing a Copy of a Pictorial or Graphic Work Registered
            Under 17 U.S.C. § 102(a)(5) Is Not Copyright Infringement ................... 18

    D.    Walters Did Not Infringe TBP's Copyright ................................................. 19

V.    CONCLUSION ........................................................................................ 19

1

# TABLE OF AUTHORITIES

2

Page

3

## CASES

4

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) ........................................................ 9

5

*Asgrow Seed Co. v. Winterboer*
513 U.S. 179, 115 S. Ct. 788, 130 L. Ed. 2d 682 (1995) ...................................................... 17

6

*B.C. v. Plumas Unified Sch. Dist.*
192 F.3d 1260 (9th Cir. 1999) ................................................................................................. 9

7

*Celotex Corp. v. Catrett*
477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986) ........................................................ 9

8

*Clifton Cattle Co. v. Thompson*
43 Cal. App. 3d 11 (1974) ...................................................................................................... 12

9

*Effects Assoc., Inc. v. Cohen.*
908 F.2d 555 (9th Cir. 1990) ................................................................................................. 11

10

*Foad Consulting Group v. Musil Govan Azzalino*
270 F.3d 821 (9th Cir. 2001) ......................................................................................... 2, 9, 10

11

*Fonar Corp. v. Domenick*
105 F.3d 99 (2d. Cir. 1997) .................................................................................................... 17

12

*Garcia v. Teitler*
443 F.3d 202 (2d Cir. 2006) ................................................................................................... 17

13

*GB Marketing USA Inc., v. Gerlsteiner Brunnen GmbH & Co.*
728 F. Supp. 763 (W.D.N.Y. 1991) ................................................................................. 13, 14

14

*I.A.E., Inc. v. Shaver*
74 F.3d 768 (7th Cir. 1996) ................................................................................................... 11

15

*Lamps Plus, Inc. v. Seattle Lighting Fixture Co.*
345 F.3d 1140 (9th Cir. 2003) ............................................................................................... 13

16

*Lasercomb America, Inc. v. Reynolds*
911 F.2d 970 (4th Cir. 1990) ................................................................................................. 13

17

*Midwest TV v. Scott, Lancaster, Mills & Atha*
205 Cal. App. 3d 442 (1988) ................................................................................................. 12

18

*Nat.'l Med. Care, Inc. v. Espiritu*
284 F. Supp. 2d 424 (S.D. W.Va. 2003) ............................................................................... 18

19

*Northwest Motorcycle Ass'n v. U.S. Department of Agriculture*
18 F.3d 1468 (9th Cir. 1994) ................................................................................................... 9

20

*Pasillas v. McDonald's Corp.*
927 F.2d 440 (9th Cir. 1991) ................................................................................................. 19

21

*Practice Management Information Corp. v. American Medical Association*
121 F.3d 516 (9th Cir. 1997) ................................................................................................. 13

22

*Robert R. Jones Assoc., Inc. v. Nino Homes*
858 F.2d 274 (6th Cir. 1988) ................................................................................................. 18

23

*Russell v. Price*

24

25

26

27

28

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

612 F.2d 1123 (9th Cir. 1979) ................................................................................. 16

4

*Shaw v. Lindheim*
919 F.2d 1353 (9th Cir. 1990) ................................................................................. 19

5

*Yankee Candle Co. v. New England Candle Company, Inc.*
14 F. Supp 2d 154 (D. Mass 1998) ................................................................... 17, 18

6

## STATUTES

7

17 U.S.C. § 101 ................................................................................................................. 17

8

17 U.S.C. § 102 ............................................................................................ 2, 3, 16, 17, 18

9

Fed.R.Civ.P. 56(c) ............................................................................................................. 9

## OTHER AUTHORITIES

10

Black's Law Dictionary (8th ed. 2004) ............................................................................ 17

11

Webster's Unabridged Dictionary 274 (2d ed. 2001) ...................................................... 17

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-iii-

MOTION FOR SUMMARY JUDGMENT;
CASE NO. C 07-05473 CRB

1

**NOTICE OF MOTION**

2  TO ALL PARTIES AND TO THE IR ATTTORNEYS OF RECORD:

3      TAKE NOTICE that Plaintiffs and Counter Defendants Louis Rovens and Adrienne

4  Rovens and Raymond Bregante and Jeffrey M. White as Trustees of the Michael W. Rovens and

5  Elise D. Shanfeld Irrevocable Trust and Counter Defendants Orlando Diaz-Azcuy Designs, Inc.,

6  Whitehouse Builders and William G. Walters, dba, Walters Architects (collectively "Plaintiffs

7  and Counter Defendants") will bring the attached motion on for hearing before this court on July

8  25, 2008, at 10:00 a.m., or as soon thereafter as the matter can be heard in Courtroom No. 8 of the

9  United States Courthouse located at 450 Golden Gate Ave., San Francisco, CA 94102.

10

**RELIEF SOUGHT**

11      Plaintiffs and Counter Defendants in this action, and each of them, moves this court for

12  summary judgment or, alternatively, summary adjudication against Theodore Brown & Partners,

13  Inc. ("TBP"), defendant and counter claimant, and request that this Court render a judgment that

14  TBP take nothing by its counterclaim and dismissing this action in its entirety, with prejudice.

15

**POINTS AND AUTHORITIES IN SUPPORT OF MOTION**

16

**I.      SUMMARY OF ARGUMENT**

17      This case involves defendant and counter-claimant Theodore Brown and Partners'

18  ("TBP's") claim for copyright infringement in preliminary and incomplete drawings for a

19  condominium unit remodel.  This motion for summary judgment should be granted for the

20  following four independent reasons:

21      First, the Rovens have an implied license to use the remodel plans they paid TBP to

22  prepare – this license arises as a matter of law to prevent an architect from blackmailing an owner

23  when a dispute arises.  TBP prepared these drawings for and was paid by the condominium

24  owners (the "Rovens") under a written hourly contract.  This contract, a copy of which is attached

25  as Exhibit A to this brief, allowed termination at any time, had no termination fee, no restrictions

26  on the owners' use of the drawings for the remodel, and no guarantee that TBP would have any

27  role in the remodel other than preparing drawings as requested on an hourly basis.  TBP contends

28  that the Rovens cannot use the plans that they commissioned from TBP.  The Ninth Circuit has

1    rejected TBP's position that an architect can withhold permission to use documents that an

2    architect was paid to create:

3           If accepted, [the architect's] claim that although it was hired to
             create documents for the project, [the owner] had no right to use the
4           documents to build the project, would allow architectural or
             engineering firms to hold entire projects hostage, forcing the owner
5           either to pay the firm off, continue to employ it, or forego the value
             of all work completed so far and start from scratch.

6

7    Foad Consulting Group v. Musil Govan Azzalino, 270 F.3d 821, 829 n.12 (9th Cir. 2001).  In this

8    situation, courts have found that that "a seller grants a buyer an implied license to use a product

9    for the purpose for which the seller sold it to the buyer." Id., at 827 n. 10.  Such a non-exclusive

10   implied license constitutes a complete defense to defendant TBP's claim of copyright

11   infringement.

12          Second, summary judgment against TBP should be granted due to copyright misuse.  TBP

13   is misusing copyright by asserting that it has exclusive rights in designs that were created by

14   others (the original building architect and/or by Roberto Salazar).  TBP's copyright registration is

15   defective, fraudulent and unenforceable because TBP registered the plans in just its own name

16   without informing the Copyright Office that others had actually done the designs.  TBP did not do

17   the remodel design, but rather just acted as a draftsperson for and drew it up using a CAD

18   ("computer aided design") program for an interior designer (Salazar) working for the owners.

19   Moreover, TBP failed to inform the Copyright Office that Salazar and TBP copied large sections

20   of the preexisting layout designed by the original building architect.  This copying arose due to

21   the fact that walls, plumbing, ducts and utilities are nearly impossible to move in a high rise

22   condominium due to the impact on adjacent units.  Despite the much greater contributions of

23   Salazar and the original building architect to the designs, TBP fraudulently registered these

24   designs without any acknowledgment that it was registering a derivative work.

25          Third, TBP's claims against Whitehouse Builders relating to building of the remodel

26   should be dismissed because building of an interior remodel is not "copying" within the scope of

27   the Copyright Act.  Remodel plans are protected only as a pictorial/graphical work under 17

28   U.S.C. § 102(a)(5).  Case law under 17 U.S.C. § 102(a)(5) establishes that a pictorial/graphical

1  depiction of a functional object such as a room has "thin" protection due to the policy against

2  protecting the function of the object, and that the copyright is not infringed by constructing the

3  physical object.  In registering its drawings, TBP erroneously claimed that the interior remodel

4  was more than just a graphical work, but was rather  a "building" qualifying for the enhanced

5  copyright protection available to buildings under the Architectural Works Protection Act (17

6  U.S.C. § 102(a)(8)).  Because an interior remodel cannot be interpreted to be a "building" under

7  the statute, the TBP drawings cannot be infringed by construction of the remodel.  Thus,

8  construction of the remodel by the builder, Whitehouse Builders, is not an infringement, and

9  TBP's claims relating to building of the remodel must be dismissed as a matter of law.

10     Fourth, summary adjudication in favor of cross-defendant Walters Architects should be

11  granted because it is undisputed that Walters did not copy the TBP plans.  Walters' only role was

12  reviewing the ODADA plans and stamping them as compliant with building codes.

## II.     FACTUAL OVERVIEW

### A.     TBP Prepared Drawings For the Rovens' Interior Designer Under a Written Contract That Allowed Termination of TBP At Will Without Penalty.

17     Plaintiffs and cross-defendants Louis and Adrienne Rovens ("the Rovens") paid defendant

18  and cross-claimant Theodore Brown and Partners ("TBP") over $40,000 to prepare a set of

19  preliminary drawings for the interior design remodel of their condominium unit in the Four

20  Seasons.  (White Declaration ¶10.)  TBP prepared these drawings under the direction of Roberto

21  Salazar, the Rovens' interior designer, pursuant to a written contract providing for hourly fees and

22  for termination at any time with no termination fee.  The TBP contract had no termination fee, no

23  restrictions on the owner's use of the drawings, and no guarantee that TBP would have any role

24  other than preparing drawings on an hourly basis reflecting the owners' desires for the remodel.

25  (A copy of the TBP contract is attached as Exhibit A to the declaration of Joseph M. Breall

26  submitted in support of this motion.)

27     The stated purpose of the "Design Objective" contained in the contract was to draft

28  construction documents for a condominium remodel to be submitted to contractors for bidding:

-3-

1

2          DESIGN OBJECTIVE

3              The objective of our work on this project is to prepare architectural
               construction drawings for the above mentioned residential unit.
4              Subsequent to client approval, the prepared drawings will be
               submitted to general contractors for price quotes.
5
(Breall Decl., Ex. A.)
6

7          Although the written contract was entered into between Defendant TBP and Salazar,

8   Defendant TBP understood that Salazar was working as the Rovens' agent and that the Rovens

9   would be paying for TBP's services.

10         Defendant TBP also claims that it has an oral contract directly with the Rovens.

11             Q.   Well, what did he [Salazar]  say to you?

12             A.   That he said to the Rovens that we were going to be the
                    architects, because  the Rovens were insisting that there be an
13                  architect on the job, and that we'd be the architects, and that he'd
                    pass our bills through the Rovens, and the Rovens would pay him,
14                  and he'd pay us.

15  (Deposition of Theodore Brown (principal of TBP) on February 28, 2008 ("Brown Depo."), at

16  93:11-16 [Breall Decl., Ex. B].)

17         Theodore Brown also testified at his deposition that he received an oral assurance from

18  Louis Rovens that TBP would be paid for its work if Salazar did not pay.  (Brown Depo. at 43:5-

19  45:5 [Breall Decl., Ex. B].)  Brown did not discuss with Louis Rovens what rights the Rovens

20  would have to use the plans should TBP be terminated.  (Brown Depo. at 124:7-125:4, Ex. B].)

21         The Rovens spent many hours and dollars with Salazar planning the remodel, and TBP

22  drew up the resulting designs in preliminary drawings that were never completed.  (White Decl.,

23  ¶¶6, 10.)  The changes that TBP made to the existing layout were the result of collaboration with

24  Salazar.  (Brown Depo, 25:17-26:10 [Breall Decl., Ex. B]; Deposition of Albert Costa taken on

25  December 4, 2007, in *Rovens, et al. v. Salazar Designs, Inc., et al.*, in the Superior Court of the

26  State of California, County of San Francisco, Case No. 458820 ("Costa Depo"), 127:7-128:15

27  [Breall Decl., Ex. C]; Deposition of Roberto Salazar on May 20, 2008 ("Salazar Depo"), 15:15-

28  17:9, 25:18-26:2, 49:20-25, 50:25-81:7 [Breall Decl., Ex. D].)  TBP and Salazar jointly discussed

1  and contributed to the apartments' design based on the input and direction Salazar received from

2  the Rovens.  (Brown Depo, 25:17-26:10 [Breall Decl., Ex. B].)  While, TBP was responsible for

3  drafting the plans, Salazar participated in and contributed to the design elements contained in

4  those plans.  (Costa Depo, 127:7-128:15 [Breall Decl., Ex. C]; Salazar Depo, 15:15-17:9, 25:18-

5  26:2, 49:20-25, 50:25-81:7 [Breall Decl., Ex. D].)

6         Because walls, columns, plumbing, wiring and ducts cannot be easily moved (if at all) in a

7  high rise condominium, the pre-existing layout of the rooms in the condominium was largely

8  copied in the Salazar design and the TBP drawings.  (Kudrave Decl., ¶11.)  The plans TBP

9  prepared for the Rovens were based on and substantially incorporated the apartment's "as built"

10  floor plan.  (Kudrave Decl., ¶¶ 3-10, Exs. A-E.)[1]  When the Rovens purchased the apartment, the

11  apartment's interior was fully constructed according to the standard floor plan designed and built

12  by the Four Seasons (the "Four Seasons' Plans").  (White Decl., ¶7; Kudrave Decl., ¶ 3, Ex. A.)

13  Before TBP began drawing its preliminary plans for the Project, TBP obtained a copy of the Four

14  Seasons' Plans and, additionally, surveyed and plotted the apartment's existing layout.  (Costa

15  Depo, 55:16-56:5, 62:15-63:10 [Breall Decl., Ex. C].)  Albert Costa, TBP's primary architect on

16  the Project, started drafting TBP's plans by incorporating into his drawings the apartments'

17  existing layout.  (Id.)  TBP's plans were developed by making changes to this existing layout and

18  retained the overall floor plan contained in the Four Seasons' Plans.  (Kudrave Decl., ¶¶ 8-10.)

19         As TBP knew would happen, the Rovens relied on the drawings in working with their

20  designer to purchase over a million dollars of stone and art work to be used in the remodel.

21  (White Decl., ¶8.)

22         **B.    TBP Was Terminated After Refusing to Continue on the Project.**

23

24         The Rovens became dissatisfied as the work by Salazar and TBP fell months behind

25  schedule.  (White Decl., ¶¶9, 10.)  Concerned over the amount of time it was taking TBP to

26  ─────────────────────

27         [1] The exhibits attached to the e-filed Kudrave Declaration have been reduced to letter size to facilitate filing.  The exhibits attached to the Kudrave Declaration lodged with the Court are provided in a larger, 11x 17 format but are otherwise identical.

28

1   complete plans for a small unit with a floor plan dictated by existing conditions, the Rovens

2   discussed changing architects with Salazar.  (White Decl., ¶9.)  During these conversations

3   Salazar assured the Rovens that they had the ability to change architects and have a new architect

4   use the plans TBP was drafting.  (White Decl., ¶9.)  Although Salazar advised against such a

5   move, he told the Rovens that they had the ability to do so and that this was why Salazar

6   negotiated an hourly contract with a termination provision.  (White Decl., ¶9.)

7         When the Rovens discovered fraud by Salazar, the interior designer, the Rovens explained

8   their concerns to TBP and asked TBP to continue on the project without Salazar, but TBP

9   refused.  (White Decl., ¶¶11, 12.)  During this conversation the Rovens informed TBP that it was

10  leaving them little choice but to take the plans to another architect to complete.  (White Decl.,

11  ¶12.)  During this conversation TBP never indicated that the Rovens could not use the plans or

12  that any fee or additional charge would be owed for using the plans.  (White Decl., ¶ 12.)   The

13  Rovens therefore terminated both Salazar and TBP.  (White Decl., ¶13.)

14        At the time TBP was terminated on the project and for eight months thereafter, TBP did

15  not inform the Rovens of its claim to a copyright preventing the Rovens from using the TBP

16  plans.  (White Decl., ¶13.)

17        The Rovens brought claims in a state court action against both Salazar and TBP.  (White

18  Decl., ¶14.)  The claims against TBP arose in part from TBP's failure to provide drawings that

19  were adequately detailed and on schedule.  (White Decl., ¶14.)  In the state court action against

20  TBP, TBP never asserted that it had not been paid in full for its drawings.  (White Decl., ¶15.)

21  TBP ultimately settled the state court action by paying the Rovens and waiving any claim that the

22  Rovens owed TBP any payment.  (TBP state court settlement agreement [Breall Decl., Ex. E].)

23        **C.    A New Designer, ODADA, Prepared New Plans for the Rovens That**
               **Preserved Much of the Preexisting Layout of the Apartment.**

24

25        After the termination of Salazar and TBP, the Rovens hired a new interior designer,

26  Orlando Diaz-Azcuy Design Associates ("ODADA"), to continue the project and try to get it

27  back on schedule.  (White Decl., ¶16.)  With the understanding that they had bought and paid for

28  the preliminary Salazar designs shown in the TBP drawings, the Rovens gave these drawings to

1    ODADA and directed ODADA to use elements such as octagonal stone columns that had already

2    been ordered based on the Salazar design.  (White Decl., ¶17.)

3         ODADA then prepared a new and ultimately more complete set of plans for the remodel.

4    Due to the same constraints of walls, columns, plumbing, wiring and ducts, ODADA's plans

5    largely preserved the pre-remodel layout of the apartment just as the TBP plans did.  (White

6    Decl., ¶18.)  ODADA also preserved other design elements that had been in the TBP  plans such

7    as an octagonal entryway because the Rovens liked the octagon idea and large quantities and very

8    expensive materials had been ordered for it.

9         **D.     Walters Was Hired By ODADA's Third Party Permit Expediter To Review**
              **And Stamp ODADA's Plans.**
10

11        After ODADA completed its plans, ODADA hired a "permit expediter" to assist with and

12   facilitate the process of obtaining the city permits necessary to commence construction.

13   (Deposition of William G. Walters ("Walters Depo"), 17:2-17 [Breall Decl., Ex. F].)  ODADA's

14   permit expediter hired architect William Walters to review and stamp ODADA plans so that the

15   plans could be submitted to the city for review.  (Id., at 19:15-25.)  Walters did know about and

16   never had access to TBP's plans.  (Id., at 25:25-26:20.)  Walters did not copy, distribute, sell or

17   even retain a copy of TBP's or ODADA's plans.  (Id., at 28:7-9.)  Walters was not hired by the

18   Rovens to work on the Project and never spoke with the Rovens, the Trust, or ODADA about the

19   Project.  (Id., at 37:1-10, 31:17-32:25.)

20        **E.     Whitehouse Builders Was Later Hired to Build the ODADA Plans Without**
              **Ever Seeing the TBP Plans.**
21

22        After a competitive bid process, the Rovens retained Counter Defendant Whitehouse

23   Builders to perform the remodel of the condominium.  (Declaration of Neil Whitehouse, ¶2.)

24   Whitehouse Builders, Inc. ("Whitehouse") was only given ODADA's plans to bid.  (Whitehouse

25   Decl., ¶3.)  Whitehouse was completely unaware of defendant TBP's plans and never viewed or

26   copied defendant TBP's plans.  (Whitehouse Decl., ¶¶3, 4.)  Whitehouse is presently constructing

27   the Rovens' condominium using the ODADA plans.  (Whitehouse Decl., ¶5.)

28

1

2

**F.    Months After ODADA Started on the Project, TBP Registered Its Plans With the Copyright Office.**

3

On August 22, 2007, eight months after being terminated from the Project, TBP filed an

4

application to register TBP's plans with the U.S. Copyright Office.  (TBP's 8/22/07 Copyright

5

Application [Breall Decl., Ex. G].)  In its application, TBP claimed to be the sole author of an

6

original architectural work.  (Id.)  TBP did not disclose, however, that TBP's plans were based on

7

and derivative of the Four Seasons' Plans nor did TBP acknowledge Salazar's authorship.  (Id.)

8

TBP also sought to register its plans both as an "architectural work" and as a "technical drawing."

9

(Id.)

10

**G.    TBP Has Asserted That Its "Copyright" Is Infringed By Construction of the Remodel.**

11

12

TBP contends that, even though the Rovens commissioned the plans, the Rovens are not

13

allowed to use them without TBP's consent:

14

15

16

> Q.    So -- going back for a moment to the hypothetical I asked you, so assume that you had completed the -- the construction drawings and you had been paid for all your hourly invoices up to that point in time, and you were terminated.  Do you believe you -- is it your understanding that you would have a right to withhold the use of those construction plans on the project?

17

> THE WITNESS:  Yeah.

18

> *                    *                    *

19

20

> Q.    Well, what I'm asking is, if someone pays you to prepare plans, what -- what do they get in return? Do they get to use the plans?

21

> A.    They get our services.

22

> Q.    Do they get to use the plans that you prepared?

23

> A.    Not without our permission.

24

25

> Q.    So if someone pays you to prepare plans and you prepare the plans, you can withhold the plans and ask for additional payment before they can use the plans?

26

> THE WITNESS:  Yes.

27

(Brown Depo, 75:4-14 ; 80:25-81:13 [Breall Decl., Ex. B].)

28

### III.    LEGAL STANDARD OF REVIEW

Summary judgment allows courts to avoid unnecessary trials where no material factual dispute exists.  Northwest Motorcycle Ass'n v. U.S. Department of Agriculture, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court should award summary judgment where no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).

In deciding whether to grant summary judgment, a court must take three necessary steps: (1) it must determine whether a fact is material; (2) it must determine whether there exists a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) it must consider that evidence in light of the appropriate standard of proof.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).  Summary judgment is not proper if material factual issues exist for trial.  B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir. 1999).  As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Disputes over irrelevant or unnecessary facts should not be considered.  Id. Where there is a complete failure of proof on an essential element of the nonmoving party's case, all other facts become immaterial, and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).  Summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules as a whole.  Id..

### IV.    ARGUMENT

**A.    Because TBP Was Paid For Preparation of Its Plans For Use in the Remodel, the Rovens Have An Implied Non-Exclusive License To Use The TBP Plans.**

When an owner has paid an architect for the creation of architectural plans under a contract that is silent on the owner's ability to use those plans, an implied license allowing the owner to use the plans for that project arises as a matter of law.  Foad Consulting Group v. Musil Govan Azzalino, 270 F.3d 821 (9th Cir. 2001).  As recognized by the Foad court, this license is

1   necessary in order to avoid allowing an architect to hold "entire projects hostage, forcing the

2   owner either to pay the firm off, continue to employ it, or forego the value of all work completed

3   so far and start from scratch." Id., at 829 n.12. Thus, although an architect may have a copyright

4   in its plans, the architect cannot use that copyright to blackmail an owner by refusing to allow the

5   owner to use plans that the owner paid for. This principle compels summary judgment against

6   TBP on all its claims.

7           In Foad, an engineering firm was hired to create a preliminary and final concept

8   development plan for a shopping center. The engineering firm obtained a copyright for the plan.

9   The engineering firm then claimed that its copyright was infringed by the architectural firm who

10  used the plans to develop a final site plan.

11          On appeal, the Foad court found that the initial contract with the engineering firm granted

12  an implied license to copy and adapt the revised plot plan and to publish the resulting derivative

13  work for construction of the project it was designed for. The Foad court found that the "central

14  purpose of the contract was the production of a set of engineering documents" and to "process"

15  these documents with the city." Id., at 828. In interpreting the contract, the court indicated that

16  "[g]iven the amount of money GenCom paid for Foad's services and because part of the

17  agreement was for Foad to help GenCom with its application to the city, it would be surprising if

18  the parties had intended for GenCom to seek Foad's permission before using the plans to build the

19  project." Id. As to the use of the plans by the successor firms, the court in Foad observed that the

20  contract contained no language prohibiting others from modifying the plans; and that the absence

21  of any prohibition against modification by others indicates that the contract granted an implied

22  license to hire others to create derivative works using the plan for the purpose of completing the

23  project. Id., at 829. Furthermore, the court found that since the contract granted a license to

24  reproduce and adapt the revised plot plan for the purpose of developing the project, it would have

25  to follow that the owner could publish the derivative work, since there was no contractual

26  provision barring such action. Id., at 831.

27          Applying the Foad court's analysis, it is clear that the Rovens and their new agents

28  (ODADA, Whitehouse Builders and Walters) received an implied non-exclusive license to use,

1    copy and adapt the TBP plans to complete the remodel.  The central purpose of the contract, the

2    "DESIGN OBJECTIVE", was the creation of "architectural construction drawings for the

3    [Rovens] unit . . . [which was to] be submitted to general contractors for price quotes."  Given the

4    large amount of money the Rovens paid TBP and the fact that the plans were to go to general

5    contractors for bid, it makes no sense that the Rovens needed TBP's permission before using the

6    plans for the project.[2]

7        The express terms of the contract are consistent with the creation of an implied license to

8    use the drawings.  The contract allowed termination at any time, had no termination fee, no

9    restrictions on the owners' use of the drawings for the remodel, and no guarantee that TBP would

10   have any role in the remodel other than preparing drawings as requested on an hourly basis.  The

11   contract contained no language prohibiting others from modifying the plans or prohibiting

12   publishing derivative works.  If the parties had intended that TBP would have a guaranteed role

13   throughout the entire project and the right to charge a license fee for use of their plans, these

14   terms would have been specified in the written contract.  The fact that the parties did not agree to

15   give TBP a termination or license fee in the written contract confirms that the Rovens received a

16   right to use the plans that they had paid for.

17       The existence of an implied license is also confirmed by two instances of TBP's conduct

18   before the litigation arose.

19   •    First, shortly after TBP was retained for the project, Theodore Brown confirmed

20        with Louis Rovens that TBP would be paid if Salazar did not pay, and Louis

21        Rovens provided that assurance.  In that conversation, Brown did not indicate that

22        the Rovens could not use the plans that they were paying for.  The reasonable

23   _____

24        [2] Defendant TBP cannot argue that the Rovens are not entitled to an implied license
     because they did not fully pay for the plans.  Courts have repeatedly held that full payment is not
25   a contractual precondition for the grant of an implied license as long as a substantial sum has been
     paid.  See I.A.E., Inc. v. Shaver, 74 F.3d 768, 778 (7th Cir. 1996) (rejecting plaintiff's argument
26   that an implied license "did not spring into existence" because only half the contract sum was
     paid); and Effects Assoc., Inc. v. Cohen., 908 F.2d 555, 559 n.7 (9th Cir. 1990) (refusing to
27   construe payment in full as a condition precedent to implying a license where such a condition
     was not required by plain, unambiguous contract language.)
28

1    understanding from that conversation is that the Rovens would pay TBP and

2    receive the right to use the plans. [3]

3    •    Second, TBP did not warn the Rovens against use of its plans when TBP was

4    terminated.  When the Rovens had decided to terminate Salazar, the original

5    interior designer, the Rovens offered to allow TBP to continue work on the project,

6    but TBP refused to work directly for the Rovens.  (White Decl., ¶12.)  TBP knew

7    at that point that its plans had been used to order materials for construction of the

8    remodel, and that construction would continue without TBP's participation.  (Id.)

9    Despite this understanding, TBP failed to assert to the Rovens that the Rovens had

10   no right to use TBP's work.  (Id.)  TBP's conduct confirms that the parties

11   understood that the Rovens could use the drawings.

12   The Court should find that an implied nonexclusive license exists here.  The only

13   reasonable interpretation of the parties' writings and conduct is that the parties intended that the

14   Rovens would have an implied license to use the TBP drawings.  Had the parties intended that

15   TBP would receive a license fee in the event of termination, the fee would have been specified in

16   the written contract.  The absence of such a fee confirms that an implied license was intended.  As

17   the Foad court observed, without such an implied license, an architect could demand that the

18   owner pay a "ransom" just as TBP seeks here.  To prevent inequitable ransom demands arising

19   ────────────────

20        [3] TBP cannot use the fact the contract was entered into with Salazar, the Rovens' agent, as
     a means to escape an implied license to the Rovens.  Under California law, even though the TBP

21   contract was in the name of Salazar, defendant TBP is presumed to have contracted with the
     disclosed principals, the Rovens:

22
         Generally, if at the time the contract is made the identity of the principal is

23       disclosed to the third party, the latter is presumed to have contracted with the
         principal unless at the time of making the contract it chooses to hold the agent

24       solely liable.

25   Midwest TV v. Scott, Lancaster, Mills & Atha, 205 Cal. App. 3d 442, 449 n.4 (1988), citing

26   Clifton Cattle Co. v. Thompson, 43 Cal. App. 3d 11, 17 (1974).  Moreover, the fact that Theodore
     Brown sought and received an oral assurance of payment from Louis Rovens creates an oral

27   contract between the architect and owner, and that contract must include the implied license
     arising as a matter of law in Foad.

28

1  from an after-the-fact demand for a license fee, the Court should find that plaintiffs and cross-

2  defendants received an implied license to use the TBP plans and enter summary judgment against

3  TBP.

   **B.    TBP Has Misused Its Copyright And, Thus, Should Be Barred From
          Prosecuting Its Infringement Claims Against Counter Defendants.**

6      Copyright misuse is a broad equitable doctrine that bars use of a copyright to work an

7  injustice.  See <u>Practice Management Information Corp. v. American Medical Association</u>, 121

8  F.3d 516, 520 (9th Cir. 1997) (recognizing copyright misuse as defense to copyright

9  infringement); <u>Lasercomb America, Inc. v. Reynolds</u>, 911 F.2d 970, 978 (4th Cir. 1990) (misuse

10  defense turns on "whether the copyright is being used in a manner violative of the public policy

11  embodied in the grant of a copyright.").

12      The copyright misuse doctrine should be applied here to bar TBP's claims for two

13  reasons:  First, TBP registered its plans solely in its own name without crediting the original

14  layout of the apartment which was largely preserved in its drawings and without crediting

15  Roberto Salazar, the interior designer.  Second, in pursuing the claims in this litigation, TBP is

16  improperly asserting similarities of design that arise from the original building layout rather than

17  from new creative expression by TBP.

   **1.    TBP's Copyright Is Unenforceable Because TBP Misled The
          Copyright Office Regarding The Fact That Its Plans Are Derivative
          And That TBP Is Not The Sole Author.**

21      In order assert a claim for copyright infringement; the plaintiff <u>must</u> establish ownership

22  of a valid copyright.  <u>Lamps Plus, Inc. v. Seattle Lighting Fixture Co.</u>, 345 F.3d 1140, 1143-44

23  (9th Cir. 2003).  While a registration certificate from the Copyright Office creates a rebuttable

24  presumption of a valid copyright, that presumption can be overcome with proof that the plaintiff

25  knowingly omitted facts from its registration form that might have caused the Copyright Office to

26  reject the plaintiff's application.  <u>GB Marketing USA Inc., v. Gerlsteiner Brunnen GmbH & Co.</u>,

27  728 F. Supp. 763, 774 (W.D.N.Y. 1991); <u>accord</u> <u>Lamps Plus, Inc.</u>, 345 F.3d at 1145.  The

28  rationale behind this rule is simple:

1
2
3
4

> [A]lthough the court would ordinarily defer to the judgment of the
> Copyright Office when the question of originality is a close one,
> that is impossible to do when the Copyright Office has not had a
> fair opportunity to pass on the question because of the copyright
> claimant's failure to advise the Office of the existence of a prior
> work.

5

GB Marketing USA Inc., 728 F. Supp. at 774-75.

6
7
8
9
10

This rule serves to protect against copyright claimants abusing the copyright registration process in order to stake a greater monopoly than the law and equity allow and is particularly important in cases such as this one that involve a subject matter—e.g., architectural drawings—that requires a higher degree of originality than other works.  See, e.g., GB Marketing USA Inc., 728 F. Supp. at 774.

11
12
13
14
15
16

In this case, the undisputed evidence establishes that TBP knowingly failed to disclose to the Copyright Office the fact that TBP's plans were based on and derivative of the "as built" floor plans for the Four Seasons Apartment and that the designs included in TBP's plans were authored, at least in part, by Roberto Salazar.  TBP then abused its improper "copyright" in an attempt to extort a "licensing fee" from the Rovens.  Accordingly, TBP's "copyright" in the TBP plans is unenforceable and cannot support TBP's claim for infringement.

17
18
19
20
21
22
23
24
25
26
27
28

TBP's plans are derivative of and include the apartment's original layout.  Albert Costa, TBP's primary architect on the Rovens' Project, has admitted that he had access to the Four Season's plan before commencing work on TBP's plans and that he began drafting TBP's plans only after incorporating the apartment's existing footprint and layout into the initial drawings. (Costa Depo, 55:16-56:5, 62:15-63:10 [Breall Decl., Ex. C].)  Comparing TBP's plans with the Four Seasons' Plans showing the apartment's existing layout, it is obvious that TBP's plans are primarily based on and incorporate elements of the apartment's existing layout, including the location of the bathrooms, kitchen, bedrooms, family room and dining room.  (Kudrave Decl., ¶¶8-10, Exs. B, D & E.)  While there are some differences, such as the expansion of the master suite and the re-design of the entrance way, those changes make up only a small part of the overall plans and, also, fit within the general outline of the existing layout.  (Id., at ¶10.)

1   TBP's plans are not solely TBP's designs. Costa admitted that the designs included in

2   TBP's plans were the result of collaboration with Salazar in which TBP worked up the technical

3   drawings and Salazar directed the overall design. (Costa Depo, 127:7-128:15 [Breall Decl., Ex.

4   C].) Brown and Salazar also testified that Salazar contributed drawings and ideas that TBP

5   incorporated into TBP's plans. (Brown Depo, 25:17-26:10 [Breall Decl., Ex. B]; Salazar Depo,

6   15:15-17:9, 25:18-26:2, 49:20-25, 50:25-81:7 [Breall Decl., Ex. D].)

7       Despite being on notice of both the derivative nature of its plans and the contribution of

8   Salazar, TBP knowingly omitted from its copyright registration application the fact that TBP's

9   plans are derivative of the original Fours Seasons plans and the fact that Salazar co-authored the

10  designs included in the plans. TBP's copyright registration forms, which were filed eight months

11  after TBP was terminated from the Project, do not identify the TBP plans as a derivative work

12  and asserts that TBP is the sole author. Brown, TBP's principal and managing partner, admitted

13  that when he filed the copyright registration he <u>had not</u> compared TBP's plans to the Four

14  Seasons' plans and, in fact, had never even seen the Four Seasons' plans. (Brown Depo, 159:2-

15  161:9 [Breall Decl., Ex. B].)

16      Brown's decision to assert copyright protection as the <u>sole</u> author of TBP's plans is

17  inexcusable given that Costa, TBP's lead architect on the Project, openly and admittedly based

18  TBP's plans on the apartment's existing layout, that even a cursory look at the original Four

19  Season' plans would reveal the substantial similarity between TBP's plans and the original plans

20  and that both Brown and Costa admit that Salazar made substantial contributions to the designs

21  incorporated in the plans. Clearly, TBP is attempting to misuse the copyright registration process

22  and should be precluded from enforcing its "copyright" against the Counter Defendants.

23      **2.    TBP Has No Copyright In And No Remedy For "Infringement" Of**
24      **The Derivative Aspect Of Its Plans.**

25      In addition to abusing the copyright application process, TBP is attempting to abuse

26  whatever copyright that it is entitled to, if any, by seeking damages for infringement based on <u>all</u>

27  of the similarities between TBP's and ODADA's plans. TBP has not limited or narrowed its

28  claims to account for the fact that <u>both</u> TBP's and ODADA's plans were drawn up for the same

1    apartment and are, thus, derivative of and copy from a common source—the apartment's original

2    floor plan.  Under TBP's theory, because TBP prepared plans for the Project that incorporated

3    aspects of the apartment's original floor plan, the Rovens cannot prepare new plans that

4    incorporate the same aspects of the apartment's original floor plan without infringing on TBP's

5    copyright.  This result is both absurd and contrary to the policies and principles of copyright law.

6    TBP has no copyright in and no right to enforce a copyright in the aspects of its plans that were

7    derived and/or copied from the Four Seasons' Plans or the apartment's existing layout.  Russell v.

8    Price, 612 F.2d 1123, 1128 (9th Cir. 1979).  TBP's claim is an attempt to gain rights not provided

9    by copyright law and can and should be rejected based on TBP's blatant copyright misuse.

C.    **Construction of the Remodel Does Not Constitute Copyright Infringement Because Drawings of the Interior Remodel of a Condominium Unit Are Not A "Building" Protected Under the Architectural Works Protection Act.**

13          Copyright protects expression rather than ideas or functionality.  Thus, when a

14    copyrighted drawing depicts a functional object such as a room, the copyright does not protect the

15    underlying functionality of the room and the copyright is not infringed by construction of the

16    depicted room.  A limited exception to this principle was created by the protection given to the

17    drawing of an "architectural work" which is further defined as the "design of a building" by the

18    Architectural Works Copyright Protection Act ("AWCPA").  However, this exception does not

19    apply here because an interior remodel is not a "building".  Thus, because the remodel drawings

20    here are merely a pictorial/graphical work protected under 17 U.S.C. § 102(a)(5) rather than a

21    "building" protected under 17 U.S.C. § 102(a)(8), the construction of the remodel is not copyright

22    infringement, and TBP's claims against Whitehouse Builders related to construction of its plans

23    must be dismissed.

1.    **The TBP Plans Do Not Depict a Building.**

26          Defendant TBP registered for copyright of the Rovens' plans under both 17 U.S.C. §

27    102(a)(5) (allowing registrations for pictorial and graphical works) and 17 U.S.C. § 102(a)(8)

28    (allowing registration of "architectural works").

1    Defendant is not entitled to the broader protection of 17 U.S.C. § 102(a)(8) for

2    "architectural works."[4]  The term "architectural work" is further defined as the "design of a

3    building" in 17 U.S.C. § 101.

4    Because the Copyright Act does not define the key term "building," the Court must start

5    with the term's ordinary meaning.  Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187, 115 S. Ct.

6    788, 130 L. Ed. 2d 682 (1995);  Garcia v. Teitler, 443 F.3d 202, 207 (2d Cir. 2006).   The Eighth

7    Edition of Black's Law Dictionary defines a building as "[a] structure with walls and a roof, esp.

8    a permanent structure."  Black's Law Dictionary (8th ed. 2004).  Similarly, the Second Edition of

9    Webster's Unabridged Dictionary defines building as "a relatively permanent enclosed

10   construction over a plot of land, having a roof and usually windows and often more than one

11   level, used for any of a wide variety of activities, as living, entertaining, or manufacturing."

12   Webster's Unabridged Dictionary 274 (2d ed. 2001).  Under either of these definitions, as well as

13   in common parlance, defendant TBP's interior space plan for the Rovens' condominium does not

14   qualify as a "building."

15   The TBP space plan is for a condominium, which by definition is not a structure but

16   simply airspace within a structure.  Under the definition of a condominium, there is no ownership

17   of exterior walls, roof or utilities, the very components that define a "building."  At least one

18   court has reviewed this issue and found that interior space plans are not "buildings" for copyright

19   purposes:

20       The Court has difficulty concluding that constructing an empty
         room in a large shopping mall into a candle shop with a colonial
21       motif transforms that room into a "building" within the meaning of
         the Copyright Act.  The entire mall itself, with its exterior walled
22       off and divided into separate spaces for stores, easily qualifies as a
         building, but individual stores do not. . .  The Court believes that
23       protection extends to free standing structures . . . not individual
         units comprising a larger structure.  Surely Congress did not intend
24

25   ─────────────────────────
        [4] Although the Copyright Office allowed registration under 17 U.S.C. § 102(a)(8), that is
26   not conclusive, and the court must determine if the registration was proper.  The presumption of
     validity created by a certificate of registration may be rebutted through presentation of evidence
27   that the allegedly copyrighted work is not copyrightable.  See, e.g., Fonar Corp. v. Domenick, 105
     F.3d 99, 104 (2d. Cir. 1997).

28

FOLGER LEVIN &
KAHN LLP
ATTORNEYS AT LAW

-17-                MOTION FOR SUMMARY JUDGMENT;
                    CASE NO. C 07-05473 CRB

1
2

       for individual offices in an office building, though elaborately
       designed, to qualify as buildings themselves.

3

<u>Yankee Candle Co. v. New England Candle Company, Inc.</u>, 14 F. Supp 2d 154, 159-60 (D. Mass

4

1998) (later vacated as part of a settlement.)

5

      Extending the analogy the court used in <u>Yankee Candle</u>, residential apartments or

6

condominiums are identical to offices within office buildings.  Although a condominium within a

7

larger building may be "elaborately designed," it does not qualify as a building itself and

8

therefore the plans do not qualify for protection under 17 U.S.C. § 102(a)(8).

9

     **2.**       **Constructing a Copy of a Pictorial or Graphic Work Registered Under
              17 U.S.C. § 102(a)(5) Is Not Copyright Infringement.**

10

11

      Under case law developed prior to passage of the Architectural Works Copyright

12

Protection Act ("AWCPA"), it was well established that "a building [was] not a 'copy' of the

13

underlying plans, with the result that construction of the structure [did] not constitute

14

infringement." 1 NIMMER, § 2.08[D][2][a] at 1-124 (Rel. 63, Apr. 2004) (citations omitted).

15

      Furthermore, courts have held that "one may construct a house which is identical to a

16

house depicted in copyrighted architectural plans, but one may not directly copy those plans and

17

then use the infringing copy to construct the house."   <u>Robert R. Jones Assoc., Inc. v. Nino</u>

18

<u>Homes</u>, 858 F.2d 274, 280 (6th Cir. 1988).  "[C]ourts agree that copying a structure depicted in

19

plans, without copying the plans themselves, is not copyright infringement."  <u>Nat.'l Med. Care,</u>

20

<u>Inc. v. Espiritu</u>, 284 F. Supp. 2d 424, 435 (S.D. W.Va. 2003) (citations omitted).

21

      Whitehouse Builders is only in this case for constructing the remodel, and because

22

construction is not infringement for a 17 U.S.C. § 102(a)(5) work, the claims against Whitehouse

23

should be dismissed.  It is undisputed that Whitehouse did not copy the TBP plans, and in fact

24

had no knowledge of defendant TBP or its relationship to the Rovens' project prior to the

25

litigation.  Whitehouse is simply the contractor that is building the remodel based upon the new

26

ODADA plans.  Under this scenario Whitehouse should have no liability to defendant TBP for

27

copyright infringement.

28

1

**D.    Walters Did Not Infringe TBP's Copyright.**

2          Walters did not infringe on TBP's copyright and should be dismissed from this action.

3    The undisputed evidence demonstrates that Walters did not engage in any conduct that violated

4    TBP's copyright.  <u>Pasillas v. McDonald's Corp.</u>, 927 F.2d 440, 442 (9th Cir. 1991) (no liability

5    absent proof of copying).  Walters did not copy, create a derivative work from or distribute TBP's

6    plans.  In fact, Walters had never seen and did not know about TBP's plans until after this lawsuit

7    was filed.  TBP's Lanham Act claim against Walters for "reverse passing off" also fails because it

8    is wholly dependent on TBP's claims for infringement.  <u>Shaw v. Lindheim</u>, 919 F.2d 1353, 1364

9    (9th Cir. 1990).

10                              **V.    CONCLUSION**

11          Summary judgment should be granted against TBP.  As set out above, TBP was paid for

12    its work, and should not be allowed to blackmail the Rovens by asserting that the Rovens did not

13    receive a license to use the plans they paid for.  Moreover, TBP's claim is a misuse of copyright

14    because the TBP copyright registration claims copyright ownership of the works of the original

15    building designer and Roberto Salazar.  TBP's claim is further flawed because construction of a

16    drawing of a remodel is not infringement, and because Whitehouse Builders and Walters did not

17    copy the TBP plans.

18          For these reasons, summary judgment in favor of plaintiffs and cross-defendants is

19    appropriate.

                                        Respectfully submitted,

20

21                                      /s/
     Dated: June 13, 2008              Joseph M. Breall
22                                      Attorneys for
                                        Plaintiffs and Counter Defendants
23

24    81052\2001\605456.2

25

26

27

28