1  TOBIN & TOBIN
   PAUL E. GASPARI, ESQ., SBN #76496
2  GREGORY J. RYKEN, ESQ., SBN #58199
   500 Sansome Street, 8th Floor
3  San Francisco, CA 94111-3211
   Telephone:    (415) 433-1400
4  Facsimile:    (415) 433-3883
   Email:  pgaspari@tobinlaw.com
5
   Attorneys for Defendant and Counter Claimant
6  THEODORE BROWN & PARTNERS, INC.,
   a California corporation
7

8             UNITED STATES DISTRICT COURT

9           NORTHERN DISTRICT OF CALIFORNIA

10              SAN FRANCISCO DIVISION

11
   LOUIS ROVENS, ADRIENNE ROVENS,          CASE No. 07-05473-CRB
12 and RAYMOND BREGANTE and
   JEFFREY M. WHITE as Trustees of the     **DEFENDANT AND COUNTER-**
13 Michael W. Rovens and Elise Shanfeld    **CLAIMANT'S OPPOSITION TO MOTION**
   Irrevocable Trust,                      **FOR SUMMARY JUDGMENT AND/OR**
14                                         **SUMMARY ADJUDICATION**
                 Plaintiffs,
15                                         Judge:  Hon. Charles R. Breyer
         v.                                Date:    July 25, 2008
16                                         Time:   10:00 a.m.
   THEODORE BROWN & PARTNERS, INC.         Courtroom 8, 19th Floor
17
                 Defendant.
18
   THEODORE BROWN & PARTNERS,
19 INC.,
20
                 Counter Claimant,
21       v.
22 LOUIS ROVENS, ADRIENNE ROVENS,
   and RAYMOND BREGANTE
23 JEFFREY M. WHITE as Trustees of the
   Michael W. Rovens and Elise Shanfeld
24 Irrevocable Trust, ORLANDO DIAZ-
   AZCUY DESIGNS, INC., WILLIAM G.
25 WALTERS, dba WALTERS ARCHITECTS,
   and WHITEHOUSE BUILDERS
26               Counter Defendants.

**TABLE OF CONTENTS**

I.    INTRODUCTION..................................................................................1

II.   STATEMENT OF FACTS....................................................................1

III.  APPLICABLE SUMMARY JUDGMENT STANDARD.................................4

IV.   THE ROVENS DID NOT HAVE A CONTRACT WITH TBP.........................5

V.    THE ROVENS DID NOT HAVE AN IMPLIED LICENSE TO USE THE BROWN
      PLANS...........................................................................................8

      1.  The Ongoing Relationship.............................................................9

      2.  The TBP-Salazar Contract............................................................10

      3.  The Creator's Conduct................................................................10

      4.  The Rovens' Burden...................................................................11

      5.  The Rovens' Reliance on *Foad* is Misplaced....................................13

VI.   TBP HAS A VALID COPYRIGHT IN THE TBP PLANS............................15

VII.  WHITEHOUSE BUILDERS IS LIABLE FOR CONSTRUCTING THE ROVENS
      CONDOMINIUM USING INFRINGING PLANS.....................................17

      1.  The TBP Plans Qualify as an Architectural Work and Are Protected under U.S.C.
          §102(a)(8)...........................................................................18

      2.  Whitehouse Builders Is Liable for Copyright Infringement......................23

VIII. CONCLUSION................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Aitken, Hazen, Hoffman, Miller, P.C. v. Empire Construction Co.*, 542 F. Supp. 252, 259 (D. Neb. 1982) ........................................................................................... 17

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) .................................................................................................... 5

*Arthur Rutenberg Homes, Inc. v. Maloney* (M.D.Fl. 1995) 891 F.Supp. 1560, 1568 ......... 16, 25

*Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001) ........................................ 5

*Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2nd Circ. 1995) ................................... 8

*Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829 (11th Cir. 1990) ................................................................................................... 25

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ................................................ 5

*Cleary v. News Corp.*, 30 F.3d 1255, 1259 (9th Cir. 1994) ......................................... 4

*Costello Publishing Co. v. Rotelle*, 670F.2d 1035, 1044 (D.C.Cir. 1981) ......................... 25

*CSM Investors, Inc. v. Everest Development, Ltd.*, 840 F.Supp. 1304, 1310 (D. Minn. 1994) ........................................................................................................ 16

*East/West Venture v. Wurmfeld Assoc., P.C.*, 722 F. Supp. 1064, 1068, n. 3 (S.D.N.Y. 1989) ........................................................................................................ 16

*Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990) ................................ 11

*First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 & n.19, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968) ...................................................................................... 5

*Fitzgerald Publ'n Co. v. Baylor Publ'n Co.* (2nd Cir. 1986) 807 Fed.2d 1110, 1113 ............... 25

*Foad Consulting Group v. Musil Govan Azzalino*, 270 F.3d 821 (9th Cir. 2001) ....... 9, 10, 13, 14

*Folio Impressions, Inc. v. Byer California*, 937 Fed.2d 759, 764 – 65 (2nd Cir. 1991) .......... 16

*Fong v. American Airlines, Inc.*, 626 F.2d 759, 762-63 (9th Cir. 1980) ........................... 5

*Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) ......................................... 5

*Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365 (D.C. Cir. 2000) ............. 5

*I.A.E., Inc v. Shaver*, 74 F3d 768 (7th Cir. 1996) ............................................. 9, 14

*Innovative Networks, Inc. v. Young* (S.D. N.Y. 1997) 978 F.Supp. 167, 176 ......................... 24

*Intown Enterprises, Inv. v. Barnes* (N.D. Ga. 1989) 1989) 721 F.Supp. 1263, 1266 – 1267 .................................................................................................... 24

*John G. Danielson, Inc. v. Winchester-Conant Properties, Inc., et al.*, 322 F.3d 26, 41 (1st Cir. 2003) .......................................................................................... 9

*Johnson v. Jones*, 149 F.3d 494 (6th Cir. 1998) ........................................ 9, 10, 12, 14

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348 (1986) ................................................................................................ 5

DEFENDANT AND CROSS-CLAIMANT'S OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION

*Midwest TV v. Scott, Lancaster, Mills & Atha*, 205 Cal.App.3d 442 (1988)................................ 6

*Moser Pilon Nelson Architects, LLC v. HNTB Corp.* (D. Conn. Aug. 8, 2006) WL 2331013 at p. 6) .......................................................................................................... 21, 22

*National Medical Care, Inc. v. Espiritu* (S.D.W.V. 2003) 284 F.Supp.2d 424 ......................... 24

*Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505 (4th Cir. 2002)........... 9, 10, 11, 12

*People v. Chase* (1931) 117 Cal.App.Supp. 775, 778 [1 P.2d 60] ............................................. 21

*People v. Gillespie* (1931) 344 Ill. 290, 294 [176 N.E. 316] .................................................... 21

*Pereira v. County of Santa Clara*, 113 Cal.App.4th 549, 571 (2003) ......................................... 6

*Robert R. Jones Associates v. Nino Homes* (6th Cir. 1988) 858 Fed.2d 274 ....................... 23, 24

*Samet & Wells, Inc. v. Shalom Toy Co.*, 429 F. Supp. 895, 904 (E.D.N.Y. 1977, aff'd, 578 F.2d 1369 (2d Cir. 1978)........................................................................................... 25

*Shine v. Childs*, 382 F.Supp.2d 602, 610 (S.D.N.Y. 2005) .................................................... 16

*SmithKl. Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, 211 F.3d 21,25 (2nd Circ. 2000) ........................................................................................................ 8

*State v. Ornelas* (1937) 42 N.M. 17 [74 P.2d 723, 725] ......................................................... 21

*T.W. Electrical Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630-31 (9th Cir. 1987) .............................................................................................. 4

*Tetra Techs. Inc. v. Harter*, 823 F.Supp. 1116, 1120 (S.D.N.Y. 1993) .................................... 5

*Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991) ..................................................... 5

*T-Peg, Inc. v. Vermont Timber Works, Inc.* (1st Cir. 2006) 459 Fed.3d 97, 109 ....................... 18

*Weissman v. Freeman*, 868 Fed.2d 1313, 1321 (2nd Cir. 1989)............................................. 16

*Yankee Candle Co. v. New England Candle Company, Inc.* (D. Mass. 1998) 14 F.Supp.2d 154, 159 – 160 .................................................................. 19, 20, 21, 22, 23


**STATUTES**

17 U.S.C. §101.............................................................................................................. 18, 19

17 U.S.C. §102(a)(5)...................................................................................................... 18, 23

17 U.S.C. §102(a)(8)................................................................................................. 18, 19, 23

17 U.S.C. §501(a) ................................................................................................................ 25

37 C.F.R. §202.11(b)(2)....................................................................................................... 22

37 C.F.R. §202.11(d)(1)....................................................................................................... 22

Architectural Works Copyright Protection Act ["AWCPA"] (Pub.L. No. 101-650, §§701 – 706, 104 Stat. 5089, 5133 – 5134.)................................................................ 18

**DEFENDANT AND CROSS-CLAIMANT'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION**

1

## OTHER AUTHORITIES

2

1990 U.S.C.C.A.N. at 6935, 6949 ................................................................... 20, 21

3

## RULES

4

Fed.R.Civ.P. 56(c) ..................................................................................................... 4

5

Fed.R.Civ.P. 56(e) ..................................................................................................... 5

6

7

## TREATISES

Black's Law Dictionary (4th ed. 1968)................................................................... 21

8

Black's Law Dictionary (6th ed. 1990) .................................................................. 20

9

Oxford English Dictionary (2nd ed.2000)............................................................. 21

10

Webster's New World Dictionary (2nd ed. 1984) ................................................. 20

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT AND CROSS-CLAIMANT'S OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION

Defendant and Counter-Claimant, THEODORE BROWN & PARTNERS, INC. (hereinafter "Defendant" or "TBP"), hereby submits its Opposition to Motion for Summary Judgment and/or Summary Adjudication.

## I. INTRODUCTION

The gravamen of Plaintiffs' Motion for Summary Judgment and/or Summary Adjudication springs from the erroneous belief that because the Rovens thought they could use an independent architect's plans without restrictions, that belief should become law. Plaintiffs' motion should fail because:

1. The Rovens do not hold an implied license to use the plans;

2. The TBP Plans belong to TBP, not the Rovens; and

3. The Counter-Defendants are liable to TBP for use of TBP's design drawings to construct the Condominium.

## II. STATEMENT OF FACTS

In June, 2006, the Rovens purchased a 4,800 square foot condominium (the "Condominium") in the Four Seasons Residences on Market Street in San Francisco. Jeffrey M. White Declaration, filed by Plaintiffs (Document 44-3) ("White Declaration") ¶ 2. Although the Condominium was relatively new, the Rovens wanted to demolish and remodel it. The Rovens engaged Salazar Designs, Inc. ("Salazar") as the designer for the renovations. The Rovens had used Salazar as their designer on prior projects. Deposition of Jeffrey White, Exhibit D to Gaspari Declaration ("White deposition"), P. 20, l. 5 – P. 21, l. 15[1]. Since Salazar was not an

---

[1] All deposition references are attached to the Declaration of Paul E. Gaspari.

architect, the Rovens-Salazar contract authorized him to retain the services of an "independent, licensed architect". White Declaration, ¶ 3, Exhibit A; White Deposition, P. 21, ll. 23 - 25.

Thereafter, Salazar entered into a written contract with TBP to provide architectural services for the project. Declaration of Theodore Brown in Opposition to Motion ("Brown Declaration"), Exhibit A. TBP and Salazar previously worked together on a number of construction projects and, based upon that course of conduct, had a mutual understanding that the TBP's plans were instruments of service on which TBP had a copyright. It was also their understanding, based upon their past experience, that Salazar, the Rovens, and the contractors working on the Condominium project had a non-exclusive license to use the plans that TBP would prepare, so long as TBP was working on the project. Deposition of Roberto Salazar, Exhibit C to Gaspari Declaration, ("Salazar deposition"), P. 27, ll. 4 – 9; P. 128, l. 24 – P. 129, l. 19; Brown Declaration, ¶ 3.

TBP prepared demolition and construction plans for the renovation of the Condominium the "TBP Plans"). However, because the Rovens did not approve the employment of sub-consultants (e.g. electrical and mechanical engineers) to prepare drawings for the Condominium project, the TBP Plans were not filed with the City of San Francisco for permit approval. Brown Declaration, ¶ 7.

For reasons unrelated to TBP, the Rovens became disenchanted with Salazar and fired him in December 2006. At that time, Jeffrey White, representing the Rovens, approached Theodore Brown and asked him to remain on the project through to completion of the Rovens' condominium. Since TBP's contract was with Salazar, Brown told White that he would need Salazar's permission before he would consider accepting his offer. Thereafter, Brown asked

DEFENDANT AND CROSS-CLAIMANT'S OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION

Salazar if he would object if TBP worked directly with the Rovens. He did object, and Brown called White and told him that TBP would not be able to work on the project. As a consequence, TBP was terminated on the project. Brown Declaration, Paragraph 8; White deposition, P. 73, l. 25 – P. 74, l. 25. Thereafter, White told Costa, TBP's partner in charge of the project, if you don't enter into a contract with us, "how can we sue you". Costa Delcaration, ¶ 5. After Salazar's termination on the Rovens project, Salazar continued to make payments to TBP based upon past due amounts that were still owing, until Salazar filed for bankruptcy protection. Brown Declaration, ¶ 8.

In February 2007, the Rovens entered into a written contract with Counter-defendant Orlando Diaz-Azcuy Designs Associates, Inc. ("ODA") to provide interior design services to the Condominium project. Deposition of Gregory Stewart, Exhibit B to Gaspari Declaration, ("Stewart deposition"), P. 28, l. 12 – P. 30, l. 7, Exhibit 1. The contract stated that among ODA's services, ODA would "review and provide comments on current architectural plans." When Brown learned that ODA had been employed to replace Salazar, Brown spoke with Orlando Diaz Azcuy, who assured him that he was going to prepare an original design and not use TBP's plans. Brown Declaration, ¶ 9. It was not until eight months later, that TBP learned that the ODA plans appeared to be copies of the TBP Plans, and it was not until the deposition of Gregory Stewart that TBP learned that ODA traced TBP's floor layout. Brown Declaration, Paragraph 10; Stewart deposition, P. 52, ll. 4 - 8.

TBP registered its plans for copyright protection with the Copyright Office on August 22, 2007. Brown Declaration, ¶ 10. On August 23, 2007, TBP sent a letter to ODA, and on September 4, 2007, TBP sent a letter to Whitehouse Builders, notifying them that they were using

3

the plans that TBP had prepared, thereby infringing upon TBP's copyright.  Brown Declaration, ¶ 10; Stewart deposition, P. 86, l. 20 – P. 88, l. 18; Deposition of Neil Whitehouse, Exhibit A to Gaspari Declaration, ("Whitehouse deposition"), P. 48, l. 22 – P. 49, l. 17.

### III.  APPLICABLE SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when there is no genuine issue of material fact and, when viewing the evidence in the light most favorable to the nonmoving party, the movant is clearly entitled to judgment as a matter of law.  See Fed.R.Civ.P. 56(c); *Cleary v. News Corp.*, 30 F.3d 1255, 1259 (9th Cir. 1994).

In judging evidence at the summary judgment stage, [T]he judge does not weigh conflicting evidence with respect to a disputed material fact…Nor does the judge make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions…These determinations are within  the province of the fact finder at trial.  Therefore, ***at summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party***:  if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, ***the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact***.  *T.W. Electrical Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630-31 (9th Cir. 1987) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348 (1986); *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 & n.19, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) (internal citations omitted, emphasis added).  See also, *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991).

Because "[v]erdicts cannot rest on inadmissible evidence" and a grant of summary judgment is a determination on the merits of the case, the evidence presented by the moving party must be admissible. Fed.R.Civ.P. 56(e); *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365 (D.C. Cir. 2000). Hearsay statements found in affidavits are inadmissible. See, e.g., *Fong v. American Airlines, Inc.*, 626 F.2d 759, 762-63 (9th Cir. 1980). Thus, the moving party's affidavits must be free of hearsay. For the nonmoving party, the evidence standard is lower. "We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material in a form not admissible in evidence may be used to avoid, but not to obtain summary judgment...." *Tetra Techs. Inc. v. Harter*, 823 F.Supp. 1116, 1120 (S.D.N.Y. 1993). The Ninth Circuit has held that "***to survive summary judgment***, a party does ***not*** necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (citing *Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001)) (emphasis added).

## IV.  THE ROVENS DID NOT HAVE A CONTRACT WITH TBP

The fundamental premise behind the Rovens' argument that the Rovens had an implied license to use the TBP Plans after TBP was terminated from the project is that a contractual relationship existed between TBP and the Rovens. Since there is no evidence of any contract between the Rovens and TBP, the Rovens' brief asserts that the contract between Salazar and TBP was, in fact, a contract between Rovens and TBP because Salazar was an agent for a disclosed principal, i.e., the Rovens. Rovens' Brief, p. 12, fn. 3.

In support of their argument, the Rovens' brief cites *Midwest TV v. Scott, Lancaster, Mills*

5

& *Atha*, 205 Cal.App.3d 442 (1988). However, that case does not support the Rovens' argument because the court in that case held that defendant was not the agent for a disclosed principal, stating: "The mere fact a contracting party knew the identity of the other party's principal does not necessarily establish, as a matter of law, that the agent was not a party to the contract." *Id.*, at p. 451.

The only evidence submitted by the Rovens in support of their contention that the contract between Salazar and TBP was really a contract between TBP and themselves is the following: (1) the contract between Salazar and TBP states that TBP is to prepare plans for the Condominium, Exhibit A to the Breall Declaration, (2) a conversation between Lou Rovens and Theodore Brown in which Mr. Brown expressed concern about payment for his services and Mr. Rovens said "that if there became any problem he would pay it," Exhibit B to the Breall Declaration, p. 43, ll. 13 – 18, and (3) the understanding of Jeffrey White, based upon hearsay conversations, that TBP was retained "for the benefit of the Rovens." White Declaration, ¶ 5.

The court of appeal in *Pereira v. County of Santa Clara*, 113 Cal.App.4[th] 549, 571 (2003) described what evidence was required to prove an agency relationship:

> " ' "Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." [Citation.] "The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on his behalf and subject to his control." [Citation.]' (Edwards v. Freeman (1949) 34 Cal.2d 589, 592, 212 P.2d 883, quoting Restatement, Agency, §1.) Thus, the 'formation of an agency relationship is a bilateral matter. Words or conduct by both principal and agent are necessary to create the relationship …' (Hanks v. Carter & Higgins of Cal., Inc. (1967) 250 Cal.App.2d 156, 163, 58 Cal.Rptr. 190.)"

None of the evidence offered by the Rovens in support of their motion is sufficient to establish that Salazar was acting as an agent for a disclosed principal when he entered into the

contract with TBP, thereby transforming what appears on its face to be a sub-consultant agreement into a direct contract between the Rovens and TBP. No declaration was submitted by Lou Rovens regarding anything he said to Salazar, and no evidence of anything that Salazar said or did that would establish that he understood and agreed that he was working as the agent for the Rovens when he contracted with TBP.

On the other hand, there is considerable evidence that there was a contract between Salazar and TBP. First, the Rovens entered into a contract with Salazar to develop ideas for the remodel of the Condominium. This contract is memorialized, according to the Rovens, by "several emails exchanged between the Rovens and Salazar." See White Declaration, ¶ 3. This contract recognized that Salazar was not an architect and that "Professional Architectural Fees are not covered in this proposal and will be provided by an independent, licensed & accredited Architectural firm, to be billed hourly and paid by Salazar Designs, Inc." [Emphasis added.] Exhibit A to White Declaration. The Rovens-Salazar contract did not identify Salazar as the agent of the Rovens or grant Salazar authority to act as the agent of the Rovens.

Second, the contract between Salazar and TBP – the only contract that matters here – Exhibit A to the Brown declaration, identifies the parties to that contract as TBP and Salazar, not the Rovens.

Third, after the Rovens terminated Salazar and TBP from the project, Salazar continued to pay TBP the past due fees that were owing. Brown Declaration, ¶ 8.

Fourth, in December 2006, Jeffrey White talked to Albert Costa of TBP about remaining on the project, and during that conversation acknowledged that there was no direct contract between the Rovens and TBP. Costa Declaration, ¶ 5.

DEFENDANT AND CROSS-CLAIMANT'S OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION

Fifth, when the Rovens decided to terminate Salazar, White "contacted the architects at TBP and inquired whether they would alter the contract to have a direct written contract with the Rovens. Brown refused to enter into such a contract." White Declaration, p. 3, ll. 18 – 20. Obviously, if the Rovens had a direct contractual relationship with TBP, it would not have been necessary for White to ask Brown "to have a direct written contract with the Rovens."

Thus, the Rovens did not have a contract with TBP.

## V. THE ROVENS DID NOT HAVE AN IMPLIED LICENSE TO USE THE BROWN PLANS

The burden of proving the existence of an implied license is on the party claiming its protection, the putative licensee. *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2nd Circ. 1995). Implied licenses are upheld only in narrow circumstances. See S*mithKl. Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, 211 F.3d 21,25 (2nd Circ. 2000).

In the context of architectural plans, five circuits have resolved cases in which the architect sued for copyright infringement and the defendant answered that it had a nonexclusive license to use the plans. *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc., et al.*, 322 F.3d 26, 41 (1st Cir. 2003); *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505 (4th Cir. 2002); *Foad Consulting Group v. Musil Govan Azzalino*, 270 F.3d 821 (9th Cir. 2001); *Johnson v. Jones*, 149 F.3d 494 (6th Cir. 1998); *I.A.E., Inc. v. Shaver*, 74 F.3d 768 (7th Cir. 1996).

While these circuits reached different results, based upon the particularized facts of each case, each Circuit applied a similar analysis. The "touchstone" for finding an implied license, they all agreed, is intent – that is, the intent of the architect. The focus is "on manifestations of the architects'" intent that plans may or may not be used on a project without their involvement". *Danielson*, 322 F.3d at 41.

In *Danielson*, the First Circuit looked at its four predecessor circuits' opinions and distilled their analysis into three factors:  (1) whether the parties were engaged in a short-tem discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts, such as the AIA contract, providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated  that use of the material without the creator's involvement or consent was permissible. *Danielson*, 322 F. 3d at 41, citing *Nelson-Salabes*, 284 F.3d at 516.  Each of these factors turns in TBP's favor.

1.     The Ongoing Relationship

TBP and Salazar were and had been engaged in an ongoing, long term relationship. Theodore Brown and Salazar had worked on several projects together in the past, beginning in the 1980s, and expected to do so again in the future.  Brown Declaration, ¶ 3; Salazar deposition, P. 27, ll. 4 – 9; P. 27, l. 19; P. 30, l. 24.

Even if the Court were to consider that the test is whether the relationship on the specific project was to be "ongoing" or of only a short duration, this too turns in TBPs favor.  The contract for the Four Seasons remodel job was based on an hourly rate for a reason – no one knew how long the project would last.  Brown and Salazar expected that he would be involved through to the end of the project, initially by designing the plans and thereafter by providing architectural services – of the type that no one else involved in the project could perform as Brown was the only retained architect.  Brown Declaration at ¶ 6; Salazar deposition, P. 131, ll. 2 - 10.  The contract provided for these continued services.  Exhibit A to Brown Declaration.  Indeed, even the Rovens expected Brown's involvement to last past that of Salazar.  When they terminated

9

1  Salazar, they went to Brown to ask that he stay on the job.  Brown Declaration at ¶ 8; White

2  deposition, P. 73, l. 25 – P. 74, l. 25.

3        2.    The TBP-Salazar Contract

4        While the TBP-Salazar written contract was silent as to continued use of the plans, that

5  silence was a natural outgrowth of the course of conduct and understanding of the parties.  It was

6  always understood between them that Salazar would have no right to use the plans without

7  Brown's involvement in the project and, given that understanding, there was no need to reduce it

8  to writing.  Brown Declaration at Paragraph 4; Salazar deposition, P. 128, l. 24 – P. 129, l. 21.

9        In *Nelson-Salabes*, the defendant made much of the fact that plaintiff had failed to

10 "contractually prohibit" the use of its drawings.  *Nelson-Salabes*, 284 F.3d at 514.  The court

11 relied on the *Foad*, *Shaver* and *Johnson* decisions to reach its decision that such a contractual

12 prohibition was not necessary to defeat an implied license claim.  The Fourth Circuit found that

13 the plaintiff had an ongoing relationship that contemplated the plaintiff's future involvement in

14 the project, that the plaintiff did negotiate for an AIA agreement (an item not necessary here) and

15 that the plaintiff did not intend for the defendant to use the drawings without its future

16 involvement or consent.  Thereafter the Court was "satisfied that these facts do not support a

17 finding that [the plaintiff] granted [an implied] non-exclusive license.  *Nelson-Salabes*, 284 F.3d

18 at 516-17.

19        3.    The Creator's Conduct

20        TBP's conduct in the creation and delivery of the plans demonstrated that use without his

21 involvement was not permissible.  TBP contracted with Salazar, not the Rovens.  TBP expected to

22 remain on the project for its duration.  TBP delivered the plans to Salazar, with whom and only

with whom it had a contractual relationship. Upon leaving the job and learning that ODA was to come onto the project, Brown called ODA to confirm that ODA would be preparing an original design for the condominium project. Brown Declaration at ¶ 9. The totality of Brown's conduct leads only to the conclusion that he did not intend that the Rovens could use his plans absent his continued involvement in the remodel project.

4.    The Rovens' Burden

In order to establish that they had an implied license to use the Brown Plans after Brown was terminated, the Rovens must prove (1) the Rovens requested the creation of the Brown Plans, (2) Brown created the plans and gave the plans to the Rovens, and (3) Brown intended for the Rovens to copy and distribute its work. (*Nelson-Salabes, Inc. v. Morningside Development, LLC, supra,* 284 F.3d at p. 514.) This is the three-part test created by the Ninth Circuit. *Effects Associates, Inc. v. Cohen,* 908 F.2d 555 (9th Cir. 1990).

As demonstrated above, TBP did not have a contract with the Rovens to provide architectural services to the project; TBP had a contract with Salazar. Consequently, it was Salazar, not the Rovens, who requested the creation of the Brown Plans, and TBP gave the plans to Salazar, not to the Rovens. Most importantly, it was neither Brown's nor Salazar's intent that the Brown Plans should be available for the Rovens' use and distribution in the event that Brown was no longer involved with the project.

The court in *Nelson-Salabes, Inc. v. Morningside Development, LLC, supra,* 284 F.3d at p. 516 determined that an implied license was not given:

> "[L]ike the architect in *Johnson,* NSI and Strutt plainly contemplated NSI's long-term involvement in Satyr Hill, and they engaged in ongoing discussions for more than nine months concerning NSI's development of the Project. And during those discussions, NSI submitted contracts to Strutt that, similar to those in *Johnson,*

contained the standard AIA prohibition against use of the NSI Drawings without NSI's future involvement or its express consent. Indeed, NSI never expressed to Strutt by its representations or conduct that Strutt could use NSI's plans without NSI's future involvement or express consent; in fact, NSI specifically advised Strutt to the contrary on at least two occasions."

An important element to consider here, as the 6th Circuit did in *Johnson v. Jones*, 149 F.3d 494, was that Brown did not deliver his plans to ODA. He delivered them to Salazar, who gave them to the Rovens, who gave them to ODA. Like *Johnson*, Brown was not even aware that his plans were being used until many months later, when he discovered them by happenstance. See *Johnson v. Jones*, 149 F.3d at 501.

Brown and Salazar have both testified that based upon their many years of experience together on a variety of construction projects, it was their mutual understanding: (1) that the architectural plans prepared by Brown are instruments of service and are protected by Brown's copyright, (2) that Salazar, the owner of the project, and the contractors who work on the project have a nonexclusive right to use Brown's plans on the project so long as Brown continues as the architect for the project, (3) that the nonexclusive license does not permit Salazar, the owner, or any of the contractors to use Brown's plans on any other project, (4) that the nonexclusive license terminates if Brown is no longer the architect on the project, and (5) that Brown's involvement in a construction project includes both the design of the plans as well as construction administration services during the course of construction, which would include the interpretation of its plans, resolving conflicts between plans, and the review of submittals from contractors.

Thus, Brown did not grant the Rovens an implied nonexclusive license to use the Brown Plans in the event that TBP was terminated from the project since TBP did not have a contract with the Rovens, only with Salazar. In addition, Brown did not grant Salazar an implied

1   nonexclusive license to use the TBP Plans in the event that TBP was terminated from the project

2   since Brown and Salazar had a contrary understanding.  Consequently, Salazar could not grant the

3   Rovens an implied nonexclusive license to use the Brown Plans in the event that Brown were

4   terminated from the project because Salazar could not grant the Rovens rights that he did not have

5   himself.

6

7         5.  The Rovens' Reliance on *Foad* is Misplaced.

8         The Rovens place great weight on the analysis by the 9th Circuit in *Foad Consulting*

9   *Group, Inc. v. Azzalino, et al.* (9th Cir. 2001) 270 F.3d 821.  In *Foad*, a developer hired Foad to

10  create a "preliminary concept development plan" for a shopping center project.  Foad prepared a

11  preliminary plan showing the location of proposed buildings, parking lots and landscape area.

12  That plan was submitted to the City of Arroyo Grande as part of its permit application process.

13  Under a second contract, Foad created final engineering drawings.   A revised plot plan was

14  submitted to the city and the project was approved.

15

16        The original developer transferred its rights to a successor who hired Azzalino's

17  predecessor, MGA, to perform architectural and engineering services.  MGA obtained the plot

18  plan from the city and copied much of the revised plot plan by tracing from it onto an overlay.

19  Although the developer had wished to substantially revise Foad's plot plan, the city was unwilling

20  to allow major deviation.  Its approval was limited to the plot plan submitted by Foad.

21

22        In its analysis of Foad's claim for copyright infringement, the 9th Circuit found that Foad

23  had granted a nonexclusive implied license to the developer.  The majority based its opinion on

24  application of California law allowing the court to consider, beyond the contract, testimony,

25  course of conduct and custom and practice of the parties.  While, in *Foad*, the course of conduct

26

13

suggested that a license had been given, the facts here point to the exact opposite conclusion:

1.  Unlike *Foad*, where the creator was in direct contract with the infringer, there is no contract here between TBP and the Rovens;

2.  Unlike *Foad*, where the city would not approve deviation from the permitted plan, the TBP Plans were not been submitted to the City; the Rovens were not restricted to the TBP floor plan; and the Rovens had a "blank slate" from which to work;

3.  Unlike *Foad*, where the developer could not go back to square one and start over, the Rovens' project was at "square one" when ODA was brought in.

In his concurring opinion, Judge Kozinski relied on federal authority to reach the same conclusion. But, even under his analysis, the facts are dissimilar. Judge Kozinski relied on the 7th Circuit's decision in *I.A.E., Inc v. Shaver*, 74 F3d 768 (7th Cir. 1996) and the 6th Circuit's decision in *Johnson v. Jones*, 149 F.3d 494 (6th Cir. 1998). Again, the facts in those two cases are dissimilar to our own.

1.  Unlike *Shaver*, in which the creator's contract demonstrated no expectation of further participation in the project, TBP expected to provide architectural services through to the completion of the project. In fact, this is demonstrated by the Rovens' own conduct, in which they did their best to induce TBP to stay on the job after they terminated Salazar[2].

2.  Like *Johnson*, the client had fair notice that the architect intended to retain

---

[2] Apparently, to defeat the fact that TBP had an expectancy to remain with the project, the Rovens offer a state court settlement agreement as evidence that TBP had been paid in full. The use of such a settlement agreement is improper pursuant to Federal Rules of Evidence, Rule 408 and is in direct breach of its confidentiality provision, which was agreed to in writing and signed by both Mr. White and Mr. Breall. Demand has been made that the document and all references to it be withdrawn. Mr. Breall has written counsel for Mr. Brown indicating that while a "lock" has been placed on the ECF filing system, he may use the document if necessary for his purposes. The terms of the agreement are clear that he and Mr. White have breached the agreement.

**DEFENDANT AND CROSS-CLAIMANT'S OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION**

control over his designs and any derivative work.

## VI.  TBP HAS A VALID COPYRIGHT IN THE TBP PLANS

The Rovens acknowledge that, by registration of the TBP Plans with the Copyright Office, it created a rebuttable presumption that TBP has a valid copyright in the TBP Plans.  Rovens Brief, p. 13, ll. 23 – 24.  Nonetheless, the Rovens argue that TBP does not have a valid copyright in the TBP Plans because (1) the TBP Plans were derivative since they were based upon the as-built floor plans of the Condominium, (2) the TBP Plans included the design ideas of Salazar, and (3) the TBP Plans and the ODA Plans were both copied from the original design of the Condominium.

Regarding the Rovens' first argument, other than the opinion offered by the Rovens' expert witness, this claim is not supported by any evidence.  In fact, the deposition testimony of Albert Costa to which the Rovens' brief refers, p. 14, l. 21, states just the opposite.  In his deposition Mr. Costa stated that he found the drawings that he had been given were unreliable and the TBP created its own drawings.  Exhibit C to the Breall Declaration, p. 55, l. 16 – p. 56, l. 5, p. 62, l. 15 – p. 63, l. 10.

Moreover, the Rovens' argument misunderstands the level of originality required in order for architectural plans to obtain copyright protection.  As the court stated in *Shine v. Childs*, 382 F.Supp.2d 602, 610 (S.D.N.Y. 2005):

> "Plaintiff need not clear a high bar in order for his architectural works to qualify as original:  In the copyright context, originality means the work was independently created by its author, and not copied from someone else's work. The level of originality and creativity that must be shown is minimal, only an 'unmistakable dash of originality need be demonstrated, high standards of uniqueness in creativity are dispensed with.'  *Folio Impressions, Inc. v. Byer California*, 937 Fed.2d 759, 764 – 65 (2nd Cir. 1991) (quoting *Weissman v. Freeman*, 868 Fed.2d 1313, 1321 (2nd Cir. 1989))"

1

2      As the court stated in *Arthur Rutenberg Homes, Inc. v. Maloney* (M.D.Fl. 1995) 891

3  F.Supp. 1560, 1566:  "The underlying component parts of a creation are not subject to protection,

4  but a creator's independent selection and arrangement of the component parts into an original

5  design is copyrightable."  In *CSM Investors, Inc. v. Everest Development, Ltd.*, 840 F.Supp. 1304,

6  1310 (D. Minn. 1994), the court considered the following contention which is similar to the

7
   argument advanced by the Rovens:
8

9          "Plaintiffs contend that Everest's plans lack originality because the design
           of the project was dictated by geographic and legal constraints imposed on
10          development of the site.  The court disagrees.  The court notes that the site
           requirements and city ordinances limited certain aspects of the project designed by
11          Everest. The site is not of such a unique nature, however, that architectural plans
           detailing a one-story office showroom must be substantially similar.  Rather, the
12          adaptations to the site in the Everest plans reflect Everest's creativity and thus are
           copyrightable.  See, e.g., *East/West Venture v. Wurmfeld Assoc., P.C.*, 722 F.
13          Supp. 1064, 1068, n. 3 (S.D.N.Y. 1989).  In addition, Everest's plans contain
           original features not demanded by the uniqueness of the site."
14

15      In this case, TBP's expert, Richard Hannum, clearly describes the differences between the

16  original plans for the Condominium and the TBP Plans, pointing out the numerous instances of

17
   originality and creativity.  Those instances include "the fundamental ordering of space," the
18
   "concept of axis and sequencing of space," the "flow of space, using the organizing characteristics
19
   of the octagon to redirect the path of travel at the entry," the addition of "signature columns," the
20

21  "barrel vault ceiling in the living room," and the "circular raised ceiling in the dining room."

22  Hannum Declaration, ¶¶ 6 and 7.

23      Regarding the Rovens' second argument concerning the design ideas contributed by

24
   Salazar, the court in *Aitken, Hazen, Hoffman, Miller, P.C. v. Empire Construction Co.*, 542 F.
25
   Supp. 252, 259 (D. Neb. 1982) addressed this issue in a similar context:
26

16

"It is true that throughout the evolution of the 1820-22 architectural plans, Belmont contributed ideas, directed certain changes be made, and exercised approval power at the completion of each stage of development of the plans. Such involvement by a client in the preparation of architectural plans is normally expected. See *Metzer v. Zoller, supra.* Such involvement does not, however, ordinarily render the client an 'author' of the architectural plans."

While Salzar's design ideas were valuable, Salazar did not become a joint author of the TBP Plans by offering those ideas – and he has never claimed joint authorship.

Regarding the Rovens' third argument that the TBP Plans and the ODA Plans were both drawn from the same original set of plans, the Rovens offer no evidence in support of this assertion.    Costa stated in his deposition that TBP did not use the original plans of the Condominium in preparing the TBP Plans. Exhibit C to the Breall Declaration, p. 55, l. 16 – p. 56, l. 5, p. 62, l. 15 – p. 63, l. 10. In addition, Gregory Stewart admitted in his deposition that he traced the TBP Plans, not the original plans for the Condominium. Stewart deposition, p. 52, ll. 4 - 8.

Thus, the Rovens have failed to rebut the presumption that TBP owns a valid copyright in the TBP Plans.

## VII.  WHITEHOUSE BUILDERS IS LIABLE FOR CONSTRUCTING THE ROVENS CONDOMINIUM USING INFRINGING PLANS

In 1990, the United States Congress enacted the Architectural Works Copyright Protection Act ["AWCPA"] (Pub.L. No. 101-650, §§701 – 706, 104 Stat. 5089, 5133 – 5134.) in order to comply with the obligations of the United States under the Berne Convention which the United States joined in 1988. The Berne Convention required the "protection of 'works of ... architecture' as distinct from 'illustrations, maps, plans, sketches and three-dimensional works relative to ... architecture' " In accordance with the requirements of the Berne Convention, the AWCPA added

17

1  architectural works as a new category of copyrightable works.  (*T-Peg, Inc. v. Vermont Timber*

2  *Works, Inc.* (1st Cir. 2006) 459 Fed.3d 97, 109.)

3       The Rovens' brief acknowledges that TBP registered the TBP Plans as technical drawings

4  under 17 U.S.C. §102(a)(5), as "pictorial, graphic, and sculptural works" and under 17 U.S.C.

5  §102(a)(8), as architectural works.  (p. 16, ll. 26 – 28.)   As a consequence, the TBP Plans are

6

7  protected under both of these provisions.  (*T-Peg, Inc. v. Vermont Timber Works, Inc., supra,* 459

8  Fed.3d at pp. 109 – 110.)

9       1.     The TBP Plans Qualify as an Architectural Work and Are Protected under 17 U.S.C.
                §102(a)(8)
10

11       The Rovens assert that the TBP Plans do not qualify as an architectural work and, therefore,

12  are not entitled to protection under 17 U.S.C. §102(a)(8).  The term "architectural work" is defined

13  in 17 U.S.C. §101 as follows:

14

15       "An 'architectural work' is the design of a building as embodied in any tangible
         medium of expression, including a building, architectural plans, or drawings.  The
16       work includes the overall form as well as the arrangement and composition of
         spaces and elements in the design, but does not include individual standard
17       features."

18       The Rovens base their assertion upon the definition of "building" in Black's Law Dictionary

19  and in Webster's Unabridged Dictionary and on the language found in *Yankee Candle Co. v. New*

20  *England Candle Company, Inc.* (D. Mass. 1998) 14 F.Supp.2d 154, 159 – 160.   The dictionary

21  definitions of "building," quoted by the Rovens, include the following elements: a structure with

22

23  walls and a roof, permanence, construction on land, and use for human occupancy or trade.   The

24  Rovens state that since the TBP Plans concern a condominium, which is a space within a structure,

25  not a free-standing structure itself, the TBP Plans cannot qualify as an architectural work.   The

26  Rovens' conclusion finds support in the language quoted from the *Yankee Candle* case in which the

**DEFENDANT AND CROSS-CLAIMANT'S OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION**

court said that the protection afforded by 17 U.S.C. §102(a)(8) only extends to free-standing structures.

As the Rovens' brief correctly states, there is no definition of the term "building" in the AWCPA. Moreover, there are no cases that have considered the question of whether architectural plans for a residential condominium are included within the definition of an "architectural work" in 17 U.S.C. §101. In determining the meaning of "building" as used in the AWCPA – as opposed to any other usage of the word – the issue is whether Congress intended the word to refer only to the whole of a free-standing structure.

As an initial matter, it is clear that the Congress was not focused on the exterior appearance of free-standing structures when it enacted the AWCPA; Congress was also concerned with protecting interior architecture. The legislative history of the AWCPA includes the following statement of Congressional intent regarding the definition of an "architectural work":

> "The protected work is the design of a building. The term 'design' includes the overall form as well as the arrangement and composition of spaces and elements in the design. The phrase 'arrangement and composition of spaces and elements' recognizes that: (1) creativity in architecture frequently takes the form of a selection, coordination, or arrangement of unprotectable elements into an original, protectable whole; (2) an architect may incorporate new, protectable design elements into otherwise standard, unprotectable building features; and (3) interior architecture may be protected." [Emphasis added.] (H.R.Rep. No. 101-375 (1990), reprinted in 1990 U.S.C.C.A.N. at 6935, 6949.)

Second, the dictionary definitions offered in the Rovens' brief[3] do not dispose of this issue. The Black's Law Dictionary definition quoted by the Rovens refers to a structure, not a free-standing structure, and it does not refer to exterior walls or an exterior roof. The Webster's definition

---

[3] Curiously the Rovens' brief uses the language and dictionary definitions found in *Moser Pilon Nelson Architects, LLP v. HNTB Corp.* (D. Conn. Aug. 8, 2006) WL 2331013 at p. 5, rather than the dictionary definitions found (footnote continued on next page)

19

emphasizes the relative permanency of the construction of enclosed space (note the phrase "enclosed space" not "structure" and certainly not "free-standing structure"), construction on land, and use for human activities, but the definition again does not mention <u>exterior</u> walls or an <u>exterior</u> roof.

There are many definitions of "building," and some dictionary definitions are unrelated, or contrary to, the intent of Congress when the AWCPA was enacted. The definitions of "building" in the *Yankee Candle Co.* case include "a structure or edifice enclosing a space within its walls" (Black's Law Dictionary (6th ed. 1990).) and "anything that is built with walls and a roof" (Webster's New World Dictionary (2nd ed. 1984).) The court in that case correctly noted: "By these definitions, the term 'building' is susceptible to numerous interpretations." (*Yankee Candle Co. v. New England Candle Company, Inc.*, *supra*, 14 F.Supp.2d at p. 159.)

The Oxford English Dictionary (2nd ed.2000) defines "building," in part, as: "<u>That which is built</u>; a structure, edifice: now a structure <u>in the nature of a house</u> built where it is to stand" [Emphasis added.] and uses a ship as one example of a building. (2 Oxford English Dictionary p. 631.) Black's Law Dictionary defines "building" as "an edifice," a "structure", or "a fabric built or constructed." (Black's Law Dictionary (4th ed. 1968), p. 244.) Certainly the word "fabric" does not connote a free-standing structure. Black's Law Dictionary refers to a number of cases with examples of the meaning "building" that are contrary to the definition suggested by the Rovens, e.g., a water tank (*State v. Ornelas* (1937) 42 N.M. 17 [74 P.2d 723, 725], a ship (*People v. Chase* (1931) 117 Cal.App.Supp. 775, 778 [1 P.2d 60], and a tool shed (*People v. Gillespie* (1931) 344 Ill. 290, 294 [176 N.E. 316]).

(footnote continued from previous page)

in the *Yankee Candle* case quoted in the brief.

**DEFENDANT AND CROSS-CLAIMANT'S OPPOSITION TO MOTION**
**FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION**

Third, Congress' failure to define "building" in the AWCPA was not an oversight. The legislative history of the AWCPA includes the following statement of intent:

> "The sole purpose of legislating at this time is to place the United States unequivocally in compliance with its Berne Convention obligations. Protection for bridges and related non-habitable three-dimensional structures is not required by the Berne Convention. Accordingly, the question of copyright protection for these works can be deferred to another day. As a consequence, the phrase 'or other three-dimensional structures' was deleted from the definition of architectural work and from all other places in the bill.
>
> This deletion, though, raises more sharply the question of what is meant by the term 'building.' Obviously, the term encompassed habitable structures such as houses and office buildings. It also covers structures that are used, but not inhabited, by human beings, such as churches, pergolas, gazebos, and garden pavilions." (H.R.Rep. No. 101-375 (1990), reprinted in 1990 U.S.C.C.A.N. at 6935, 6951.)

Thus, the Congress provided guidance regarding what was definitely included within the definition of a building and what was not – even though a pergola would not typically come to mind when thinking of a building and even though a gazebo typically has no walls – but did not foreclose other possibilities. After the passage of the AWCPA, the Copyright Office issued interpretative regulations which followed Congress' intent as set forth in the legislative history of the AWCPA.

> "The term building means *humanly* habitable structures that are intended to be both permanent and stationary, such as houses and office buildings, and other permanent and stationary structures designed for human occupancy, including but not limited to churches, museums, gazebos, and garden pavilions." (37 C.F.R. §202.11(b)(2).)
>
> "The following structures … cannot be registered: … Structures other than buildings, such as bridges, cloverleafs, dams, walkways, tents, recreational vehicles, mobile homes, and boats." (37 C.F.R. §202.11(d)(1).)

In other words, the regulations divide structures into three broad categories: (1) structures that are humanly habitable, permanent, (2) stationary, structures that are permanent and stationary and designed for human occupancy, and (3) structures that are not designed for human habitability or

1  occupancy or are not permanent or are not stationary. (*Moser Pilon Nelson Architects, LLC v. HNTB*

2  *Corp.* (D. Conn. Aug. 8, 2006) WL 2331013 at p. 6)

3      In accordance with the legislative history of the AWCPA and the interpretative regulations of

4  the Copyright Office, the TBP Plans qualify as an architectural work because the Rovens

5  Condominium, as depicted in the TBP Plans, is a structure with walls (although the TBP Plans did

6

7  not design the exterior walls of the Rovens Condominium) that is humanly habitable, permanent, and

8  stationary.

9      In *Yankee Candle Co.*, the plaintiff claimed copyright infringement, in part, because the

10  defendant copied the interior of one of its retail candle shops which was located in a large shopping

11  mall. However, the case does not indicate whether the design elements of the candle shop included

12

13  features that were architectural and not merely decorative. (*Yankee Candle Co. v. New England

14  Candle Company, Inc., supra*, 14 F.Supp.2d at pp. 155 – 156.) The court, though, did take

15  particularly note – in a sentence omitted from the quotation in the Rovens' brief – that: "Yankee did

16  not design or construct the walls and ceiling in its store." *Id.*, at p. 159.

17

18      By contrast, TBP did. The TBP Plans include most of the interior walls in the Rovens

19  Condominium and a re-design of the ceiling. The TBP Plans did not merely depict decorative

20  features but, instead, included architectural features found in the design of any building, including

21  the arrangement and composition of spaces and elements, including walls, access, hallways, and the

22  shape of spaces in order to create the flow and sense of proportion of the place. Declaration of

23  Richard Hannum, p. 3, l. 16 – p. 4, l. 7; Exhibits E-1 to E-9 attached thereto

24

25      The TBP Plans, therefore, qualify as an architectural work and are protected under 17 U.S.C.

26  §102(a)(8).

2.     Whitehouse Builders' Is Liable for Copyright Infringement.

The Rovens' brief argues that Whitehouse Builders is not liable for two reasons:  (1) "construction is not an infringement for a 17 U.S.C. §102(a)(5) work" (p. 18, l. 22) and (2) "Whitehouse Builders did not copy the TBP plans, and in fact had no knowledge of defendant TBP or its relationship to the Rovens' project prior to the litigation." (p. 18, ll. 23 – 25.)

In support of its first argument, the Rovens' brief quotes *Robert R. Jones Associates v. Nino Homes* (6th Cir. 1988) 858 Fed.2d 274, a case that was decided before the adoption of the AWCPA. In that case, the court addressed the question of whether one who infringed on architectural plans that were protected by copyright would be liable for losses suffered by the copyright owner attributable to the subsequent use of the plans to construct a home.  The court, in the sentence quoted in the Rovens' brief, distinguished between one who builds a house without copying the plans for the house and one who copies the plans and builds a house using the infringed plans.  The two sentences that follow the sentence in the Rovens' brief read as follows:

> "As a logical extension of this rule, we hold that, where someone makes infringing copies of another's copyrighted architectural plans, the damages recoverable by the copyright owner include the losses suffered as a result of the infringer's subsequent use of the infringing copies.  Accordingly, the measure of damages in this case is the profits Jones Associates would have made on houses it would have sold but for Nino Homes' unauthorized duplication of the Aspen plans and Nino Homes' use of its infringing copies to build its Riverside houses." (*Id.*, at pp. 280 – 281.)

Thus, the *Robert R. Jones Associates* case directly contradicts the Rovens' first argument.

The Rovens' brief also quotes *National Medical Care, Inc. v. Espiritu* (S.D.W.V. 2003) 284 F.Supp.2d 424; however, the language quoted in the Rovens' brief was dicta since the court held that the defendants did not copy the technical drawings which were at issue.  (*Id.*, at p. 438.)  By contrast, the courts in the *Robert R. Jones Associates* case, in *Innovative Networks, Inc. v. Young* (S.D. N.Y.

**DEFENDANT AND CROSS-CLAIMANT'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION**

1997) 978 F.Supp. 167, 176, and in *Intown Enterprises, Inv. v. Barnes* (N.D. Ga. 1989) 1989) 721

F.Supp. 1263, 1266 – 1267 all held that the damages imposed upon a defendant who was liable for

using infringing plans would include the profits made on buildings constructed using the infringing

plans: "Construction may be appropriately considered in the computation of damages, however,

where the infringing plans were used to build the facility." (*Innovative Networks, Inc. v. Young*,

*supra*, 978 F.Supp. at p. 176.)

The Rovens' brief cites no authority in support of their second argument because there is

none – but there is authority in support of the opposite conclusion.  For example, in *Fitzgerald*

*Publ'n Co. v. Baylor Publ'n Co.* (2nd Cir. 1986) 807 Fed.2d 1110, 1113, the court held:

> "World Color argues that it relied justifiably on the Baylor-Fitzgerald
> contract and, that the terms of that contract authorized the replacement of
> Fitzgerald's copyright notice with Baylor's.  But reliance – justified or otherwise –
> is irrelevant in determining whether World Color infringed Fitzgerald's
> copyrights.  Even an innocent infringer is liable for infringement.  Under [17
> U.S.C.] §501(a) intent or knowledge is not an element of infringement.  *Samet &*
> *Wells, Inc. v. Shalom Toy Co.*, 429 F. Supp. 895, 904 (E.D.N.Y. 1977, *aff'd*, 578
> F.2d 1369 (2d Cir. 1978); see also *Costello Publishing Co. v. Rotelle*, 670F.2d
> 1035, 1044 (D.C.Cir. 1981)"

Moreover, contrary to the claim in the Rovens' brief and contrary to the declaration of Neil

Whitehouse, Whitehouse Builders was aware of TBP's role and that TBP claimed that that

Whitehouse Builders was infringing on its plans.     Theodore Brown wrote a letter to Whitehouse

on September 4, 2007 stating that "you are inadvertently copying, distributing, and using plans of our

design."    Brown informed Whitehouse that he had previously told Orlando Diaz about the

infringement and demanded that Whitehouse stop using the plans that infringed upon the TBP Plans.

(Brown Declaration, p. 3, ll. 14 – 18)

This situation is comparable to the facts before the court in *Arthur Rutenberg Homes, Inc. v.*

1   *Maloney* (M.D.Fl. 1995) 891 F.Supp. 1560, 1568:

2       "A defendant is liable for willful infringement if aware that his conduct
3       constitutes copyright infringement and he nevertheless continues to infringe
        without a good faith belief to the contrary.  See *Cable/Home Communication
4       Corp. v. Network Productions, Inc.*, 902 F.2d 829 (11th Cir. 1990).  Prior to
        construction,  McNABB  unequivocally  notified  MALONEY  that  the
5       BRADSHAW plans infringed ARH's copyrighted designs.  MALONEY's only
        response was directing BRADSHAW to cosmetically change the front elevation
6       of her plans in an admitted effort to minimize the elevations' striking similarity."

7       After receiving Brown's letter, Whitehouse continued to use the TBP Plans in constructing

8   the Rovens Condominium.  (Whitehouse deposition, P. 48, l. 22 – P. 53, l. 7)  Instead of ceasing to

9   use the ODA Plans, which infringed upon the TBP Plans, Whitehouse Builders sought protection by

10  obtaining an indemnity agreement from the Rovens.  (Whitehouse deposition, P. 60, l. 21 – P. 61, l.

11  21)

12      Thus, Whitehouse Builders is liable for damages for copyright infringement.

13                          **VIII.  CONCLUSION**

14      For the foregoing reasons, Defendant and CounterClaimant TBP respectfully requests that the

15  Court deny Plaintiff's Motion for Summary Judgment and/or Summary Adjudication.

16

17  Dated: July 3    , 2008                       TOBIN & TOBIN

18

19

20                                              By
                                                  Paul E. Gaspari
21                                                Attorneys for Defendant and
                                                  Counter Claimant
22                                                THEODORE BROWN & PARTNERS, INC.

23  *H:\PEG\Theodore Brown\OppositionMotionSummaryJudgment&OrAdjudication 070308.doc*

24

25

26

                                    25