TOBIN & TOBIN
PAUL E. GASPARI, ESQ., SBN #76496
GREGORY J. RYKEN, ESQ., SBN #58199
500 Sansome Street, 8th Floor
San Francisco, CA 94111-3211
Telephone:    (415) 433-1400
Facsimile:    (415) 433-3883
Email: pgaspari@tobinlaw.com

Attorneys for Defendant and Counter Claimant,
THEODORE BROWN & PARTNERS, INC.,
a California corporation.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LOUIS ROVENS, ADRIENNE ROVENS, and RAYMOND BREGANTE and JEFFREY M. WHITE as Trustees of the Michael W. Rovens and Elise Shanfeld Irrevocable Trust,<br><br>         Plaintiffs,<br><br>    v.<br><br>THEODORE BROWN & PARTNERS, INC.<br><br>         Defendant. | CASE No. 07-05473-CRB<br><br>**DECLARATION OF PAUL E. GASPARI IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION**<br><br>Judge: Hon. Charles R. Breyer<br>Date:    July 25, 2008<br>Time:   10:00 a.m.<br>Courtroom 8, 19TH Floor |
| THEODORE BROWN & PARTNERS, INC.,<br><br>         Counter Claimant,<br><br>    vs.<br><br>LOUIS ROVENS, ADRIENNE ROVENS, and RAYMOND BREGANTE and JEFFREY M. WHITE as Trustees of the Michael W. Rovens and Elise Shanfeld Irrevocable Trust, ORLANDO DIAZ-AZCUY DESIGNS, INC., WILLIAM G. WALTERS, dba WALTERS ARCHITECTS, and WHITEHOUSE BUILDERS<br><br>         Counter Defendants. | |

- 1 -

1    I, Paul E. Gaspari, declare as follows:

2    1.    I have personal knowledge of the matters set forth herein and if called upon to

3    testify as to them I could and would do so competently.

4    2.    I am a partner of the law firm of Tobin & Tobin, attorneys of record for defendant

5    and counter-claimant Theodore Brown & Partners, Inc. and as such I am personally familiar with

6    all aspects of this firm's representation of its client herein.

7    3.    On May 29, 2008, I attended and participated in the sworn deposition of Neil

8    Whitehouse, before a certified court reporter.  True and correct copies of portions of the transcript

9    of said deposition are attached as Exhibit "A" hereto and incorporated herein by this reference.

10    This transcript accurately reflects the testimony given at this deposition.

11    4.    On June 3, 2008, I attended and participated in the sworn deposition of Gregory

12    Stewart, before a certified court reporter.  True and correct copies of portions of the transcript of

13    said deposition are attached as Exhibit "B" hereto and incorporated herein by this reference.  This

14    transcript accurately reflects the testimony given at this deposition.

15    5.    On May 20, 2008, I attended and participated in the sworn deposition of Roberto

16    Salazar, before a certified court reporter.  True and correct copies of portions of the transcript of

17    said deposition are attached as Exhibit "C" hereto and incorporated herein by this reference.  This

18    transcript accurately reflects the testimony given at this deposition.

19    6.    On May 20, 2008, I attended and participated in the sworn deposition of Jeffrey

20    White, before a certified court reporter.  True and correct copies of portions of the transcript of said

21    deposition are attached as Exhibit "D" hereto and incorporated herein by this reference.  This

22    transcript accurately reflects the testimony given at this deposition.

23

24

25

26

DECLARATION OF PAUL E. GASPARI IN SUPPORT OF
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

1    I declare under penalty of perjury under the laws of the State of California and of the

2    United States that the foregoing is true and correct. Executed this 2nd day of July, 2008 at San

3    Francisco, California.

4

5                                                          Paul E. Gaspari

6

7

8    *H:\PEG\Theodore Brown\DeclarationPEGSupportOppositionMotionSummary Judgment 070208.doc*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**DECLARATION OF PAUL E. GASPARI IN SUPPORT OF**
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT "A"

Neil Whitehouse

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LOUIS ROVENS, ADRIENNE     )

ROVENS, and RAYMOND      )

BREGANTE and JEFFREY M.    )

WHITE as trustees of the    )

Michael W. Rovens and Elise   )

D. Shanfeld Irrevocable    )

Trust,                     )

                      )

        Plaintiffs,     )

                      )

     vs.                )    No. C 07-05473 CRB

                      )

THEODORE BROWN & PARTNERS,   )

INC.,                   )

                      )

        Defendant.     )

DEPOSITION OF NEIL WHITEHOUSE

San Francisco, California

Thursday, May 29, 2008

Reported By:

MARY F. NELSON

CSR No. 3553

Job No. 79857

EXHIBIT A

ec3708ac-c3c1-4fc1-8c42-abba0e8886c2

Neil Whitehouse                                                    May 29, 2008

Page 46

1  with this stricken, and obviously he testified he
2  doesn't have a recollection of what was stricken, let me
3  just say I'm going to conclude this the deposition and
4  reserve my right to recall him to ask those questions.
5  I hope it doesn't come to that.
6        MR. BREALL:  No, that's fine.  We'll make him
7  available.
8  BY MR. GASPARI:
9    Q   So let me turn to the supplement in Item
10 No. 4.  And it says:
11       "All cost savings on the base
12       contract amount of 5,117,071 for time and
13       materials shall be split on a 50/50 cost
14       basis between the contractor and the
15       owners?
16       Am I correct that the ultimate contract price
17 reached between you and the Rovens representing I
18 believe you said the maximum, the guaranteed maximum
19 sum was 5,117,071?
20   A   I think it was slightly higher if I recall but
21 it's somewhere close to that amount.
22   Q   Okay.  And that amount included the 12 percent
23 allocation for overhead and profit?
24   A   Yes.
25   Q   What percentage of the job is complete as of

Esquire Deposition Services   505 Sansome Street, 5th Floor San Francisco, California 9411
Phone (415) 288-4280 (800) 770-3363    Fax (415) 288-4286

Neil Whitehouse                                                    May 29, 2008

Page 48

1    A   Yes.
2    Q   And what would that document be?
3    A   It would be reflected on all the change orders
4  we submitted.  So every time we submit a change order
5  we were requesting a change in the contract.  And if
6  the change order is approved it changes the contract
7  amount by the amount of the change order.
8    Q   Do you, can you tell me the number of the last
9  change order?  You know, change Order No. 1, Change
10 Order No. 20?
11   A   I think it's Change Order No. 57 or something
12 like that.
13   Q   Do you recall receiving a letter from Theodore
14 Brown in September of 2007?
15   A   Yes.
16       MR. GASPARI:  Let's mark as next in order a
17 letter to Theodore Brown to Neil Whitehouse dated
18 September 4, 2007.
19       (Defendant's Exhibit 6 was marked for
20       identification by the court reporter.)
21 BY MR. GASPARI:
22   Q   Is this a letter you received from Theodore
23 Brown on or about September 4th, 2007?
24   A   Yes.
25   Q   Prior to September 4, 2007 were you aware that

Esquire Deposition Services   505 Sansome Street, 5th Floor San Francisco, California 9411
Phone (415) 288-4280 (800) 770-3363    Fax (415) 288-4286

Neil Whitehouse                                                    May 29, 2008

Page 47

1  today?
2    A   It's around 65, 70 percent.
3    Q   As we sit here today do you have an expectancy
4  as to whether the job will come in below the guaranteed
5  maximum sum?
6    A   I think it's going to come in fairly close to
7  where the maximum amount is.  I don't want to, I'm kind
8  of superstitious so I don't want to say it's going to
9  come in in case something unforeseen happens.  But
10 we're hoping that it, bar any major things going on or
11 anything, that it will come in at its budget.
12       I don't believe we're going to have any major,
13 major cost savings, you know, based on the original
14 scope of work that we had.
15   Q   Have there been any change orders to the
16 contract which affected the guaranteed maximum amount?
17   A   Yes.
18   Q   Has the guaranteed maximum amount changed?
19   A   Yes.
20   Q   Has it decreased or increased?
21   A   Increased.
22   Q   Tell me how much it's increased?
23   A   It's around 6 million, right now total.
24   Q   Is there a document that would reflect what
25 the exact current guaranteed maximum is?

Esquire Deposition Services   505 Sansome Street, 5th Floor San Francisco, California 9411
Phone (415) 288-4280 (800) 770-3363    Fax (415) 288-4286

Neil Whitehouse                                                    May 29, 2008

Page 49

1  Theodore Brown was involved in some manner with the
2  Rovens' project?
3    A   He called my office maybe a week prior to this.
4    Q   And tell me about that.  Did he talk to you?
5    A   He didn't speak to me directly.  He spoke to
6  either the receptionist or Candis or one of my project
7  managers.
8    Q   And who informed you of this call?
9    A   Someone from the office.  I don't recall.
10   Q   And what were you told about the call?
11   A   That someone called Theodore Brown and told us
12 that we were using copyrighted plans or something like
13 that.
14   Q   And what did you do upon receipt of that
15 information?
16   A   I believe I called Jeff and just let him know
17 that we received his call.
18   Q   And do you believe, do you know that you
19 called Jeff or do you think you may have called someone
20 else on behalf of the Rovens?
21   A   No, I think I called Jeff.
22   Q   And by Jeff, you mean Jeff White?
23   A   Jeff White.
24   Q   And you told Jeff White that Mr. Brown had
25 called saying you were using copyrighted plans?

Esquire Deposition Services   505 Sansome Street, 5th Floor San Francisco, California 9411
Phone (415) 288-4280 (800) 770-3363    Fax (415) 288-4286

Neil Whitehouse                    May 29, 2008

Page 50

1   A   Yes.
2   Q   What did Mr. White say to you?
3   A   I don't recall exactly because at that time I
4   was a little confused about who Theodore Brown was.
5   This was the first time I had heard his name on the
6   project.
7       So I believe, and I can't remember his words
8   but I think it was like, you know, just don't worry,
9   we'll take care of it or something.  I don't recall
10  exactly the words.  But it wasn't -- I don't recall the
11  words.
12  Q   Okay.  Prior to receiving the letter did you
13  have any other conversations with anyone about the
14  Theodore Brown call?
15  A   No.
16  Q   Did you do any investigation or make any
17  inquiries on your own behalf after that call?
18  A   No.
19  Q   So a week after the phone call you received
20  this letter, Exhibit 6?
21  A   Yes.
22  Q   What did you do upon receipt of the letter?
23  A   I believe I scanned it and then I e-mailed it
24  to Jeff White.
25      MR. GASPARI:  Let's mark as next in order two

Neil Whitehouse                    May 29, 2008

Page 51

1   documents, an e-mail with an attachment from Neil
2   Whitehouse to Jeff White dated September 5, 2007, Bates
3   No. ROV_BNDR02_000597 and 8.
4       (Defendant's Exhibit 7 was marked for
5       identification by the court reporter.)
6   BY MR. GASPARI:
7   Q   Is this the scanned letter and e-mail that you
8   sent to Mr. White?
9   A   Yes.
10  Q   Did you receive a response from Mr. White?
11  A   I believe I, I think I received a phone call
12  but I can't recall if I did.
13  Q   A phone call from Mr. White?
14  A   Yes.
15  Q   And do you recall anything about that phone
16  call?
17  A   I believe my question was can you deal with
18  this, and I think the answer was yes, we'll take care
19  of this.
20      So at that time I was confused, I didn't know
21  who Theodore Brown was and, you know, I just was, my
22  contract was with the Rovens and I, you know.
23  Q   In that phone call did you ask who is Theodore
24  Brown?
25  A   I don't recall whether I asked.  I think I --

Neil Whitehouse                    May 29, 2008

Page 52

1   I'm not sure if I asked specifically or what.  I think,
2   I'm not sure if I asked.  I asked something about
3   Theodore Brown but I don't know the specific words that
4   I used.
5   Q   Well, did you ask if Theodore Brown had a
6   copyright on the plans that were being used on the
7   project?
8   A   No, not that question.
9   Q   Did you ask that question in an indirect
10  manner?
11  A   I was curious to know who he was because I was
12  working from plans from Orlando Dias and I was curious
13  to know a little bit about what was going on.
14  Q   And was that curiosity satisfied?
15  A   I'm not sure if at the time it was.
16  Subsequently I --
17      MR. BREALL:  You can't disclose any
18  conversations is that you've subsequently had with
19  counsel or anything else.
20      THE WITNESS:  Okay.
21      MR. BREALL:  So just limit it to, he's just
22  asking you what happened in that conversation at this
23  point.
24      THE WITNESS:  I don't believe I got a full
25  picture about what Theodore Brown's involvement was on

Neil Whitehouse                    May 29, 2008

Page 53

1   the project.
2   BY MR. GASPARI:
3   Q   Were you given an assurance that whatever
4   problem there was would be the problem of the Rovens
5   and not a problem of yourself?
6   A   I don't believe so.  On that phone call I don't
7   think that was brought up.
8   Q   Counsel is right, I'm not entitled to anything
9   you learned through counsel.
10      At some point from sources other than from
11  counsel did you learn what Theodore Brown's involvement
12  had been?
13  A   No.
14  Q   Let's mark as next in order one, two, three,
15  four, four-page e-mail string of Bates No.
16  ROV_BNDR02_000605 through 608.
17      (Defendant's Exhibit 8 was marked for
18      identification by the court reporter.)
19  BY MR. GASPARI:
20  Q   This is a little confusing e-mail string.
21  What I want to draw your attention to is the e-mail
22  referenced on page 605, the first page that starts with
23  the, about 3 inches down, original message from Jeff
24  White, Date, Thursday 6 September 2006 to Neil
25  Whitehouse.  Do you see that part of the e-mail?

ec3708ac-c3c1-4fc1-8c42-abba0e8886c

Neil Whitehouse                    May 29, 2008

Page 58

1    A  Yes.
2    Q  And do you see the first sentence, "Jeff I did
3  not follow up with him"?
4    A  So that answers that.
5    Q  My next question is going to be that you did
6  not send the letter that Jeff White suggested you send
7  a month earlier?
8    A  Yes.
9    Q  The second sentence you said, "If I'm going to
10  do it I would follow up with my own attorney."
11      Do you see that?
12    A  Yes.
13    Q  What did you mean by that sentence?
14    A  I started to get a sense that I might need to
15  involve my attorney in this process.
16    Q  And who is your attorney?
17    A  Ken Hausman from Howard Rice.
18    Q  Did you involve Hausman?
19    A  Not in this particular, not related to this.
20    Q  Not related to this e-mail or not related to
21  Theodore Brown?
22      MR. BREALL:  Well, I think to the extent he did
23  or did not consult with Hausman invades the
24  attorney-client privilege.  I also am not sure what the
25  relevance is in it.  But I'll instruct him not to answer

Neil Whitehouse                    May 29, 2008

Page 59

1  whether or not he has consulted with any other counsel
2  besides my firm, being and Folger & Levin who is
3  representing him in this action, regarding this action.
4  Which I believe is your question, as opposed to
5  consulting with Mr. Hausman on some other thing.
6  BY MR. GASPARI:
7    Q  Right, I have no interest on consultation
8  other than this action, and I'm not seeking to inquire
9  as to any communications that may have been part of
10  that consultation.  I'm merely trying to establish, you
11  know, if he did, and when.  And I think that goes to
12  what we've, what we both recognize as an issue as to
13  when other attorney-client relationships may have
14  begun.  So I'm limiting -- all I want to know is did
15  he, and when.
16      MR. BREALL:  Okay.  And I would disagree
17  because to the extent that he had an attorney-client
18  relationship with my firm or any other firm and decided
19  to seek, as you do in the medical profession, a second
20  opinion or another opinion or consultation, doesn't
21  necessarily help to determine when his attorney-client
22  privilege with Folger & Levin or my office began.
23      And I think what you've asked him as did he
24  follow up as a result of this letter and he's already
25  testified no.  So at that point I don't have a problem

Neil Whitehouse                    May 29, 2008

Page 60

1  with him answering that.  But to the point of asking him
2  when and if he did consult other attorneys about
3  Theodore Brown post-October 8, 2007, I think it invades
4  the privilege and instruct him not to answer.
5      MR. GASPARI:  Okay.  We can deal with it later.
6  BY MR. GASPARI:
7    Q  Did you ever, ever respond to Theodore Brown?
8    A  Theodore Brown directly?
9    Q  Yes.
10    A  No.
11    Q  To your knowledge did anyone on your behalf
12  respond to Theodore Brown?
13      MR. BREALL:  Objection, vague and ambiguous,
14  calls for speculation.
15      THE WITNESS:  No one on my behalf that I know
16  of responded to Theodore Brown.
17      MR. BREALL:  You're limiting this to prior to
18  his answer to the cross-complaint?
19      MR. GASPARI:  Correct, correct.
20  BY MR. GASPARI:
21    Q  At some point in time did you or someone on
22  your behalf ask the Rovens to indemnify you from any
23  losses you might sustain on a claim from Theodore
24  Brown?
25    A  Yes.

Neil Whitehouse                    May 29, 2008

Page 61

1    Q  Did the Rovens agree to indemnify you?
2    A  They have orally agreed to.
3    Q  That was going to be my next question.  Do you
4  have a written indemnification agreement?
5    A  No.
6    Q  Have you asked them for a written
7  indemnification agreement?
8    A  Yes.
9    Q  How have the Rovens responded to your request
10  for a written indemnification agreement?
11    A  We're negotiating the wording of the agreement.
12    Q  Have you exchanged drafts of this written
13  agreement that is in negotiation?
14    A  Yes.
15    Q  How many drafts of this written agreement do
16  you have?
17    A  I think we're on, I think we're only on draft,
18  we got the original and on draft number, Iteration
19  No. 1.
20    Q  Okay.  When did you get the original?
21    A  I think about two weeks ago.
22    Q  And when did you get Draft No. 2?
23    A  Actually I sent my draft, my --
24      MR. BREALL:  Well, again he's entitled to know,
25  all he's asking is when these things occurred.  Do not

ec3708ac-c3c1-4fc1-8c42-abba0e8886c

# EXHIBIT "B"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


LOUIS ROVENS, ADRIENNE ROVENS,

and RAYMOND BREGANTE and

JEFFREY M. WHITE as Trustees

of the Michael W. Rovens and

Elise Shanfeld Irrevocable

Trust,

                              No. 07-05473-CRB

        Plaintiffs,

  vs.

THEODORE BROWN & PARTNERS,

INC.


        Defendants.

_____


DEPOSITION OF GREG STEWART

San Francisco, California

Tuesday, June 3, 2008

Volume 1, Pages 1 - 94



REPORTED BY:

CECELIA J. HENRY

CSR No.: 11970

JOB No.: 89548


EXHIBIT B

Esquire Deposition Services          505 Sansome Street, 5th Floor          San Francisco, California 9411
Phone (415) 288-4280                      (800) 770-3363                          Fax (415) 288-4286

575c1d4c-ed31-43d8-9fb3-88cc9b79668

Greg Stewart                        June 3, 2008

Page 26

1  Blickman about the job after that initial meeting?
2      A   Yes.
3      Q   On how many occasions?
4      A   I couldn't tell you how many.
5      Q   When did Blickman leave the job?
6      A   He left the job in I would say June or July of
7  2007.
8      Q   And why did he leave the job, to your
9  knowledge?
10     A   He, when our drawings were finally complete in
11 about May of 2007, it went out for bid, competitive bid,
12 and he did not win the bid process.
13     Q   What were you asked to do with those plans
14 that were drawn by Theodore Brown?
15         MR. KELLEHER:  Objection.  Assumes facts not
16 in evidence, and lack of foundation.  Do you want to
17 establish whether he was asked to do anything?
18 BY MR. GASPARI:
19     Q   Were you asked to do anything with the
20 Theodore Brown plans?
21     A   Well, I reviewed them because I had been asked
22 to carry on from where they were.
23     Q   Who asked you to carry on from where they
24 were?
25     A   Not from where they were, but at the time I

---

Greg Stewart                        June 3, 2008

Page 27

1  was brought in, they had already spent a lot of time and
2  money to get to that point.  And I know one thing Lou
3  Rovens did ask was that we try to shorten our design
4  time to continue this job running quickly and get it
5  going forward as fast as we could.
6      Q   Who asked you to pick up where Theodore Brown
7  left off?
8          MR. KELLEHER:  Objection.  Misstates his last
9  answer.
10         MR. GASPARI:  Why don't you read his last
11 answer.
12         (Record Read)
13         (ANSWER)  "Well, I reviewed them because I had
14 been asked to carry on from where they were."
15 BY MR. GASPARI:
16     Q   Who asked you to carry on from where they
17 were?
18     A   I would say from where they were in the scope
19 of construction.
20     Q   Who asked you?
21     A   I would say Dave Rovens.
22     Q   What was Dave Rovens' role in the project to
23 your knowledge?
24     A   He's been an advisor to the Rovens.  He's a
25 retired contractor.  He also had a hand in building

---

Greg Stewart                        June 3, 2008

Page 28

1  their previous home, and so he's been kind of an ongoing
2  presence on the job.
3      Q   Were you authorized to take instructions from
4  Mr. David Rovens?
5      A   Yes.
6      Q   Who authorized you to take instruction from
7  David Rovens?
8      A   He was part of the ownership group.
9      Q   Now, you prepared a contract for your work on
10 the job?
11     A   Yes.
12         MR. GASPARI:  Let's mark as first in order
13 Interior Design Proposal dated February 12, 2007 with
14 production Bates-number ROV_BNDR01_000048 through 58.
15         (Defendant's Exhibit 1 marked.)
16 BY MR. GASPARI:
17     Q   Please take a look at Exhibit 1.  Do you
18 recognize that document?
19     A   Yes.
20     Q   What is it?
21     A   It's or interior design proposal between
22 ourselves, our office, and the Rovens.
23     Q   In fact --
24         MR. BREALL:  Looks like there's more than one
25 of them.

---

Greg Stewart                        June 3, 2008

Page 29

1          MR. GASPARI:  I think there's more than one of
2  them because of the dual signatures.  This way I kind of
3  pulled it off.  I think this must have been your
4  production, Joseph, I'll blame you for it.
5          Looking at, let's start with pages 48 through
6  you 51, down in the lower right hand corner there's
7  somebody's initials above would 25/07.  Do you see that?
8          THE WITNESS:  Yes.
9  BY MR. GASPARI:
10     Q   Do you know whose initials those are?
11     A   I would say they are Jeff White's.
12     Q   And do you recognize Mr. White's signature on
13 page 52?
14     A   No, I haven't seen him sign his name.
15     Q   That's fine.  Go to page 27.  Is that your
16 signature?
17     A   Yes.
18     Q   Now in that lower right hand corner on every
19 page is what appears to be the date 2/5/07.  Do you see
20 that?
21     A   Yes.
22     Q   Is that the date that this contract was
23 signed?
24         MR. KELLEHER:  If you know, Mr. Stewart.
25         THE WITNESS:  By Jeff White.

575c1d4c-ed31-43d8-9fb3-88cc9b79668

Greg Stewart                                        June 3, 2008

Page 30

    BY MR. GASPARI:
1
2    Q  Do you know when you signed it?
3    A  It would have been a day or two prior or
4  after.
5    Q  On the first page, page 48, the first entry
6  date February 12, 2007.  Do you see that?
7    A  Yes.
8    Q  With that date in mind, can you tell me when
9  you prepared this contract?
10   A  No.
11   Q  At the time you prepared this contract, were
12  you already in possession of the Theodore Brown plans?
13   A  Yes.
14   Q  Now, let me take you down to the middle of
15  page 48 where you proposed to provide the following
16  design services.  Do you see that?
17   A  Yes.
18   Q  And then under A, Interior Design.  It says:
19      "Interior Design services shall include the
20  following: A, review and provide comments on current
21  architectural plans."
22      Do you see that?
23   A  Yes.
24   Q  By current architectural plans, did you mean
25  the Theodore Brown plans?

Greg Stewart                                        June 3, 2008

Page 31

1    A  Yes.
2    Q  What did you mean by review and provide
3  comments?
4    A  There were things that I wanted to do
5  different from the Theodore Brown plans.
6    Q  So do I take it from that, that as of your
7  preparation of this contract you had studied the Brown
8  plans and made certain decisions as to what you wanted
9  to do differently?
10   A  Yes.
11   Q  What did you want to do differently?
12   A  I wanted to get rid if fan coil units, that's
13  the heating and air conditioning units that came with
14  the building.  They were kept by Theodore Brown.  Paul
15  Blickman and I decided we could relocate them, and we
16  did.
17      I wanted to change -- there are a lot of
18  things I wanted to change.  Kitchen, family room,
19  hallway, bathrooms.  There were a lot.  Even more than
20  that.  Ceilings.  A lot of it was very sketchy as I
21  said.
22   Q  What did you want to change in the kitchen?
23   A  The initial plans on the Theodore Brown plans
24  I thought it was awful, so I wanted to change that.
25   Q  What?  What was it in the kitchen that you

Greg Stewart                                        June 3, 2008

Page 32

1  wanted to change?
2    A  Counter locations and arrangement of
3  appliances.  The whole family room and kitchen I didn't
4  think that worked that well, nor would I have thought
5  that they would have made an attractive room.  There
6  were a lot of doorways throughout the apartment that I
7  thought were not properly centered on walls.
8      That was pretty much all I could get out of
9  the plan since there was not a whole lot there to get
10  from.
11   Q  Let's go back to page 48 and look at B.
12      "Revise plans and elevations for all rooms
13  including architectural detail."
14      Do you see that?
15   A  Um-hmm.
16   Q  By the reference to plans and elevations for
17  all rooms, were you referring to the plans and
18  elevations drawn by Theodore Brown?
19   A  Yes.
20   Q  And including architectural detailing, were
21  you referring to the architectural detailing drawn by
22  Theodore Brown?
23   A  There was not a lot of detailing but, yes.
24      MR. KELLEHER: When we get a chance we've been
25  going about an hour.

Greg Stewart                                        June 3, 2008

Page 33

1      MR. GASPARI: Okay.
2      (Recess taken from 9:28 a.m.
3      until 9:40 a.m.)
4    BY MR. GASPARI:
5    Q  Mr. Stewart, at the time that you prepared
6  this contract, you had an understanding, did you not,
7  that you were taking over from Roberto Salazar?
8    A  Yes.
9    Q  Did you review the contract that the Rovens
10  had with Roberto Salazar?
11   A  No.
12   Q  Were you aware of any of the terms of the
13  contract between the Rovens and Roberto Salazar?
14   A  No.
15   Q  Were you told that Salazar had engaged the
16  services of an architect?
17   A  Yes.
18   Q  Did you undertake, as part of your work, to
19  retain the services of an architect?
20   A  No.
21   Q  Why not?
22   A  It's not how we do our business.
23   Q  It wasn't because of the work of the architect
24  had already been done?
25   A  No.  In remodel work, architects are not

575c1d4c-ed31-43d8-9fb3-88cc9b79668

Greg Stewart                                    June 3, 2008

                                                  Page 50

1      Q    You've drawn in, I take it a circular dining
2  room, circular dining room table or?
3      A    Yes.
4      Q    What is the significance, if anything, of the
5  dotted line that encircles what I believe to be the
6  chairs for the dining room table?
7      A    The dotted line, though there are two
8  different readings of the dotted line, that one happens
9  to mean something happening on the ceiling above.
10     Q    I thought so.  What's happening on the ceiling
11 above?
12     A    Our design intent was to have a circular
13 raised ceiling over the dining room table.
14     Q    Going to the center of the document foyer,
15 appears to be two concentric circles, the foyer?
16     A    What are?
17     Q    The foyer.
18     A    The center I think I would say is a plant.  On
19 the second line would be the table.  And the third
20 outside line dotted is the circular dome or circular
21 ceiling element above, which I was trying to reference
22 at the beginning something you would see later on in the
23 plan, or later on in the apartment, the circular element
24 in the dining room.
25     Q    If I understood your testimony correctly, and

Greg Stewart                                    June 3, 2008

                                                  Page 51

1  I don't mean to misinterpret your testimony, you added
2  the -- this is where the four of the six prepurchased
3  columns were put back?
4      A    Yes.
5      Q    In this plan?
6      A    Yes.
7      Q    Can you tell me where the other two were
8  placed?
9      A    They were opposite the front door in the foyer
10 between that and the vestibule beyond.
11     Q    How many hours did it take you to draw this
12 floor plan?
13     A    I don't recall.
14     Q    Do you have any records that would reflect how
15 long it took you to draw this floor plan?
16     A    No.
17     Q    Anyone assist you in drawing this floor plan?
18     A    No.
19     Q    Did this floor plan, as a pencil drawing, have
20 any prior drafts?
21     A    Yes.
22     Q    How many prior drafts?
23     A    The way I work would be it's several little
24 sketches that I would do for myself.  They would be on a
25 thin piece of trace paper.  Those I don't keep.  Those

Greg Stewart                                    June 3, 2008

                                                  Page 52

1  have all been thrown away.  But I would normally workout
2  all those small things out, work those out before you
3  would put them in a plan.
4      Q    Did you trace Theodore Brown's floor plan?
5      A    I used his plan as a base because I did not
6  have the Gary Handel's floor plan.
7      Q    Did you trace it?
8      A    Yes.
9          MR. GASPARI:  I'm going to mark as next in
10 order a document entitled Floor Plan With Furniture
11 Layout.  It is a document production date of
12 PLANS01_ROV_000006.
13         (Defendant's Exhibit 7 marked.)
14 BY MR. GASPARI:
15     Q    Do you recognize this document?
16     A    Yes.
17     Q    What is it?
18     A    It is the Robert Salazar design for the
19 apartment.
20     Q    This is the furniture floor plan preliminary
21 drawing by Theodore Brown?
22     A    Yes.
23     Q    This is one of the sheets that you had in your
24 possession?
25     A    Yes.

Greg Stewart                                    June 3, 2008

                                                  Page 53

1      Q    In January 2007?
2      A    Yes.
3      Q    How many hours did your office spend preparing
4  the permit set of drawings?
5      A    Records could tell you but I can't.
6      Q    Do your billings itemize how many hours were
7  spent preparing the permit set of plans?
8      A    No.
9      Q    What records in your office reflect how many
10 hours?
11     A    There would be no records.  There would only
12 be the monthly billing.
13     Q    I thought you told me that when I questioned
14 you how long, I thought you said you don't know, but you
15 have records?
16     A    No.  The only records would be the monthly
17 billing.
18     Q    If you don't maintain records of hours spent
19 on a job, how are your monthly billings prepared?
20     A    Well, they're time sheets.  We all have a time
21 sheet.  But I had said we don't put a task on the time
22 sheet, only the hours we have put on that job per day.
23 Not broken out by task.
24     Q    Okay.  So if you wrote down eight hours
25 Rovens, that can mean eight hours drawing, eight hours

575c1d4c-ed31-43d8-9fb3-88cc9b79668

Greg Stewart                                June 3, 2008

Page 86

1  your client to get an approval.  There would be -- once
2  an approval is reached, then there would be drawings I
3  would create for the specific pieces I have in mind, and
4  the client review and approval or comment.  At that
5  point if there was an approval, it would go out to
6  probably get priced.
7     Q  Is it your intent to design a piece of
8  furniture to fit the overall look and feel of your
9  design for the space?
10       Perhaps I will ask it a different way.
11       Do you design your furniture pieces in the
12  abstract, or do you try to, is it your purpose when
13  doing a space design as well as a furniture design to
14  have the two match?
15    A  There would always be a correlation between
16  the space and the furniture.
17    Q  That's one of the reasons why you're hired; is
18  that correct?
19    A  Yes.
20    Q  At some point did you receive a letter from
21  Theodore Brown in which he advised you that he felt you
22  had infringed upon his interest in his plans?
23    A  A letter was received.
24    Q  When was that letter received?
25    A  Mid to late August '07, I believe.

Greg Stewart                                June 3, 2008

Page 87

1     Q  And what did you do when you received that
2  letter?
3     A  I talked about it with Orlando, and I think we
4  called our attorney.
5     Q  What discussions did you have with Orlando
6  prior to calling your attorney?
7     A  I really don't recall the discussion.  I don't
8  know.
9     Q  Did you respond to Mr. Brown?
10    A  I did not.
11    Q  Did Orlando respond to Mr. Brown?
12    A  I think there was a phone call.
13    Q  A phone call between Orlando and Mr. Brown?
14    A  Yes.
15    Q  How did you come to learn of that phone call?
16    A  From Orlando.
17    Q  What did Orlando tell you about that phone
18  call?
19    A  I really don't remember.
20    Q  Did Orlando tell you that he assured Theodore
21  Brown that he had not copied his plans?
22    A  I don't know.
23    Q  Did Orlando tell you that he told Theodore
24  Brown that he had, or your office had brought original
25  work to the project?

Greg Stewart                                June 3, 2008

Page 88

1     A  I don't know.
2     Q  Do you know how many phone calls Orlando had
3  with Theodore Brown?
4     A  I don't know that for a fact.
5     Q  Did you ever talk to Theodore Brown?
6     A  Never.
7     Q  Did you ever talk to Albert Costa?
8     A  Never.
9     Q  Did you ever talk to anyone at Theodore
10  Brown's office?
11    A  Are there more than two?  No.
12    Q  Is your office being indemnified by the Rovens
13  for any claims brought by Theodore Brown in this
14  lawsuit?
15    A  Yes.
16    Q  When did the Rovens agree to indemnify your
17  office?
18    A  Certainly after that letter.
19    Q  Before the lawsuit?
20       MR. KELLEHER:  If you know.
21       THE WITNESS:  I don't know.
22  BY MR. GASPARI:
23    Q  Is that indemnity reduced to writing?
24    A  I believe so.
25    Q  When was that?  Have you seen that document?

Greg Stewart                                June 3, 2008

Page 89

1     A  I don't know if I saw the final.  I don't
2  think so.
3     Q  When was that document prepared?
4     A  I don't know.
5     Q  When was it signed?
6     A  I don't know.
7     Q  What's it look like?
8     A  I don't know.
9     Q  Does it contain any provisions other than an
10  indemnity between the Rovens and your office?
11    A  I don't know that.
12       MR. BREALL:  Were we going to take break
13  before?
14       MR. GASPARI:  Sure.
15       (Recess taken from 11:45 a.m.
16        until 11:59 a.m.)
17  BY MR. GASPARI:
18    Q  Back to the letter from Theodore Brown of last
19  August.  Did you have any discussions directly with Lou
20  or Adrienne Rovens about the Brown letter?
21    A  I don't recall.
22    Q  Do you know if Orlando did?
23    A  I don't know that.
24    Q  Did you have any direct discussions with David
25  Rovens?

575c1d4c-ed31-43d8-9fb3-88cc9b79668



Aπ EXHIBIT  /
Deponent G. Stewart
Date 6/3/08  Rptr QR
WWW.DEPOBOOK.COM

## Interior Design Proposal

**Date:**               February 1, 2007

**Project:**            Rovens Residence
                        765 Market Street, Unit 32-A
                        San Francisco, CA

**Billing Address:**    The Michael W. Rovens and Elise D. Shanfeld Irrevocable Trust
                        P O Box 590042
                        San Francisco, CA 94159

**Interior Designer:**  Orlando Diaz-Azcuy Design Associates
                        (ODADA)
                        201 Post St., 9th Floor
                        San Francisco, CA  94108
                        415-362-4500  T
                        415-788-2311  F
                        e-mail:  greg@odada.net

Orlando Diaz-Azcuy Design Associates, Inc. proposes to provide the following Design Services:

A.    Interior Design:

Interior Design services shall include the following;

a.   review and provide comments on current architectural plans;
b.   revise plans and elevations for all rooms, including architectural detailing;
c.   prepare drawings illustrating all cabinetry styles and millwork (final shop drawings to be prepared by millwork subcontractor);
d.   develop with Owner desired function, configuration, and design of specialty rooms such as bathrooms, dressing rooms, kitchen, etc. Select all fixtures, appliances, and equipment;
e.   provide the character of the lighting plan and recommend the style or type of all decorative light fixtures. (A lighting consultant should be retained through Owner to design the lighting system and to prepare all related calculations and specifications);
f.   review and comment on plans from necessary consultants to note coordination with or effect design intent;
g.   review and select with contractor all interior subcontractors;
h.   visit site during construction once a week or more frequent if requested by Owner;
i.   construction permit will be procured and signed by an Permit Expiditer/Architect, at an additional fee.  Any structural change has to be reviewed and signed by a Structual Engineer.

2/5/07

ROV_BNDR01_000048

B.    Interior Decoration:

Interior Decoration services shall include the following;

a.   prepare furniture plan for all rooms;
b.   select furniture and fabric options;
c.   select all area rugs and floor covering options;
d.   select window treatment options;
e.   select door and cabinet hardware styles for the residence (all hardware schedules and specifications to be prepared by other unless otherwise requested);
f.   present all interior design information as material samples, photographs, drawn plans, elevations and sections to communicate design intent. (Scale models, formal color renderings, 3D computer models etc. if necessary will be done upon request of Owner and as a reimbursable expense);
g.   review the location and treatment of any visible security and technical equipment, thermostats, air vents, switches, devices, etc. to assure adherence to design intent.

C.    Procurement of Furniture:

a.   all furniture, fabrics, etc. will be procured for the client at the hourly rates described below. The cost for all items will be the net price for each plus 20% mark-up. Appropriate freight charges, storage fees and sales tax, when applicable, will also be added. Any errors, omissions, or defects of goods are the responsibility of the manufacturer, supplier, or freight/delivery Company. In the event of a dispute, ODADA will act as a liaison between the client and the supplier or freight/delivery company to attempt a satisfactory resolution with ODADA , time free of charge;
b.   a proposal will be prepared for the client which will detail the item being purchased, the total price of the item, estimated freight charges, and applicable tax. The full amount due must be returned with the signed proposal to ODADA before any orders are placed;
c.   standard hourly fees will be charged for review and procurement of any antique purchase;
d.   cancellation of an invoice will be subject to all conditions imposed by the manufacturer or vendor, including the possibility of a restocking fee or a 'no cancellation' policy;
e.   For expedience, some clients opt to open a trust account (funded periodically) from which proposal amounts are drawn upon receipt of the signed and authorized proposal from Owner. Client has the right to review this account at any time.

2/5/07

D.    Art and Accessories:

    a.   discuss Owner's desires and ideas for character and subject matter of art and accessories for the project;

    b.   prepare a preliminary plan for all art and accessories, indicating approximate size, location and medium;

    c.   assist Owner in procurement and installation of art and accessories;

    d.   accessories will be purchased at standard markup per furniture, art work will be purchased by Owner from the art gallery directly.

E.    Expenses:

Owner shall reimburse ODADA for any expenses that ODADA incurs on behalf of the project as follows.

    a.   Telephone calls, faxes, delivery charges, copies, overnight delivery, postage, manufacturer's sample costs, mileage, and the like will be billed at 1.15 times ODADA's actual costs;

    b.   All air travel of more than two hours, as approved in writing by Owner, shall be business class. Owner shall pay the cost of such tickets to ODADA at the time of ticketing;

    c.   Hotel accommodations shall be single, non-smoking rooms in first class hotels;

    d.   Meals for out of town travel will be charged at the following maximums: breakfast, $25.00, lunch, $30.00, dinner, $45.00. Owner shall not pay for the cost of any alcoholic beverages. All meals provided by others during any trip will not be charged to Owner;

    e.   Should Owner request Greg Stewart to accompany Owner to procure any antiques or materials outside San Francisco, the daily fee for such request will be Fifteen Hundred Dollars, plus reimbursable expenses. Time for other requested staff to accompany owner shall be billed at standard hourly rates;

    f.   Owner shall contract with and pay directly the expenses of all approved consultants hired or recommended by ODADA.

7/5/07

ROV_BNDR01_000050

F.    Hourly Rates and Fee Structure:

All services will be billed on a monthly basis at the hourly rates described below.  Once a specific scope of work has been determined, an estimate will be established (and monitored on a monthly basis) for the duration of the project and the scope modified if necessary to meet the project needs and Owner's goals.  (There is no charge for clerical work).

| | |
|---|---|
| Greg Stewart - Principal | $200.00 HR |
| Design Staff | $80 - $150 HR |

An hourly rate for Orlando Diaz-Azcuy, should his time be requested, will be billed out at $350.00 per hour:

A retainer of $25,000 will be requested at the beginning of the project and shall be applied to the final design invoice.

G.    Invoices:

ODADA will provide monthly invoices showing number of hours by each employee, their rate, and fee total.  A description of tasks performed by each employee during time billed to the project is available upon request.  A description of all reimbursable expenses is also included. Invoices are due upon receipt.  Invoices not paid within a thirty-day period will accrue interest at a rate of eighteen percent per annum on each unpaid invoice.

H.    Notice Regarding Changes to Drawings:

All Owner desired changes to the design or construction scope during the project must be submitted and approved to necessary parties by ODADA.  ODADA will make every attempt to expedite requested modification.

2/5/07

ROV_BNDR01_000051

I.    Termination:

Either party upon five days written notice may terminate this agreement. In the event of termination not the fault of ODADA, ODADA shall be compensated for all services performed to the termination date, and a maximum of five additional days at standard hourly rates for ODADA project team members to close out the project and distribute necessary information.

J.    Arbitration:

All claims, disputes, and other matters in question between the parties to this Agreement arising out of or relating to this Agreement or the breach thereof shall be decided by binding arbitration before a single neutral arbitrator in accordance with the Construction Industry Arbitration Rules of the California Arbitration Association then obtaining unless the parties mutually agree otherwise. This agreement shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrator shall be final and judgment may be entered upon it in accordance with applicable law.

K.    Approval of Presentations:

Within five business days after presentation, Owner will inform ODADA in writing of its disapproval of any ideas, plans, concepts, or the like contained in any presentation to Owner. If Owner does not communicate its disapproval to ODADA in writing within the five-day period, such ideas, plans, concepts and the like shall be deemed approved.

L.    Photographs of Project:

ODADA may photograph the project for promotional use. Any publication of the project will be done with prior knowledge by the Owner. Owner's identity and the address of the project may be included in publications at Owner's discretion.

Jeffrey White
Trustee

Greg Stewart
Principal, ODA Design Associates

Raymond S. Bregante
Trustee

2/5/07

ROV_BNDR01_000052

**Interior Design Proposal**

| | |
|---|---|
| **Date:** | February 1, 2007 |
| **Project:** | Rovens Residence<br>765 Market Street, Unit 32-A<br>San Francisco, CA |
| **Billing Address:** | The Michael W. Rovens and Elise D. Shanfeld Irrevocable Trust<br>P O Box 590042<br>San Francisco, CA 94159 |
| **Interior Designer:** | Orlando Diaz-Azcuy Design Associates<br>(ODADA)<br>201 Post St., 9th Floor<br>San Francisco, CA  94108<br>415-362-4500  T<br>415-788-2311  F<br>e-mail:  greg@odada.net |

Orlando Diaz-Azcuy Design Associates, Inc. proposes to provide the following Design Services:

A.   Interior Design:

Interior Design services shall include the following;
a.   review and provide comments on current architectural plans;
b.   revise plans and elevations for all rooms, including architectural detailing;
c.   prepare drawings illustrating all cabinetry styles and millwork (final shop drawings to be prepared by millwork subcontractor);
d.   develop with Owner desired function, configuration, and design of specialty rooms such as bathrooms, dressing rooms, kitchen, etc. Select all fixtures, appliances, and equipment;
e.   provide the character of the lighting plan and recommend the style or type of all decorative light fixtures. (A lighting consultant should be retained through Owner to design the lighting system and to prepare all related calculations and specifications);
f.   review and comment on plans from necessary consultants to note coordination with or effect design intent;
g.   review and select with contractor all interior subcontractors;
h.   visit site during construction once a week or more frequent if requested by Owner;
i.   construction permit will be procured and signed by an Permit Expiditer/Architect, at an additional fee.  Any structural change has to be reviewed and signed by a Structual Engineer.

2/5/07

ROV_BNDR01_000053

B.    Interior Decoration:

Interior Decoration services shall include the following;

a.   prepare furniture plan for all rooms;
b.   select furniture and fabric options;
c.   select all area rugs and floor covering options;
d.   select window treatment options;
e.   select door and cabinet hardware styles for the residence (all hardware schedules and specifications to be prepared by other unless otherwise requested);
f.   present all interior design information as material samples, photographs, drawn plans, elevations and sections to communicate design intent. (Scale models, formal color renderings, 3D computer models etc. if necessary will be done upon request of Owner and as a reimbursable expense);
g.   review the location and treatment of any visible security and technical equipment, thermostats, air vents, switches, devices, etc. to assure adherence to design intent.

C.    Procurement of Furniture:

a.   all furniture, fabrics, etc. will be procured for the client at the hourly rates described below. The cost for all items will be the net price for each plus 20% mark-up. Appropriate freight charges, storage fees and sales tax, when applicable, will also be added. Any errors, omissions, or defects of goods are the responsibility of the manufacturer, supplier, or freight/delivery Company. In the event of a dispute, ODADA will act as a liaison between the client and the supplier or freight/delivery company to attempt a satisfactory resolution with ODADA , time free of charge;
b.   a proposal will be prepared for the client which will detail the item being purchased, the total price of the item, estimated freight charges, and applicable tax. The full amount due must be returned with the signed proposal to ODADA before any orders are placed;
c.   standard hourly fees will be charged for review and procurement of any antique purchase;
d.   cancellation of an invoice will be subject to all conditions imposed by the manufacturer or vendor, including the possibility of a restocking fee or a 'no cancellation' policy;
e.   For expedience, some clients opt to open a trust account (funded periodically) from which proposal amounts are drawn upon receipt of the signed and authorized proposal from Owner. Client has the right to review this account at any time.

2/5/07

D.    Art and Accessories:

    a.    discuss Owner's desires and ideas for character and subject matter of art and accessories for the project;
    b.    prepare a preliminary plan for all art and accessories, indicating approximate size, location and medium;
    c.    assist Owner in procurement and installation of art and accessories:
    d.    accessories will be purchased at standard markup per furniture, art work will be purchased by Owner from the art gallery directly.

E.    Expenses:

Owner shall reimburse ODADA for any expenses that ODADA incurs on behalf of the project as follows.

    a.    Telephone calls, faxes, delivery charges, copies, overnight delivery, postage, manufacturer's sample costs, mileage, and the like will be billed at 1.15 times ODADA's actual costs;
    b.    All air travel of more than two hours, as approved in writing by Owner, shall be business class. Owner shall pay the cost of such tickets to ODADA at the time of ticketing;
    c.    Hotel accommodations shall be single, non-smoking rooms in first class hotels;
    d.    Meals for out of town travel will be charged at the following maximums: breakfast, $25.00, lunch, $30.00, dinner, $45.00. Owner shall not pay for the cost of any alcoholic beverages. All meals provided by others during any trip will not be charged to Owner;
    e.    Should Owner request Greg Stewart to accompany Owner to procure any antiques or materials outside San Francisco, the daily fee for such request will be Fifteen Hundred Dollars, plus reimbursable expenses. Time for other requested staff to accompany owner shall be billed at standard hourly rates;
    f.    Owner shall contract with and pay directly the expenses of all approved consultants hired or recommended by ODADA.

2/5/07

ROV_BNDR01_000055

F.    Hourly Rates and Fee Structure:

All services will be billed on a monthly basis at the hourly rates described below.  Once a specific scope of work has been determined, an estimate will be established (and monitored on a monthly basis) for the duration of the project and the scope modified if necessary to meet the project needs and Owner's goals.  (There is no charge for clerical work).

| | |
|---|---|
| Greg Stewart - Principal | $200.00 HR |
| Design Staff | $80 - $150 HR |

An hourly rate for Orlando Diaz-Azcuy, should his time be requested, will be billed out at $350.00 per hour:

A retainer of $25,000 will be requested at the beginning of the project and shall be applied to the final design invoice.

G.    Invoices:

ODADA will provide monthly invoices showing number of hours by each employee, their rate, and fee total.  A description of tasks performed by each employee during time billed to the project is available upon request.  A description of all reimbursable expenses is also included.  Invoices are due upon receipt.  Invoices not paid within a thirty-day period will accrue interest at a rate of eighteen percent per annum on each unpaid invoice.

H.    Notice Regarding Changes to Drawings:

All Owner desired changes to the design or construction scope during the project must be submitted and approved to necessary parties by ODADA.  ODADA will make every attempt to expedite requested modification.

2/5/07

ROV_BNDR01_000056

I.    Termination:

Either party upon five days written notice may terminate this agreement. In the event of termination not the fault of ODADA, ODADA shall be compensated for all services performed to the termination date, and a maximum of five additional days at standard hourly rates for ODADA project team members to close out the project and distribute necessary information.

J.    Arbitration:

All claims, disputes, and other matters in question between the parties to this Agreement arising out of or relating to this Agreement or the breach thereof shall be decided by binding arbitration before a single neutral arbitrator in accordance with the Construction Industry Arbitration Rules of the California Arbitration Association then obtaining unless the parties mutually agree otherwise. This agreement shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrator shall be final and judgment may be entered upon it in accordance with applicable law.

K.    Approval of Presentations:

Within five business days after presentation, Owner will inform ODADA in writing of its disapproval of any ideas, plans, concepts, or the like contained in any presentation to Owner. If Owner does not communicate its disapproval to ODADA in writing within the five-day period, such ideas, plans, concepts and the like shall be deemed approved.

L.    Photographs of Project:

ODADA may photograph the project for promotional use. Any publication of the project will be done with prior knowledge by the Owner. Owner's identity and the address of the project may be included in publications at Owner's discretion.


Jeffrey White
Trustee


Greg Stewart
Principal, ODA Design Associates


Raymond S. Bregante
Trustee


2/5/07

I.    Termination:

Either party upon five days written notice may terminate this agreement. In the event of termination not the fault of ODADA, ODADA shall be compensated for all services performed to the termination date, and a maximum of five additional days at standard hourly rates for ODADA project team members to close out the project and distribute necessary information.

J.    Arbitration:

All claims, disputes, and other matters in question between the parties to this Agreement arising out of or relating to this Agreement or the breach thereof shall be decided by binding arbitration before a single neutral arbitrator in accordance with the Construction Industry Arbitration Rules of the California Arbitration Association then obtaining unless the parties mutually agree otherwise. This agreement shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrator shall be final and judgment may be entered upon it in accordance with applicable law.

K.    Approval of Presentations:

Within five business days after presentation, Owner will inform ODADA in writing of its disapproval of any ideas, plans, concepts, or the like contained in any presentation to Owner. If Owner does not communicate its disapproval to ODADA in writing within the five-day period, such ideas, plans, concepts and the like shall be deemed approved.

L.    Photographs of Project:

ODADA may photograph the project for promotional use. Any publication of the project will be done with prior knowledge by the Owner. Owner's identity and the address of the project may be included in publications at Owner's discretion.



Jeffrey  White
Trustee


Raymond S. Bregante
Trustee


Greg Stewart
Principal, ODA Design Associates

# EXHIBIT "C"

ROBERTO SALAZAR    May 20, 2008

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

LOUIS ROVENS, ADRIENNE ROVENS, )
and RAYMOND BREGANTE and )
JEFFREY M. WHITE as Trustees of )
the Michael W. Rovens and Elise )
D. Shanfeld Irrevocable Trust, )
)
        Plaintiffs, )
   vs. )  Case No. 07-05473-CRB
)
THEODORE BROWN & PARTNERS, INC.,)
)
       Defendant. )
)
)
THEODORE BROWN & PARTNERS, INC.,)
)
     Counter Claimant, )
)
   vs. )
)
LOUIS ROVENS, ADRIENNE ROVENS, )
and RAYMOND BREGANTE and )
JEFFREY M. WHITE as Trustees of )
the Michael W. Rovens and Elise )
Shanfeld Irrevocable Trust, )
ORLANDO DIAZ-ASCUY DESIGNS, )
INC., WILLIAM G. WALTERS dba )
WALTERS ARCHITECTS, and )
WHITEHOUSE BUILDERS, )
)
    Counter Defendants. )
)

DEPOSITION OF ROBERTO SALAZAR

———————————

MAY 20, 2008

REPORTED BY:  CAROLYN M. MANN, CSR 10066 [#409421]

EXHIBIT C

Page 1

ROBERTO SALAZAR   May 20, 2008

Page 26

1 legal construction standards and construction codes that
2 were required to receive a permit for building.
3     Q.  And isn't it correct that you referred the
4 Rovenses to Theodore Brown & Partners as potential
5 architect for the project?
6     A.  That's correct.
7     Q.  In fact, you brought Mr. Brown and his
8 partner, Mr. Costa, to the Four Seasons unit in June to
9 meet the Rovenses, correct?
10    A.  I didn't bring them; I invited them to come
11 and meet the Rovenses at the unit at that time.
12    Q.  Okay.  And you told them that you wanted them
13 to meet the owners of the unit and, because you thought
14 that they would be the architects for the project,
15 correct?
16        MR. JOHNS: I object.  It's compound.
17        THE WITNESS:  I didn't think anything at that
18 time.  That was an introduction.
19        MR. BREALL: Q.  The purpose of the
20 introductions -- strike that.
21        Did you not inform Theodore Brown the purpose
22 of the introduction was to, for the Brown firm to obtain
23 the architectural work?
24    A.  Yes.
25    Q.  Okay.  And you informed the Rovenses that the

Page 27

1 purpose of the introduction was for them to meet the
2 potential architect, correct?
3     A.  A potential architect, yes.
4     Q.  You'd worked with the Brown firm before,
5 correct?
6     A.  I have.
7     Q.  Okay.  How many occasions have you worked with
8 the Brown firm before, before this?
9     A.  Five or six, perhaps.
10    Q.  And how many of those times was the work for
11 an interior remodel?
12    A.  I would have to think about that.  I believe
13 every time that Theodore Brown was working on a project
14 for me it did involve remodel construction.  That would
15 have been the reason he was hired.
16    Q.  Okay.  Why don't you list for me the five or
17 six projects that Theodore Brown worked on with you
18 prior to the Rovenses' Four Seasons residence.
19    A.  I believe the first time I met Mr. Brown and
20 worked with his firm was in the mid to late eighties for
21 Mr. and Mrs. Freeman.  Following that would have been an
22 apartment on Broadway for Mr. and Mrs. Richard McNulty.
23 Following that, it would have been for Mr. Molyneux's
24 firm in New York, which is spelled M-O-L-Y-N-E-U-X.  And
25 that would have been, and that would have been, again,

Page 28

1 later eighties.  Following that, I think it was Angela
2 Thoshinsky at the Lombard Street apartment.  I did some
3 consultation on another project of theirs for Mr. Baldo;
4 Clementina Street, I believe.  And I think that's it.
5     Q.  Okay.  In the 1980s, the Freemans, what work
6 did -- strike that.
7        You've listed five projects where you worked,
8 that you worked on where the Brown firm worked on,
9 correct?
10    A.  Yes.
11    Q.  In each of those projects, did you have a
12 contract with Mr. Brown's firm?
13    A.  I don't recall.  I think they were directly
14 with the owners, if I remember correctly.  For, for
15 Mrs. Thoshinsky, it might have been with me.
16    Q.  For Mr. Freeman, what type of work did the
17 Brown firm do?
18    A.  Interior remodel.
19    Q.  Of the interior premises?
20    A.  No, it was the, I believe what was the second
21 floor, the master bedroom floor.
22    Q.  Okay.  For the McNultys, did Mr. Brown's work,
23 was that limited to a bathroom?
24    A.  No.  It was the entrance hall, powder room,
25 master bath, and an entrance to the master bedroom,

Page 29

1 which included the master bedroom.
2     Q.  Okay.  Mr. Baldo's house, was that a remodel
3 of the interior house?
4     A.  I know that the work was, but I don't know
5 what they were involved in from beginning to end.  I
6 know that the work was an interior remodel.
7     Q.  What about the Molyneux assignment?
8     A.  That was a new construction project, so that
9 was an interior remodel.
10    Q.  So that was from the ground up?
11    A.  No, there was an existing residence there, but
12 it was going to be completely changed.
13    Q.  Gutted.
14    A.  Yes.
15    Q.  And Angela Thoshinsky's Lombard Street
16 apartment?
17    A.  That was probably 50 percent of the unit.
18    Q.  And as far as you know, the only -- strike
19 that.
20        Your best recollection is the only one of
21 these projects that you may have had a direct contract
22 with Mr. Brown would be the Thoshinsky project, correct?
23    A.  It could have been McNulty's as well; I don't
24 recall.  That was quite some time ago.
25    Q.  Okay.  The Freeman project you said was in the

8 (Pages 26 to 29)

Page 30

1    early eighties, correct?
2         MR. JOHNS: Well, the record will say what he
3    testified to.
4         THE WITNESS: It could have been mid to late
5    eighties now that I think about it. It's been so long.
6         MR. BREALL: Q. When was the McNulty project?
7    A.  Nineties. Mid nineties.
8    Q.  And you said the Molyneux project was in the
9    late eighties, correct?
10        MR. JOHNS: Well, object to these questions.
11   The record, Mr. Breall --
12        MR. BREALL: I'm just trying to get some
13   clarification, so I'll rephrase it.
14   Q.  Was the Molyneux project in the late eighties?
15   A.  I don't recall. It could have been.
16   Q.  Do you recall any other time it could have
17   been?
18   A.  No.
19   Q.  When was the Thoshinsky project?
20   A.  Early nineties, I think.
21   Q.  And when was the Baldo project that you
22   consulted on?
23   A.  That was most recent, so I do recall that that
24   was within the last three years.
25   Q.  You are fairly certain that you did not hold a

Page 31

1    contract with Mr. Brown for the Baldo project, correct?
2    A.  That's correct.
3    Q.  Now, you proposed the Brown firm as a
4    potential architect to the Rovenses, correct?
5    A.  I did.
6    Q.  Okay. And the Rovenses accepted your
7    proposal, correct?
8    A.  I do recall that they, meaning Mr. Rovens, was
9    agreeable to using Mr. Brown and his firm if I thought
10   they were well suited to do the job.
11   Q.  And in fact, you asked Mr. Rovens whether he
12   should, whether he wanted to execute the Brown contract
13   or you should, correct?
14   A.  No. I asked him if he -- or why he would not
15   sign the Brown contract and what his preference would
16   be.
17   Q.  Isn't it correct that you asked him what his
18   preference would be, whether he should sign the Brown
19   contract or have you do it?
20   A.  No, he said, "I'd like you to do it." "You
21   sign it," is what he said.
22   Q.  And it made sense for you to sign the contract
23   if you were going to be billing the Rovenses for the
24   Brown fees, correct?
25        MR. JOHNS: I object as vague.

Page 32

1         THE WITNESS: I don't understand what you mean
2    by, "It made sense."
3         MR. BREALL: Q. Well, if you look at
4    Exhibit 1, your proposal to the Rovenses is that you
5    would be billing, you would be billing them for the
6    architect's hourly fee.
7         MR. JOHNS: What's the question?
8         MR. BREALL: Q. I'm first asking him, isn't
9    that what your proposal is?
10   A.  The proposal states such, yes.
11   Q.  So it would make sense that you would sign the
12   Brown contract and bill the Rovenses their hourly fee,
13   would it not?
14        MR. JOHNS: The question is argumentative and
15   is vague.
16        THE WITNESS: I believe this proposal was
17   probably following the meeting with Brown. So that's
18   why I included that statement that I would be billing
19   them for his services; otherwise, I would not have
20   included it.
21        MR. BREALL: Q. Well, you hadn't had -- maybe
22   I misunderstood it. Are you saying that you had already
23   signed the Brown contract?
24   A.  No, I didn't say that. I most likely made the
25   introduction and most likely Mr. Rovens requested that I

Page 33

1    sign the contract myself.
2    Q.  Well, this is a proposal you're making; you
3    hadn't agreed on these terms with the Rovenses at the
4    time you made this proposal, correct?
5         MR. JOHNS: I object. The question is
6    argumentative.
7         THE WITNESS: I don't recall.
8         MR. BREALL: Q. Okay. As you review
9    Exhibit 1, you don't recall whether or not you'd already
10   come to an agreement with the Rovenses on the terms of
11   your proposal.
12   A.  No, I do not.
13   Q.  But it's your best recollection as you sit
14   here today that you had already agreed with Mr. Rovens
15   to hire the Brown firm before you made this proposal?
16   A.  I don't recall. I may have.
17        MR. BREALL: Let's mark this as Exhibit 3.
18        (Deposition Exhibit 3 was marked for
19        identification.)
20        MR. BREALL: Q. Let me know when you've had a
21   chance to look at this.
22   A.  Okay.
23   Q.  Did you review this agreement when you
24   received it?
25   A.  I most likely did, yes.

ROBERTO SALAZAR    May 20, 2008

Page 126

1  architectural planning and construction, architectural
2  plans for construction that it refers to there.
3      A.  I see that.
4      Q.  And did you not invite Mr. White -- strike
5  that.
6          Did you not provide this to Mr. White to
7  inform him that Mr. Rovens should not be upset at the
8  rate of progress because it was all planned out?
9          MR. JOHNS:  Objection, compound.
10         THE WITNESS:  I don't recall that
11 conversation.
12         MR. GASPARI:  Vague as to time.
13         MR. BREALL:  Q.  Going back to Exhibit 13,
14 regarding the specification writer, do you remember the
15 specification writer?
16     A.  No, I don't.  What is that?
17     Q.  Well, in the note from the Brown office, they
18 talk about the fact that a specification writer couldn't
19 get specifications until the end of January.
20     A.  The only time I ever heard mention of that is
21 when David Rovens requested it at the behest of Mr. and
22 Mrs. Rovens.  And I remember Albert Costa saying that
23 they don't typically do that but they would accommodate
24 them if they so wished.  But there were some time
25 constraints with that.

Page 127

1      Q.  Albert Costa said that they don't prepare a
2  specification booklet, correct?
3      A.  No, you asked about a specification writer,
4  someone to write the specs for the project.  Is that
5  what you're referring to?
6      Q.  Yes.
7      A.  They're two different things.
8      Q.  Okay.  Who normally prepares the
9  specifications for a project at Theodore Brown &
10 Company?
11         MR. GASPARI:  Lacks foundation.
12         MR. JOHNS:  Speculation.
13         THE WITNESS:  I don't know.
14         MR. BREALL:  Q.  Based on your knowledge of
15 working with Theodore Brown on five different occasions
16 prior to this, who in those projects prepared the
17 specifications?
18         MR. GASPARI:  Lacks foundation.
19         THE WITNESS:  I don't know who in his office
20 would do that.
21         MR. BREALL:  Q.  But Mr. Brown, Theodore Brown
22 & Partners prepared documents with specifications in it,
23 is that correct, in those instances?
24     A.  Some specifications, yes.
25     Q.  Okay.  Were those compiled in a separate

Page 128

1  document other than the plans?
2      A.  Not that I recall.  They could have been.
3      Q.  And was David Rovens requesting an actual
4  specification booklet?
5      A.  I seem to recall he did at one point, yes.
6      Q.  Okay.  And is that -- and did Mr. Costa
7  indicate they don't prepare specification booklets for
8  residential projects?
9      A.  No, I don't recall that.  I just recall him,
10 David Rovens, requesting a specification writer,
11 somebody to write them, which I understood to be an
12 outside person.
13     Q.  Why couldn't Mr. Costa write the
14 specifications?
15     A.  I don't know.
16         MR. GASPARI:  Calls for speculation.
17         MR. BREALL:  Q.  Did Mr. Costa indicate he
18 would not or could not write the specifications?
19     A.  Not to me, no.
20         MR. BREALL:  Okay.  I think that's all I have
21 right now.
22         EXAMINATION BY MR. GASPARI
23         MR. GASPARI:  I just have a couple.
24     Q.  Mr. Salazar, at the time that you and
25 Mr. Brown entered into the contract that was identified

Page 129

1  as Exhibit 3?
2      A.  Yes.
3      Q.  Did you have an understanding as to who might
4  or might not be able to use the plans to be drawn by
5  Mr. Brown in the event of termination of the contract?
6      A.  I did.
7      Q.  And what was that understanding?
8      A.  That they were the property of Theodore Brown
9  & Partners.
10     Q.  And was that your understanding at the time of
11 your entry into any prior contracts with Mr. Brown?
12     A.  Yes.
13     Q.  Did that represent the course of dealing that
14 you and Mr. Brown had?
15     A.  Yes, it did.
16     Q.  Mr. Breall showed you the transparency of the
17 drawings drawn by Mr. Brown, and you talked about room
18 to room to room.  Did Mr. Brown's, Brown, Theodore Brown
19 & Partners' design for the Rovenses' residence differ
20 from the design of that unit at the time it was
21 purchased by the Rovenses?
22         MR. BREALL:  Objection, calls for expert
23 opinion testimony.
24         THE WITNESS:  Well, if you're saying that they
25 changed the layout of the unit?

33  (Pages 126 to 129)

ROBERTO SALAZAR    May 20, 2008

Page 130

1    MR. GASPARI: Q. That's what I'm asking you.
2    A. Yes.
3    Q. And those were designs drawn by Theodore Brown
4    & Partners?
5    A. Yes.
6    Q. Those changes.
7    Have you ever seen the design layout drawn by
8    ODA Architects?
9    A. The design of the Rovenses' unit, or a design?
10    Q. Yes, of the Rovenses' unit.
11    A. No, I have not.
12    Q. Looking at Exhibit 14, your timeline?
13    A. The timeline? Yes.
14    Q. Again, at the time of your entry into the
15    contract identified as Exhibit 3, the contract with
16    Theodore Brown & Partners --
17    A. Yes.
18    Q. -- was it your intent -- or strike that.
19    Was it your expectation that Mr. Brown's work
20    was to cease and he'd have no further work to do on the
21    project once the last drawing was made?
22    MR. BREALL: Objection. The document speaks
23    for itself.
24    THE WITNESS: Could you clarify the question?
25    MR. GASPARI: Q. Sure. Let me ask it a

Page 131

1    different way.
2    Was it your expectation that Theodore Brown &
3    Partners would perform architectural services on the job
4    throughout the job to its completion?
5    A. Yes.
6    Q. And it was not your expectation that Theodore
7    Brown & Partners would perform work only in October of
8    2006.
9    A. No, it typically went through the end of a
10    project.
11    MR. GASPARI: That's all I have at this time.
12    FURTHER EXAMINATION BY MR. BREALL
13    MR. BREALL: I have a few.
14    Q. When Counsel asked you your understanding
15    regarding who will be able to use the plans if Mr. Brown
16    was terminated, you said that the plans were the
17    property of Theodore Brown, correct?
18    A. Well, I always believed them to be the
19    property of Theodore Brown, whether he was terminated or
20    not.
21    Q. Okay. But you also understood that the client
22    that Mr. Brown prepared the plans for could use the
23    plans, didn't you?
24    MR. JOHNS: Well, I object to that. What do
25    you mean "the client"?

Page 132

1    MR. GASPARI: Vague.
2    MR. JOHNS: I think the testimony is that he's
3    the client, or SDI was the client.
4    MR. BREALL: You know, Mr. Johns, just object,
5    make a legal objection. Do not tell him what you want
6    his testimony to be.
7    MR. JOHNS: I don't care what he testifies to.
8    MR. BREALL: This isn't a state case. All you
9    need to say is, "Objection, vague and ambiguous."
10    MR. JOHNS: But you have the document here,
11    Exhibit 3, which I believe identifies Salazar Designs as
12    the client, and I think that you should ask clear
13    questions.
14    MR. BREALL: Actually, it was a general
15    question, so I don't need to -- Mr. Johns, state your
16    legal objection, okay. From now on, just state your
17    legal objection. If you think it's vague and ambiguous,
18    state it.
19    Can I have the question read back.
20    (Record read by the reporter as follows:
21    Q. But you also understood that the
22    client that Mr. Brown prepared the plans
23    for could use the plans, didn't you?)
24    MR. JOHNS: I object to the question. It's
25    vague and ambiguous as to the identity of the client.

Page 133

1    THE WITNESS: And I don't understand what you
2    mean by "the client."
3    MR. BREALL: Q. Well, Counsel asked you in
4    all the jobs that you worked for where Theodore Brown
5    was involved, who owned the plans? And you told him you
6    always understood them to be the property of Theodore
7    Brown & Partners.
8    A. Correct.
9    Q. I'm asking you, generally on those jobs didn't
10    you understand that the client had the right to use
11    those plans?
12    MR. JOHNS: I object to the question on the
13    grounds previously stated.
14    MR. GASPARI: It's an incomplete hypothetical.
15    THE WITNESS: I don't understand the question.
16    MR. BREALL: Q. What don't you understand,
17    sir?
18    A. The use of the plans by the client. I don't
19    know what the terms of the contracts were with these
20    clients, so.
21    Q. Well, you were involved with them, sir.
22    A. Yes.
23    Q. The Molyneux project, say it didn't get built;
24    Mr. Brown was done with his plans. Would the Molyneux
25    firm who paid for those plans be able to use those plans

34 (Pages 130 to 133)

# EXHIBIT "D"

Jeffrey M. White

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LOUIS ROVENS, ADRIENNE          )
ROVENS, and RAYMOND             )
BREGANTE and JEFFREY M.         )
WHITE as trustees of the        )
Michael W. Rovens and Elise     )
D. Shanfeld Irrevocable         )
Trust,                          )
                                )
            Plaintiffs,         )
                                )
      vs.                       )      No. C 07-05473 CRB
                                )
THEODORE BROWN & PARTNERS,      )
INC.,                           )
                                )
            Defendant.          )

DEPOSITION OF JEFFREY MITCHELL WHITE

San Francisco, California

Thursday, May 22, 2008

Reported By:
MARY F. NELSON
CSR No. 3553
Job No. 79854

**EXHIBIT D :**

Esquire Deposition Services          505 Sansome Street, 5th Floor          San Francisco, California 9411
Phone (415) 288-4280                      (800) 770-3363                      Fax (415) 288-4286

Jeffrey M. White                    May 22, 2008

Page 18

1    A   No. I know that Rob saw it and looked at the
2    unit with her before the offer was made. It all
3    happened within a series of a few, ten days, a week.
4    Very quick.
5        Repeat the question for me.
6    Q   Well, my question, it was really foundational.
7    My question was do you know when the first conversation
8    between Adrienne and Rob took place?
9    A   I don't. Knowing them, knowing Adrienne,
10   knowing Rob, I think it would be when they were walking
11   through the unit. I'd like to do this, I'd like to do
12   that, wouldn't it be great to do that.
13   Q   At some time were you brought into the
14   discussion as to what changes to the unit Lou or
15   Adrienne Rovens wished to make?
16   A   I tried to stay out of the esthetics. No, not
17   in terms of -- that's not accurate. Repeat the
18   question for me.
19       MR. GASPARI: Can you read the question back?
20       (Record read as follows):
21           "At some time were you brought into
22       the discussion as to what changes to the
23       unit Lou or Adrienne Rovens wished to
24       make?"
25       THE WITNESS: It's a hard question for me to

Jeffrey M. White                    May 22, 2008

Page 19

1    answer because I was involved in the process,
2    facilitating the process with Mr. Salazar, with Rob,
3    with Albert in October and November. But it wasn't so
4    much to decide if you should do this or do that. It was
5    more in terms of facilitating the process so it would
6    move along.
7    BY MR. GASPARI:
8    Q   Well, let me ask it perhaps a different way:
9    Based upon what you've told me am I correct that at the
10   time of purchase Mrs. Rovens had some definite ideas as
11   to what she wanted changed in the unit?
12   A   I mean you'd have to ask her I'd say. I know
13   she had ideas. I don't know specifically.
14   Q   And again, my followup question would be are
15   you aware of what changes Mrs. Rovens discussed with
16   Rob Salazar on or about the time of purchase of the
17   unit?
18   A   I can't say if it was on or about the purchase.
19   I know the ideas that she talked about. I don't know
20   if it happened on a Tuesday or a Thursday.
21   Q   That's fair. Why don't you tell me the ideas
22   they talked about?
23   A   I know she wanted to expand the master bedroom
24   and make it a suite. I know she wanted to change the
25   stone. I know she wanted to make the entry bigger. I

Jeffrey M. White                    May 22, 2008

Page 20

1    know she wanted to raise the ceilings.
2        I know they wanted, Lou wanted, he always wants
3    very solid walls. He doesn't like these hollow walls.
4    I know he wanted a bar. So that's what I recall.
5    Q   Now prior to the acquisition of the Four
6    Seasons unit the Rovens had a pre-existing relationship
7    with Rob Salazar, correct?
8    A   Yes.
9    Q   And Mr. Salazar designed a home for the Rovens
10   in lake Las Vegas, Nevada?
11   A   Yes.
12   Q   And you told me that coming out of that
13   remodel there was some concerns that the Rovens had
14   about Mr. Salazar's work?
15   A   Yes.
16   Q   What were those concerns?
17   A   Concerns were more, they always felt he was a
18   brilliant designer. They didn't feel he was, they
19   didn't feel his forte was following through on details
20   and administrative things. And they felt his attention
21   sometimes would be scattered and he'd divide it up
22   between different jobs.
23   Q   On how many -- had the Rovens worked with Rob
24   Salazar on projects other than Lake Las Vegas?
25   A   Yes.

Jeffrey M. White                    May 22, 2008

Page 21

1    Q   What other projects?
2    A   The relationship began '99, 2000 I think, when
3    they moved into their current residence at 101 Lombard.
4    He assisted there. And he assisted with -- their son
5    had a home in Los Angeles. He assisted there.
6    Q   With regard to the 101 Lombard project, when
7    was that?
8    A   '99, 2000 I think.
9    Q   And Mr. Salazar was to be the designer for the
10   project, correct?
11   A   Yes.
12   Q   Did the Rovens or a Rovens entity enter into a
13   design contract with Mr. Salazar for the 101 Lombard
14   project?
15   A   I believe they did.
16   Q   Did the 101 Lombard project require the
17   retention of a licensed architect?
18   A   I don't know. I don't know. I would think
19   they would have had to in order to get permits.
20       MR. BREALL: Don't guess.
21       THE WITNESS: I don't know.
22   BY MR. GASPARI:
23   Q   Fair enough. Foundational question, you're
24   aware that Mr. Salazar is not a licensed architect?
25   A   Yes.

bb458554-fa10-4014-9704-5a8678bc5daa

Jeffrey M. White                                    May 22, 2008

Page 70

1  reflect the octagon itself. That was impossible.
2  That's been changed. The powder room has been changed.
3      Q   How so?
4      A   The toilet and the sink have been moved,
5  reversed. The guest bedroom hallway I think is a
6  different width.
7      Q   Do you know by how much of a variance?
8      A   No. The guest bedroom, the wall between the
9  guest bedroom and the master bedroom is different.
10     Q   How so?
11     A   It's indented on this plan. It is not now
12 indented.
13        It looks like the ceiling in the guest bedroom
14 is different.
15     Q   How so?
16     A   It looks here to be, like it looks like it's
17 recessed. That's not the case now. It's a cove.
18        His matter closet and bathrooms have been
19 reversed.
20     Q   Are you saying the closet is where the
21 bathroom is and the bathroom is where the closet is?
22     A   Yes. This master bedroom hallway, that closet
23 I think had been moved. The entrance to her dressing
24 room has been moved. The closets are different. The
25 cabinetry is different. The mechanical HVAC is

Jeffrey M. White                                    May 22, 2008

Page 71

1  different.
2      Q   How is the mechanical HVAC different?
3      A   It's in the ceiling. It was moved into the
4  ceiling.
5        The bar, I think it's larger.
6      Q   Do you know by how much?
7      A   No. The vestibule's shape, that had been
8  changed.
9      Q   How so?
10     A   I believe it's more of a square. The gallery I
11 believe had been widened. The dining room, the ceiling
12 in the dining room is different. It looks to be a
13 square. That's not the case now.
14        The doors in the dining room are different.
15     Q   How so?
16     A   Alignment. The ceiling in the family room is
17 different. Different shape. It looks like this has a
18 cabinet on the southeast corner. There is no cabinet
19 there.
20        The kitchen layout is different. Service
21 hallway is different.
22     Q   How so?
23     A   Cabinetry alignment.
24        The laundry room is different.
25     Q   How so?

Jeffrey M. White                                    May 22, 2008

Page 72

1      A   Chase is not there. You know, that was always
2  an issue for her.
3      Q   The chase in the laundry room?
4      A   Yeah, in the laundry room. Because actually
5  she didn't understand -- God, when was this? When
6  Pellandini was there, and I think Albert was there, and
7  Rob, she wanted to know what could be removed, what
8  could she do, where could she express her ideas. And
9  she wanted a bigger laundry room.
10        And there was this chase in the corner. And
11 there was a lot of discussion about that. And they
12 said it couldn't be removed. But actually it was dead
13 space.
14        The service bath is different.
15     Q   How so?
16     A   Location of lav, sink, removal of shower
17 cabinetry is different. Lighting plan is different.
18 Okay.
19     Q   Okay. At some point, I believe it was
20 December, but you tell me if I'm wrong, at some point
21 Salazar was terminated, correct?
22     A   That's correct.
23     Q   Am I correct it was December of 2007?
24     A   Yes.
25     Q   Do you recall a specific date?

Jeffrey M. White                                    May 22, 2008

Page 73

1      A   8th?
2      Q   How was Salazar terminated?
3      A   A letter from, an e-mail from Mr. Rovens to
4  Mr. Salazar.
5      Q   Why was Mr. Salazar terminated?
6      A   Billing irregularities, failure to execute per
7  agreement, failure to provide furniture still in Las
8  Vegas that had been paid for. Stone, issues
9  surrounding the stone, demands for additional money by
10 Mr. Salazar, failure to answer RFIs on this project,
11 fraud, alleged fraud. I believe there's more.
12        MR. BREALL: I'd stipulate that the reasons for
13 Mr. Salazar's termination are encompassed in two
14 lawsuits that are currently pending in state court.
15 BY MR. GASPARI:
16     Q   And again, I'm not seeking to place, place any
17 limitation on your itemization of cause or frankly to
18 comment on your itemization of cause.
19        Do I understand that in part, in part not only
20 was he being terminated for what he did or did not do
21 on the Four Seasons project, but there was also some
22 cause related to what he did or did not do on the Lake
23 Las Vegas project?
24     A   There were issues there, yes.
25     Q   Subsequent to termination of Salazar did you

bb458554-fa10-4014-9704-5a8678bc5daa

Jeffrey M. White                                         May 22, 2008

1   or the Rovens approach Theodore Brown & Partners and
2   ask that they continue with the project?
3       A   I did prior to termination.
4       Q   Okay.  Who approached Theodore Brown &
5   Partners and asked them to continue on the project
6   irrespective of Mr. Salazar?
7       A   I did.
8       Q   Okay.  When was that?
9       A   End of November.
10      Q   Did you do this in a face-to-face meeting,
11  e-mail, telephone, how was --
12      A   I placed phone calls, had phone conversations
13  with Albert and Mr. Brown.
14      Q   And what was the substance of those phone
15  calls with Albert and Mr. Brown?
16      A   With Albert I wanted to know, I wanted to, I
17  asked about changing the contract.  I wanted to put it
18  into the trust name, the Rovens' name.
19          I explained that we were having serious issues
20  with Mr. Salazar, that we wanted to continue on with
21  the Brown firm and wanted to change the contract.
22          And he had had a longstanding relationship
23  with Mr. Salazar and he couldn't do that.
24      Q   That was Mr. Costa who said that?
25      A   Thank you, yes, that's correct.

Jeffrey M. White                                         May 22, 2008

1       MR. BREALL:  Mr. Costa said that about
2   Mr. Salazar.
3   BY MR. GASPARI:
4       Q   Right.  I want to clarify the conversation you
5   just relied was not with Brown but rather with Costa?
6       A   That was the conversation I had had with
7   Mr. Costa.  When Mr. Costa explained that to me I
8   called up Brown and said the same thing.  And I said I
9   don't understand this.  I said, you know, we want to
10  work with you.  We want to continue on.  I don't want
11  to get another architect.  I said we're going to, we
12  are probably going to have to let Mr. Salazar go.  And
13  we want to have a contract with you.
14          And he said I have a longstanding relationship
15  with Mr. Salazar.  And I said I don't understand.  We
16  paid you these funds, we want to work with you, why
17  can't we work with you?
18          He said I have a relationship with
19  Mr. Salazar.
20          I said you're giving me know choice.  I'm
21  going to have to take the plans and go elsewhere.  And
22  his response was there is a lot of friction and unease
23  between you and Mr. Salazar.  I don't want to get in
24  the middle of that.
25          And I said Mr. Brown, you're leaving me very

Jeffrey M. White                                         May 22, 2008

1   few options.
2           And he said, you know, you're going to have to
3   do what you're going to have to do.
4           And I said I want to stay with you.  Why can't
5   we work this out and have a contract with you?
6           And his response again was, Mr. Salazar, we
7   have a long-term relationship with Mr. Salazar.
8           And I said we're going to have to take the
9   plans and go elsewhere.  And his response was you need
10  to do what you need to do.
11      Q   Do you specifically recall him saying you need
12  to take the plans and go elsewhere?
13      A   Yes.
14      Q   And in response to that specific statement he
15  said you have to do what you need to do?
16      A   Yes.
17      Q   And it was subsequent to those conversations
18  that Salazar was terminated?
19      A   Yes.
20      Q   Once Salazar was terminated did you have any
21  further discussions with Brown or Costa?
22      A   No.
23      Q   Did you or the Rovens take any steps to
24  terminate the Salazar Brown contract, and by that I
25  mean subsequent to terminating Salazar did Rovens or

Jeffrey M. White                                         May 22, 2008

1   you send an e-mail or letter or other communication
2   directly to Brown saying we terminate you, stop work?
3       A   No.  Mr. Salazar did.
4       Q   Who retained Orlando Diaz-Azcuy Designs?
5       A   What do you mean, retained?
6       Q   Who hired ODA?
7       A   It was the contract or --
8       Q   Yeah, somebody, ODA came onto the job?
9       A   Right.
10      Q   Who hired them?
11      A   The contract is between the trust and the
12  Rovens and the ODA.
13      Q   Which individual brought ODA onto the job?
14      A   We were introduced, I mean we had heard of them
15  and I think Paul Blickman arranged the first meeting.
16      Q   Paul Blickman from 38 Degrees North Latitude?
17      A   Yes.
18      Q   When was this first meeting with ODA?
19      A   It was either the end of December or the very
20  beginning of January.
21      Q   Who was present?
22      A   Adrienne, Lou, David and I believe Greg, and I
23  don't know if Paul was there or not.
24      Q   And by Greg you mean Greg Stewart?
25      A   Yes.

bb458554-fa10-4014-9704-5a8678bc5da