FOLGER LEVIN & KAHN LLP
Michael F. Kelleher (CSB No. 165493, mkelleher@flk.com)
Kevin P. O'Brien (CSB No. 215148, kobrien@flk.com)
Embarcadero Center West
275 Battery Street, 23rd Floor
San Francisco, CA 94111
Telephone: (415) 986-2800
Facsimile: (415) 986-2827

BREALL & BREALL
Joseph M. Breall (CSB No. 124329, jmbreall@breallaw.com)
1255 Post Street, Suite 800
San Francisco, CA 94109
Telephone: (415) 345-0545

Attorneys for Plaintiffs and Counter Defendants.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOUIS ROVENS, ADRIENNE ROVENS, and RAYMOND BREGANTE and JEFFREY M. WHITE as Trustees of the Michael W. Rovens and Elise D. Shanfeld Irrevocable Trust,<br><br>Plaintiffs,<br><br>v.<br><br>THEODORE BROWN & PARTNERS, INC.<br><br>Defendant.<br><br>_____<br><br>AND RELATED COUNTER CLAIMS | Case No. C 07-05473 CRB<br><br>**SUPPLEMENTAL DECLARATION OF JOSEPH M. BREALL IN SUPPORT OF REPLY IN SUPPORT OF PLAINTIFFS AND COUNTER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**<br><br>**Judge:** **Hon. Charles R. Breyer**<br>**Date:** **July 22, 2008**<br>**Time:** **10:00 a.m.**<br>**Courtroom:** **8, 19th Floor** |

I, Joseph M. Breall, hereby declare and state as follows:

1.     I have personal knowledge of the matters stated herein, except for those matters set forth on information and belief, which I believe to be true, and if called to testify, I can and will testify competently as to all matter set forth herein.

2.    I am an attorney duly licensed to practice law in all courts in the State of California and am an attorney and co-counsel of record for the Plaintiffs and Cross Defendants in this matter.

3.    Attached hereto as Exhibit A is a true and correct copy of excerpts of Roberto Salazar's deposition which was taken on May 20, 2008.

4.    Attached hereto as Exhibit B is a true and correct copy of a June 6, 2006 Email from Roberto Salazar to Lou Rovens that was previously marked as Exhibit 12 to the May 20, 2008 deposition of Roberto Salazar.

5.    Attached hereto as Exhibit C is a true and correct copy of excerpts of Albert Costa's deposition taken on December 4, 2007 and January 22, 2008 in *Rovens, et al. v. Salazar Designs, Inc., et al.*, in the Superior Court of the State of California, County of San Francisco, Case No. 458820.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct. Executed this 11 day of July, 2008, at San Francisco, California.

_____
Joseph M. Breall

81052\2001\609132.1

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| LOUIS ROVENS, ADRIENNE ROVENS, and RAYMOND BREGANTE and JEFFREY M. WHITE as Trustees of the Michael W. Rovens and Elise D. Shanfeld Irrevocable Trust,<br><br>Plaintiffs,<br><br>vs.<br><br>THEODORE BROWN & PARTNERS, INC.,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 07-05473-CRB |

| | |
|---|---|
| THEODORE BROWN & PARTNERS, INC.,<br><br>Counter Claimant,<br><br>vs.<br><br>LOUIS ROVENS, ADRIENNE ROVENS, and RAYMOND BREGANTE and JEFFREY M. WHITE as Trustees of the Michael W. Rovens and Elise Shanfeld Irrevocable Trust, ORLANDO DIAZ-ASCUY DESIGNS, INC., WILLIAM G. WALTERS dba WALTERS ARCHITECTS, and WHITEHOUSE BUILDERS,<br><br>Counter Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CERTIFIED COPY

DEPOSITION OF ROBERTO SALAZAR

———————————

MAY 20, 2008

REPORTED BY:  CAROLYN M. MANN, CSR 10066 [#409421]

ROBERTO SALAZAR    May 20, 2008

1          (Record read by the reporter)

2          THE WITNESS:  I believe they accepted parts of

3    it but not entirely.

4          MR. BREALL:  Q.  They paid you the hundred

5    thousand dollars interior architectural design fee,

6    correct?

7          A.    Yes, they did.

8          Q.    Okay.  They paid you $25,000 a month for your

9    general design development -- interior architectural

10   details, correct?

11         A.    Yes, they did.

12         Q.    What part of this proposal do you believe they

13   did not accept and pay you for?

14         A.    I don't know that.

15         Q.    Now, did you, in fact, design and develop

16   interior floor plans for the entire unit?

17         A.    If you mean design and develop, provide them

18   with a floor plan for the unit at the Four Seasons, yes,

19   I did.

20         Q.    Okay.  And these floor plans included the

21   overall layout and/or redesign of each area, including

22   all architectural design elements and finishes, as

23   required?

24         A.    No, I believe it was for area locations only.

25   We did not get as far as a lot of the details that were

15

**ROBERTO SALAZAR    May 20, 2008**

1    required because the job did not go through completion.

2    So it was limited.

3        Q.    But it was -- but you did supply the layout

4    and redesign of the locations, correct?

5        A.    No, I provided locations of rooms as requested

6    by the owner, general locations of rooms as requested by

7    the owner.

8        Q.    Well, under Exhibit A, it says, "This includes

9    the overall layout and or redesign of each area."

10        MR. JOHNS:   What's Exhibit A?

11        MR. BREALL:   Q.   Excuse me, Exhibit 1.

12        A.    That's correct, that's what it says, but I'm

13    telling you what I provided.

14        Q.    So you did not provide that?

15        A.    I provided a plan that had the general

16    locations of each room as requested by the owner.

17        Q.    What you mean, as requested by the owner?

18        A.    Well, the owner requested that locations of

19    rooms and door openings, entries, general -- for

20    example, there was an area that was a bathroom that they

21    wanted to make a closet, so we made it a closet.

22        Q.    Okay.  So the owner told you that's what they

23    wanted?

24        A.    Yes.

25        Q.    And things like changing the foyer into an

16

**ROBERTO SALAZAR    May 20, 2008**

1    contract with Mr. Brown for the Baldo project, correct?

2        A.    That's correct.

3        Q.    Now, you proposed the Brown firm as a

4    potential architect to the Rovenses, correct?

5        A.    I did.

6        Q.    Okay.  And the Rovenses accepted your

7    proposal, correct?

8        A.    I do recall that they, meaning Mr. Rovens, was

9    agreeable to using Mr. Brown and his firm if I thought

10    they were well suited to do the job.

11        Q.    And in fact, you asked Mr. Rovens whether he

12    should, whether he wanted to execute the Brown contract

13    or you should, correct?

14        A.    No.  I asked him if he -- or why he would not

15    sign the Brown contract and what his preference would

16    be.

17        Q.    Isn't it correct that you asked him what his

18    preference would be, whether he should sign the Brown

19    contract or have you do it?

20        A.    No, he said, "I'd like you to do it."  "You

21    sign it," is what he said.

22        Q.    And it made sense for you to sign the contract

23    if you were going to be billing the Rovenses for the

24    Brown fees, correct?

25            MR. JOHNS:  I object as vague.

31

ROBERTO SALAZAR    May 20, 2008

1           THE WITNESS:  I believe that based on what I'm

2       reading here and my recollection, that Mr. and

3       Mrs. Rovens accepted my proposal for the fees that I put

4       forth for this period of time.

5           MR. BREALL:  Q.  For the fees and the services

6       you were going to provide, correct?

7           A.   Yes.

8           Q.   And if you look at the first page of

9       Exhibit 12, you told them that when they returned from

10      their African trip, basically within a week, Theodore

11      Brown's office would produce a bid document, correct?

12          A.   Well, it says based on what they've approved.

13      So I don't know what they approved at that point in

14      time.  It's speculation.

15          Q.   You indicated that it would take a week for

16      Theodore Brown's office to produce a bid document,

17      correct?

18          A.   I believe I'm referring to changes.  It says,

19      "These changes will be turned around within a weeks

20      time," not the actual document.

21          Q.   Well, you say that you expected to have all

22      the interior architectural designs completed at that

23      time, correct?

24          A.   At what time?

25          Q.   When they returned from Africa at the end of

                                                                79

# EXHIBIT B

## Lou Rovens

**From:** salazardesigns@aol.com
**Sent:** Tuesday, June 06, 2006 9:35 PM
**To:** Lou Rovens
**Subject:** Re: Fees-SF Res.

Lou,

As for payment amounts and dates;

Interior Architectural Design Fee;  **$100,000.00**   **Due June '06**

Interior Design and Decoration Fee;   *$25,000.00    **Due June, July, August.**
*With these fees, Salazar agrees
not to accept new work for these
respective months.

-----Original Message-----
From: Lou Rovens <lrovens@acpac.com>
To: salazardesigns@aol.com
Sent: Tue, 6 Jun 2006 15:02:29 -0700
Subject: RE: Fees-SF Res.

*I am still not clear on how you want to be paid.  How much and when?  Give me dates.*



From: salazardesigns@aol.com [mailto:salazardesigns@aol.com]
Sent: Tuesday, June 06, 2006 2:27 PM
To: Lou Rovens
Subject: Re: Fees-SF Res.



Lou,

Thanks for your response.
I am agreeable to your terms with the exception of the Intial Design Fee sum.
This fee is for INTERIOR ARCHITECTURAL DESIGN ONLY.
I would like this payment in full, instead of the the two payments.

The reason being, I intend to have all Interior Architectural Designs completed upon your return
from Africa.
I will meet with you and Adrienne for a walk through of the Apt. and then make whatever changes
you request
at that time.
These changes will be turned around within a weeks time, (based  on what you have already
approved), and
produced as a bid document by T.Brown's office for bid by the respective contractors.

Also, in your absence, I will meet with serveral contractor's and provide them with basic
construction information, so that they will have a jump on bidding the main part of the project prior
to your return.
You will not have to wait weeks to get bids from them, and Adrienne and I could then start the

4/16/2007                                                                    R        9

Interior
Design & Decoration part of the job while waiting for the bids to come in.
the $25Kper month is the Interior Decoration part of the contract.

As for the $25K per month. You may pay this the end of each month.
This is the amount per month that I have agreed to not take on new work, and work with Adrienne
to "fast track" the Interior Decoration of your new place.
As I have discussed this with Adrienne, she feels that right now I should plan for June, July, Aug.
(possibly Sept.)

I am agreeable to this given the main Architectural Design Fee be paid in full.

I hope you are ok with this.

With regards,

Rob Salazar

-----Original Message-----
From: Lou Rovens <lrovens@acpac.com>
To: salazardesigns@aol.com
Sent: Tue, 6 Jun 2006 08:53:21 -0700
Subject: RE: Fees-SF Res.

Rob:

I will not be available. I have AIG people here for next two days, very intense.

You do not say how last $50K will be paid time-wise. I would like to make it after you and Adrienne have come to
agreement on furniture placement in condo and have decided, as much as we can (as we do not have stone) on
color schemes. I want a plan of action for ordering. I don't know if that means a quick trip to Milan or a search of
all rock yards here and in L.A.

Breaking the payment in two also works for me. I cannot believe that I can't be totally satisfied by end of 90 day
period.
I already said that I would accept the total sum.

Lou

From: salazardesigns@aol.com [mailto:salazardesigns@aol.com]
Sent: Tuesday, June 06, 2006 6:39 AM
To: Lou Rovens
Subject: Fees-SF Res.

Lou,

Please give me a call today if possible, as I have a meeting today at 4pm N.Y. time.

I must advise my availability for the next three months, on another potential project.
I am sure you understand, and I do not want you to feel I am pressuring you on this issue.
But I need to determine or advise the respective party if and when I will be available, and if it
meets the schedule they expect.

If you do decide to "secure" the next 2-3 months, It is something I am willing to live with if you
agree to the
fees and we go forward. As stated in my proposal to you, I will not take any "New" work for these

4/16/2007                                                                    R    10

months.

I am also aware that this may not work for the other party and they may seek another designer. So be it.
However, I want to be able to tell them right off the bat, what my availabiltiy is before we go any further.
I feel that I owe them this, as I am sure you would appreciate it if you were in the same situation.

As discussed with Adrienne, I have come up with a solution that will allow 1, to 3 mos. of time to dedicate
efforts to the beggining of your project.  This will guarentee that your job starts off in an organized and
time effective manner, that will benefit you in the long run for the 1 year period of design and construction
period you have set forth.

If you could call me by 12:30 pm your time today.  I will be available.  (415) 608-6417

Regards,

Rob Salazar

---

**Check out AOL.com today**. Breaking news, video search, pictures, email and IM. All on demand. Always Free.
The information contained in this e-mail is strictly confidential
and for the intended use of the addressee only; it may also be
legally privileged and/or price sensitive. Notice is hereby given that
any disclosure, use or copying of the information by anyone other than the
intended recipient is prohibited and may be illegal. If you have received this
message in error, please notify the sender immediately by return e-mail.
Every reasonable precaution has been taken to ensure that any attachment
to this e-mail has been swept for viruses. We accept no liability for
any damage sustained as a result of software viruses and advise you
carry out your own virus checks before opening any attachment.

---

**Check out AOL.com today**. Breaking news, video search, pictures, email and IM. All on demand. Always Free.
The information contained in this e-mail is strictly confidential
and for the intended use of the addressee only; it may also be
legally privileged and/or price sensitive. Notice is hereby given that
any disclosure, use or copying of the information by anyone other than the
intended recipient is prohibited and may be illegal. If you have received this
message in error, please notify the sender immediately by return e-mail.
Every reasonable precaution has been taken to ensure that any attachment
to this e-mail has been swept for viruses. We accept no liability for
any damage sustained as a result of software viruses and advise you
carry out your own virus checks before opening any attachment.

---

**Check out AOL.com today**. Breaking news, video search, pictures, email and IM. All on demand. Always Free.

4/16/2007

R    11

# EXHIBIT C

**CONDENSED TRANSCRIPT**

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN FRANCISCO
UNLIMITED JURISDICTION

LOUIS ROVENS and ADRIENNE ROVENS,

Plaintiffs,

vs.

SALAZAR DESIGNS, INC., et al.,                    No. 458820

Defendants.



DEPOSITION OF ALBERT COSTA

VOLUME I

SAN FRANCISCO, CALIFORNIA

TUESDAY, DECEMBER 4, 2007

Reported by Cynthia Manning, CSR No. 7645

PAULSON

Albert Costa - Volume I                              December 4, 2007

51

1    fax.

2    BY MR. BREALL:

3        Q.   Okay.   Did Mr. -- and I take it at that point,

4    June 2nd, you were already having conversations with

5    Mr. Salazar about this project, correct?

6             MR. JOHNS:   Object as vague.

7             THE WITNESS:   Yes.

8             MR. ZAMCZYK:   Well, for the record, it's also

9    June 2nd, 2006 at 9:34 p.m.   Still June 2nd.

10   BY MR. BREALL:

11       Q.   Did Mr. Salazar inform you that he hadn't

12   decided whether or not he was going to be involved with

13   this project at that point?

14       A.   Can you repeat that, please?

15            (Whereupon the reporter read the record as

16            follows:

17            "Question:   Did Mr. Salazar inform you that he

18            hadn't decided whether or not he was going to

19            be involved with this project at that point?")

20            THE WITNESS:   No.

21   BY MR. BREALL:

22       Q.   Did Mr. Salazar tell you anything regarding

23   his -- what was your understanding as of June 2nd

24   regarding Mr. Salazar's role in this project?

25       A.   Our understanding is that Mr. Salazar was

52

1   requesting architectural services for this property in

2   the Four Seasons.

3       Q.  On behalf of a client he had been retained by?

4       A.  On behalf of a client, yes.

5       Q.  So as far as you knew on June 2nd, he was

6   already retained on this project, correct?

7           MR. JOHNS:  Object; leading.

8           THE WITNESS:  I don't know.

9           MR. ZAMCZYK:  Misstates his testimony.

10  BY MR. BREALL:

11      Q.  Well, as far as you understood June 2nd, he was

12  asking you for potential architectural services; was

13  that your understanding?

14      A.  Yes.

15          MR. JOHNS:  Object; leading.

16  BY MR. BREALL:

17      Q.  Who's John Sweeney?

18      A.  I don't know.

19      Q.  Going back to Exhibit 225 that you put down,

20  this is what the Four Seasons floor plan is for an "A"

21  residence; is that correct?

22      A.  "For an 'A' residence"?

23      Q.  An "A" residence, what they consider an "A"

24  residence?

25      A.  I don't know.



124

1       A.   That was his role.   His role was an interior

2   designer.

3       Q.   Well, interior designer can pick fabric, an

4   interior designer can pick finishes?

5       A.   Exactly.

6       Q.   Did he supply drawings that you used or were

7   instructed to use to make the design plans that you

8   produced?

9            MR. ZAMCZYK:   Vague and ambiguous, compound.

10           THE WITNESS:   No.

11  BY MR. BREALL:

12      Q.   What was the purpose of having Mr. Salazar's

13  name on the plans?

14           MR. ZAMCZYK:   Calls for speculation.

15           Other than the fact that that's who Theodore

16  Brown contracted with?

17           MR. BREALL:   It doesn't say that on the plans.

18      Q.   Look at the front of your plans, sir.   Is his

19  name on the front of those plans?

20      A.   On the title block of all the plans is Theodore

21  Brown's firm information, as well as Salazar's.

22      Q.   And what was the purpose of your company

23  listing Salazar's information --

24           MR. ZAMCZYK:   Objection --

25  //

125

1   BY MR. BREALL:

2       Q.  -- on the plans?

3           MR. ZAMCZYK:  -- to the extent that it calls

4   for a legal conclusion.  Assumes facts not in evidence.

5   You're assuming there was a purpose.

6   BY MR. BREALL:

7       Q.  Well --

8       A.  If there was a purpose, it would be to show the

9   teamwork of architect and interior designer.

10      Q.  Did Mr. Salazar give you any instruction on how

11  to draft your plans?

12          MR. ZAMCZYK:  It's vague and ambiguous.

13          THE WITNESS:  No.

14  BY MR. BREALL:

15      Q.  Did he tell you where to move walls?

16          MR. ZAMCZYK:  I'll just object again to the

17  extent that it encroaches on the copyright claim and is

18  irrelevant to this claim.

19          MR. BREALL:  I would say I disagree, since my

20  clients paid $200,000 for interior architectural design

21  and that's an issue in this case.

22      Q.  Did he tell you where to move walls?

23      A.  No.

24      Q.  Did he provide any drawings to you as to how he

25  wanted the new development design laid out?

126

1          MR. ZAMCZYK:  Vague and ambiguous in regards to

2     the term "drawings."

3          You can answer.

4          THE WITNESS:  No.

5     BY MR. BREALL:

6          Q.  When you provided Mr. Salazar your Option 1, or

7     Option A, which you testified at the very beginning of

8     your billings, it was your first concept, did

9     Mr. Salazar come up with that concept or did Theodore

10    Brown & Partners come up with that concept?

11         MR. ZAMCZYK:  I'll object to the extent that

12    it's irrelevant.  It's an issue for the copyright case,

13    not for this case.

14         THE WITNESS:  We decided where the walls would

15    go.  We put it down on paper.  And the layout was a

16    collaboration between Salazar Designs and Theodore Brown

17    & Partners.

18    BY MR. BREALL:

19         Q.  What do you mean by the "layout"?  How do you

20    define "layout"?

21         A.  It would be the adjacencies; the progression of

22    when you enter the front door, you know, until you reach

23    the back of the unit.  It's the space.  It's the room

24    layouts.  It's --

25         Q.  Well, you decided where the walls were going.

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN FRANCISCO
UNLIMITED JURISDICTION

LOUIS ROVENS and ADRIENNE ROVENS,

        Plaintiffs,

vs.                                       No. 458820

SALAZAR DESIGNS, INC., et al.,

        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


DEPOSITION OF ALBERT COSTA
VOLUME II
SAN FRANCISCO, CALIFORNIA
JANUARY 22, 2008


Reported by Cynthia Manning, CSR No. 7645

PAULSON

233

1          Yes.

2          Q.  You understood from that e-mail that

3     Mrs. Rovens had to approve the layout, did you not?

4               MR. ZAMCZYK:  It misstates the exhibit.

5               THE WITNESS:  No.

6     BY MR. BREALL:

7          Q.  You did not understand that Mr. Salazar was

8     conveying to you that he needed to get Mrs. Rovens'

9     approval of a design or layout?

10         A.  No.

11         Q.  Mr. Salazar told you throughout the project

12    that he needed his client's -- strike that.

13              Mr. Salazar told you throughout the project

14    that he needed to review plans and designs with his

15    clients, did he not?

16              MR. ZAMCZYK:  Asked and answered.

17              THE WITNESS:  Can you repeat that?

18              (Whereupon the reporter read the record as

19              follows:

20              "Question:  Mr. Salazar told you throughout the

21              project that he needed to review plans and

22              designs with his clients, did he not?")

23              THE WITNESS:  Yes.

24    BY MR. BREALL:

25         Q.  And you knew the clients were the Rovens,

234

1    correct?

2        A.   Our client is Mr. Salazar.

3            MR. BREALL:  Motion to strike, nonresponsive.

4            MR. ZAMCZYK:  Well, the question was vague and

5    ambiguous.  Who --

6    BY MR. BREALL:

7        Q.   You understand that Mr. Salazar's client that

8    he needed to review the designs and plans with were the

9    Rovens, correct?

10       A.   Yes.

11           MR. BREALL:  And, in fact, let's mark this next

12   in order.

13           (Deposition Exhibit No. 247 was marked for

14            identification)

15   BY MR. BREALL:

16       Q.   I'm going to show you, sir, what is an e-mail

17   from your office to Mr. Salazar and a response where, in

18   fact, he is stating explicitly on this occasion that he

19   needs to review options with his clients, correct?

20           MR. ZAMCZYK:  Well, you're again misconstruing

21   the e-mails.  The e-mail actually started with Salazar

22   to Albert Costa and then Albert Costa responded.

23   BY MR. BREALL:

24       Q.   All I'm saying is -- that's exactly what I

25   said.

240

1    A.   They were not finalized.

2    Q.   Again, from now on when I use the term "final

3    plans," I'm talking about the final set you produced

4    prior to being instructed not to work on the project

5    anymore.

6         Okay?

7    A.   Yes.

8    Q.   So in that final set, October 31st, 2006 plans,

9    what shape is the foyer shown?

10   A.   Octagon.

11   Q.   Did Mr. Salazar -- was the foyer always shown

12   in an octagon shape from the beginning?

13   A.   Yes.

14   Q.   Did Mr. Salazar ever inform you that his client

15   preferred the octagonal shape for a foyer?

16   A.   No.

17   Q.   Who made the decision to come up with an

18   octagonal shape for the foyer?

19   A.   Mr. Salazar directed us to draw the octagon.

20   Q.   When did you first meet Mr. White?

21   A.   I don't recall.

22   Q.   Would it be correct to say that you interfaced

23   with Mr. White towards the end of the project, the end

24   of your participation in the project?

25   A.   No.

303

1      Q.   I understand you went to Mr. Brown and said

2   there was a discussion about changing who the client is

3   in the prime contract.

4           Did Mr. Brown ask your opinion?

5      A.   No.

6      Q.   Well, then you said -- then you just told me

7   Mr. Brown agreed with your assertion that that shouldn't

8   happen.  When did you tell Mr. Brown your assertion that

9   that should not happen?

10     A.   I made the -- I made -- I made a decision --

11  or, at least, I had made it known to Mr. White that we

12  were not desiring to change the prime contract from what

13  we had, and I subsequently spoke with Mr. Brown and he

14  agreed with my assertion.

15     Q.   And why did you make the decision that you were

16  not willing to change the contract?

17     A.   Well, Mr. White asked me first before asking

18  Mr. Brown.

19     Q.   Well, he didn't ask Mr. Brown; he asked you and

20  you asked Mr. Brown?

21     A.   Correct.

22     Q.   So what was your thought process in coming to

23  the conclusion:  No, I don't think we should do that?

24     A.   I don't recall my thought process.  It's just

25  that we already had a prime contract and we're already